# EXHIBIT B

Excerpts from CEC 2013 Annual Report (SEC Form 10-K) (filed March 17, 2014)

# CAESARS ENTERTAINMENT CORP

## FORM 10-K
(Annual Report)

Filed 03/17/14 for the Period Ending 12/31/13

| | |
|---:|:---|
| Address | ONE CAESARS PALACE DRIVE<br>LAS VEGAS, NV 89109 |
| Telephone | 7024076000 |
| CIK | 0000858339 |
| Symbol | CZR |
| SIC Code | 7011 - Hotels and Motels |
| Industry | Casinos & Gaming |
| Sector | Services |
| Fiscal Year | 12/31 |



http://www.edgar-online.com

© Copyright 2014, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549
## FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE FISCAL YEAR ENDED December 31, 2013

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File No. 1-10410

# CAESARS ENTERTAINMENT CORPORATION
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **62-1411755** |
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| **One Caesars Palace Drive, Las Vegas, Nevada** | **89109** |
| (Address of principal executive offices) | (Zip code) |

**Registrant's telephone number, including area code:**
**(702) 407-6000**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| <u>Title of each class</u> | <u>Name of each exchange on which registered</u> |
|---|---|
| Common stock, $0.01 par value | NASDAQ Global Select Market |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:**

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | | (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

The aggregate market value of common stock held by non-affiliates of the registrant as of June 30, 2013 was $529.9 million .

As of March 1, 2014 , the registrant had 137,161,183 shares of Common Stock outstanding.

The expansion of casino entertainment into new markets also presents competitive issues for us that have had a negative impact on our financial results. In particular, our facilities have been adversely impacted by the addition of gaming and room capacity, particularly our operations located in New Jersey with the expansion of gaming in Maryland, New York and Pennsylvania, and our operations located in Nevada with the expansion of gaming in California. Several states and Indian tribes are also considering enabling the development and operation of gaming facilities in their jurisdictions.

In addition, while we do not believe it to be the case, some have suggested that Internet gaming could create additional competition for us and could adversely affect our brick and mortar operations. We also compete with other non-gaming resorts and vacation areas, with various other entertainment businesses, and with other forms of gaming, such as lotteries.

The casino entertainment industry is also subject to political and regulatory uncertainty. See Item 7, " Management's Discussion and Analysis of Financial Condition and Results of Operations — Consolidated Operating Results " and Item 7, " Management's Discussion and Analysis of Financial Condition and Results of Operations — Regional Operating Results ." See also Exhibit 99.1 to this Form 10-K.

*Summary of 2013 Events*

*CEOC Financing Transactions*

In January and February 2013, CEOC converted $133.9 million aggregate principal amount of original maturity revolver commitments held by held by consenting lenders to Term B-6 Loans and terminated $133.9 million principal amount of revolving commitments of extending lenders.

In February 2013, CEOC completed the offering of $ 1,500.0 million aggregate principal amount of 9% senior secured notes due 2020, the proceeds of which were used to repay $1,433.3 million of CEOC's existing term loans at par. In conjunction with this transaction we amended our existing CEOC Credit Facilities as described in *Item 7 - Key Business Initiatives and Financing Transactions.*

*Horseshoe Cincinnati*

In March 2013, ROC opened the 100,000-square-foot Horseshoe Cincinnati casino in Cincinnati, Ohio, which we manage for ROC for a fee under a management agreement that expires in March 2033.

*ThistleDown Racino*

In April 2013, the 71,700-square-foot ThistleDown Racino near Cleveland, Ohio opened its slot gaming operations. We manage this facility for ROC under a management agreement.

*Conrad Punta del Este Resort and Casino*

In May 2013, we formed a strategic relationship with Enjoy S.A. ("Enjoy") in Latin America. Enjoy acquired 45% of Baluma S.A., our subsidiary that owns and operates the Conrad Punta del Este Resort and Casino in Uruguay (the "Conrad"), in exchange for total consideration of $139.5 million. After customary deductions for expenses associated with the closing, we received $50.4 million in cash (net of $29.7 million of cash deconsolidated), a note receivable of $31.9 million, and a 4.5% equity stake in Enjoy.

In connection with the transaction, Enjoy assumed control of the Baluma S.A. board and primary responsibility for management of the Conrad. Upon completion of the transaction, we deconsolidated Baluma S.A. from our financial statements and began accounting for Baluma S.A. as an investment in non-consolidated affiliates utilizing the equity method of accounting.

*Caesars Acquisition Company / Caesars Growth Partners, LLC Transactions*

CAC was formed to directly own 100% of the voting membership units in CGP LLC. CGP LLC was formed for the purpose of acquiring certain businesses and assets of Caesars Entertainment.

On October 21, 2013, the CGP LLC joint venture was formed between subsidiaries of Caesars Entertainment and CAC through the execution of the series of transactions described below:

(i)  The Class A common stock of CAC was made available via a subscription rights offering by Caesars Entertainment to its shareholders as of October 17, 2013, the record date (the "CAC Rights Offering"), whereby each subscription right entitled its holder to purchase from CAC one share of CAC's Class A common stock or the right to retain such subscription right;

(ii)  Sponsors exercised their basic subscription rights in full and purchased $457.8 million worth of CAC's Class A common stock at a price of $8.64 per whole share;

7

(iii) CAC used the proceeds from the exercise of the basic subscription rights in (ii) above to purchase 100% of the voting units of CGP LLC;

(iv) CGP LLC in turn used $360.0 million of the proceeds received from CAC in (iii) above to purchase from CEOC (we refer to the following assets as the "Purchased Assets"):

    a. the equity interests of a subsidiary of PHW Las Vegas, LLC that holds all of the assets and liabilities formerly held directly by PHW Las Vegas, LLC, including Planet Hollywood;

    b. the equity interests of Caesars Baltimore Investment Company, LLC, the entity that indirectly holds interests in the owner of Horseshoe Baltimore in Maryland (the "Maryland Joint Venture"), a licensed casino development project expected to open in the third quarter of 2014; and

    c. a 50% interest in the management fee revenues of PHW Manager, LLC, which manages Planet Hollywood, and Caesars Baltimore Management Company LLC, which holds an agreement to manage the Maryland Joint Venture.

(v) Caesars Entertainment contributed all of the shares of CIE's outstanding common stock held by a subsidiary and approximately $1.1 billion in aggregate principal amount of senior notes held by a subsidiary (the "CEOC Notes" and, together with the shares of CIE, the "Contributed Assets") to CGP LLC, in exchange for all of CGP LLC's non-voting units.

Pursuant to the terms of the CGP LLC transaction, CGP LLC is obligated to issue additional non-voting membership units to us to the extent that the earnings from CIE's social and mobile games business exceeds a specified threshold amount in 2015. The number of units to be received is capped at a value of $225 million divided by the value of the non-voting units at the date of the CGP LLC transaction.

The closing of the CAC Rights Offering for subscription rights not previously exercised by recipients of the rights, and for any over-subscription privileges, including oversubscription by the Sponsors, occurred on November 18, 2013. CAC distributed a total of 135,771,882 shares of Class A common stock to the holders of subscription rights who validly exercised their subscription rights and paid the subscription price in full. CAC received aggregate gross proceeds from the CAC Rights Offering of approximately $1,173.1 million. See Note 5 , " Caesars Growth Partners, LLC Transactions ."

The transactions above were considered to be a reorganization of entities under common control; accordingly, we have not recognized any gain or loss, and CGP LLC has recorded the acquired assets on the same basis as previously recorded by Caesars Entertainment.

*Refinancing of CMBS and Linq/Octavius ("CERP Transaction")*

On October 11, 2013, CERP, Caesars Entertainment Resort Properties Finance, Inc. and certain subsidiaries of CEOC (comprised of Harrah's Atlantic City Holding, Inc.; Harrah's Las Vegas, LLC; Harrah's Laughlin, LLC; Flamingo Las Vegas Holding, LLC; Paris Las Vegas Holding, LLC; and Rio Properties, LLC; each a wholly owned subsidiary of Caesars, and formerly collectively known as the "CMBS Properties") (i) completed the offering of $1,000 million aggregate principal amount of their 8% first-priority senior secured notes due 2020 and $1,150 million aggregate principal amount of their 11% second-priority senior secured notes due 2021 (together with the 8% first-priority senior secured notes due 2020, the "CERP Notes") and (ii) entered into a first lien credit agreement governing their new $2,769.5 million senior secured credit facilities, consisting of senior secured term loans in an aggregate principal amount of $2,500.0 million (the "CERP Term Loans") and a senior secured revolving credit facility in an aggregate principal amount of up to $269.5 million.

The net proceeds from the offering of CERP Notes and the borrowings under the CERP Term Loans, together with cash, were used to retire 100% of the principal amount of loans under the mortgage and mezzanine loan agreements entered into by certain subsidiaries of the CMBS Properties, repay in full all amounts outstanding under the senior secured credit facility entered into by Caesars and Caesars Linq, LLC and Caesars Octavius, LLC, each an indirect subsidiary of Caesars, and to pay related fees and expenses.

*Macau Land Concession*

On November 1, 2013, the Company completed the sale of all of the equity interests of the subsidiaries that held the Company's investment in a land concession in Macau (the "Macau Land Concession") to Pearl Dynasty for a total sales price of $438.0 million. Net proceeds from the sale, after commissions and customary closing costs, amounted to approximately $420 million.

*Code of Commitment*

For over a decade, we have maintained our Code of Commitment as a guiding framework for our approach to responsible and ethical business. First published in 2000, our Code of Commitment is a public pledge to our employees, guests and communities that we will honor the trust they have placed in us. Our Code of Commitment is deeply embedded in our organization's communications and culture and widely displayed in all our properties for our guests and all who visit. We use training events to reinforce our expectations of all employees with regard to ethics, compliance and anti-corruption at all levels of the business.

*Environmental Stewardship*

As part of our Code of Commitment, we accept our duty to help preserve the planet for current and future generations. For the past five years, we have been advancing a strategy to reduce our effect on the environment in our main areas of impact. Our multi-year strategy, CodeGreen, is a structured, data-driven and disciplined program that leverages the passion of our employees and engages our guests and suppliers. Since our baseline year of 2007, we have reduced energy consumption across all our properties by more than 18%, and greenhouse gas emissions by more than 20%, both on an air-conditioned square foot basis, and we reduced absolute water consumption by 7%. Nearly 25% of our total waste was recycled in 2012. Additionally, we have received Green Key certifications at all 31 of our properties with hotels in North America, most at the four key level.

*Diversity and Inclusion*

We create a dynamic and innovative working culture where individual growth is rewarded, recognized and celebrated. Caesars is the only company in the casino entertainment industry to receive a perfect score, seven consecutive times, on the Human Rights Campaign Corporate Equality Index, including the latest 2013 publication. We were also recognized as one of the top Diversity Leaders by Profiles in Diversity Journal for our innovation, communication, and dedication to diversity and inclusion practices. In 2012, our employees included more than 55% who belong to minority groups. In terms of gender balance, we encourage the advancement of women, and in 2012, more than 40% of the managers in our organization were women.

*Caesars Foundation*

Established in 2002, the Caesars Foundation (the "Foundation") is a private charitable foundation funded by a portion of operating income from resorts owned and operated or managed by Caesars. The Foundation's objective is to strengthen organizations and programs in the communities where our employees and their families live and work, and include our employees in volunteer efforts associated with the causes we support. We maintain our Foundation commitment each year and since its inception, the Foundation has gifted more than $60 million to help support vibrant communities. For more information, visit *www.caesarsfoundation.com* .

*Available Information*

Our Internet address is *www.caesars.com*. We make available free of charge, on or through our website, our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission (the "SEC"). We also make available through our website all filings of our executive officers and directors on Forms 3, 4, and 5 under Section 16 of the Exchange Act. These filings are also available on the SEC's website at *www.sec.gov*. Our Code of Business Conduct and Ethics is available on our website under the "Investor Relations" link. We will provide a copy of these documents without charge to any person upon receipt of a written request addressed to Caesars Entertainment Corporation, Attn: Corporate Secretary, One Caesars Palace Drive, Las Vegas, Nevada 89109. Reference in this document to our website address does not constitute incorporation by reference of the information contained on the website.

**ITEM 1A.    Risk Factors**

***Our substantial indebtedness and the fact that a significant portion of our cash flow is used to make interest payments could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry and prevent us from making debt service payments.***

We are a highly leveraged company. As of December 31, 2013 , we had $23,589.3 million face value of outstanding indebtedness and our current debt service obligation for the next 12 months is estimated to be $2,383.0 million , which includes estimated interest payments of $2,185.9 million . As of December 31, 2013 , CEOC had $19,589.1 million face value of outstanding indebtedness including $285.4 million owed to Caesars Entertainment, and CEOC's debt service obligation for the next 12 months is $1,967.1 million , which includes estimated interest payments of $1,853.7 million . As of December 31, 2013 , CERP had $4,676.7 million

These sales or divestitures affect our costs, revenues, profitability, financial position, liquidity and our ability to comply with our debt covenants. Divestitures have inherent risks, including possible delays in closing transactions (including potential difficulties in obtaining regulatory approvals), the risk of lower-than-expected sales proceeds for the divested businesses, and potential post-closing claims for indemnification. In addition, current economic conditions and relatively illiquid real estate markets may result in fewer potential bidders and unsuccessful sales efforts. Expected costs savings, which are offset by revenue losses from divested properties, may also be difficult to achieve or maximize due to our fixed cost structure.

*We are controlled by the Sponsors, whose interests may not be aligned with ours.*

Hamlet Holdings, the members of which are comprised of individuals affiliated with each of the Sponsors, as of December 31, 2013, controls approximately 63.9% of our common stock, and controls us, pursuant to an irrevocable proxy providing Hamlet Holdings with sole voting and sole dispositive power over those shares. As a result, the Sponsors have the power to elect all of our directors. Moreover, Hamlet Holdings has the ability to vote on any transaction that requires the approval of our Board or our stockholders, including the approval of significant corporate transactions such as mergers and the sale of all or substantially all of our assets. As a result, Hamlet Holdings is in a position to exert a significant influence over us, and the direction of our business and results of operations. The interests of the Sponsors could conflict with or differ from the interests of other holders of our securities. For example, the concentration of ownership held by the Sponsors could delay, defer or prevent a change of control of us or impede a merger, takeover or other business combination which another stockholder may otherwise view favorably. Additionally, the Sponsors are in the business of making or advising on investments in companies they hold, and may from time to time in the future acquire interests in or provide advice to businesses that directly or indirectly compete with certain portions of our business or are suppliers or customers of ours. One or both of the Sponsors may also pursue acquisitions that may be complementary to our business, and, as a result, those acquisition opportunities may not be available to us. A sale of a substantial number of shares of stock in the future by funds affiliated with the Sponsors or their co-investors could cause our stock price to decline. So long as Hamlet Holdings continues to hold the irrevocable proxy, they will continue to be able to strongly influence or effectively control our decisions.

In addition, we have an executive committee that serves at the discretion of our Board and is authorized to take such actions as it reasonably determines appropriate. Currently, the executive committee may act by a majority of its members, provided that at least one member affiliated with TPG and Apollo must approve any action of the executive committee.

*Reduction in discretionary consumer spending resulting from the downturn in the national economy over the past few years, the volatility and disruption of the capital and credit markets, adverse changes in the global economy and other factors could negatively impact our financial performance and our ability to access financing.*

Changes in discretionary consumer spending or consumer preferences are driven by factors beyond our control, such as perceived or actual general economic conditions; high energy, fuel and other commodity costs; the cost of travel; the potential for bank failures; a soft job market; an actual or perceived decrease in disposable consumer income and wealth; the recent increase in payroll taxes; increases in gaming taxes or fees; fears of recession and changes in consumer confidence in the economy; and terrorist attacks or other global events. Our business is particularly susceptible to any such changes because our casino properties offer a highly discretionary set of entertainment and leisure activities and amenities. Gaming and other leisure activities we offer represent discretionary expenditures and participation in such activities may decline if discretionary consumer spending declines, including during economic downturns, during which consumers generally earn less disposable income. The economic downturn that began in 2008 and adverse conditions in the local, regional, national and global markets have negatively affected our business and results of operations and may continue to negatively affect our operations in the future. In addition, the Atlantic City gaming market in particular has seen a massive decline. For example, according to the Atlantic City Gaming Industry Impact Report, prepared by the Office of Communications, State of New Jersey Casino Control Commission, reported gaming revenues for Atlantic City properties have declined from $4,920.8 million in 2007 to $2,862.1 million in 2013. During periods of economic contraction, our revenues may decrease while most of our costs remain fixed and some costs even increase, resulting in decreased earnings. While economic conditions have improved, our revenues may continue to decrease. For example, while the gaming industry has partially recovered from 2008, there are no assurances that the gaming industry will continue to grow as a result of economic downturn or other factors. Any decrease in the gaming industry could adversely affect consumer spending and adversely affect our operations.

Additionally, key determinants of our revenues and operating performance include hotel average daily rate ("ADR"), number of gaming trips and average spend per trip by our customers. Given that 2007 was the peak year for our financial performance and the gaming industry in the United States in general, we may not attain those financial levels in the near term, or at all. If we fail to increase ADR or any other similar metric in the near term, our revenues may not increase and, as a result, we may not be able to pay down our existing debt, fund our operations, fund planned capital expenditures or achieve expected growth rates, all of which could have a material adverse effect on our business, financial condition, results of operations and cash flow. Even an uncertain economic outlook may adversely affect consumer spending in our gaming operations and related facilities, as consumers

*Income Tax Benefit*

The effective tax rate benefit for 2013 , 2012 and 2011 , was 34.7% , 38.5% and 42.2% , respectively. The 2013 effective rate benefit was primarily impacted by the tax benefits from a capital loss resulting from a tax election made for U.S. federal income tax purposes and the reversal of uncertain tax positions offset by the change in our federal valuation allowance and the deferred tax implications of the CGP LLC transaction in 2013. The 2012 effective tax rate benefit was primarily impacted by the tax benefit from the reversal of uncertain tax positions offset by the tax effects of nondeductible goodwill impairments. Should the Company continue to experience operating losses of the same magnitude it has experienced in the past several years, it is reasonably possible in the near term that the future reversal of its U.S. federal deductible temporary differences could exceed the future reversal of its U.S. federal taxable temporary differences, in which case the Company would record a valuation allowance for such excess with a corresponding reduction of federal income tax benefit on its Consolidated Statements of Operations.

The year-over-year decrease in the effective tax rate benefit for 2012 was, primarily due to (i) nondeductible goodwill impairments in 2012, (ii) a decrease in the tax benefit from foreign operations in 2012 mostly related to the effect of providing deferred taxes on unremitted earnings from foreign subsidiaries in Uruguay that are no longer permanently reinvested, (iii) a decrease in state deferred tax benefits recognized in 2012 relative to 2011 mostly as a result of a state restructuring completed in 2011, and (iv) deferred tax benefits recognized in 2011 from a correction of the deferred tax liabilities, which were partially offset by tax benefits recognized in 2012 from the decrease of uncertain tax positions relating to the settlement of a foreign matter and our IRS examinations.

See Note 15 , " Income Taxes ," for additional information.

*Income/(Loss) from discontinued operations, net of income taxes*

During the year ended December 31, 2013, loss from discontinued operations, net of income taxes was $30.0 million , primarily comprised of charges totaling $21.5 million for exit activities and the write-down of intangible and tangible assets related to the March 4, 2013 closure of the Alea Leeds casino and net write-downs of $5.8 million related to our land concession in Macau.

During the year ended December 31, 2012 , loss from discontinued operations, net of income taxes was $114.6 million and included a $101.0 million tangible asset impairment charge related to our land concession in Macau.

During the year ended December 31, 2011 , income from discontinued operations, net of income taxes was $27.3 million and included $63.9 million of income taxes related to the sale of the Harrah's St. Louis casino.

**Liquidity and Capital Resources**

*Liquidity Discussion and Analysis*

We are a highly leveraged company and a significant amount of our liquidity needs are for debt service, including significant interest payments. As of December 31, 2013, we had $23,589.3 million face value of outstanding indebtedness and our current debt service obligation for 2014 is $2,383.0 million , consisting of $197.1 million in principal maturities and $2,185.9 million in required interest payments. Our debt service obligation for 2015 is $3,223.7 million , consisting of $1,212.2 million in principal maturities and $2,011.5 million in required interest payments.

The following table summarizes the annual maturities of the face value of our long-term debt as of December 31, 2013 :

| (In millions) | 2014 | 2015 | 2016 | 2017 | 2018 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| CEOC | $ 113.4 | $ 1,108.5 | $ 2,084.0 | $ 2,715.5 | $ 8,447.1 | $ 4,819.8 | $ 19,288.3 |
| Less: CEOC to affiliate [(1)] | — | (427.3) | (324.5) | (390.9) | (3.9) | — | (1,146.6) |
| CERP | 35.9 | 33.9 | 31.8 | 25.0 | 25.1 | 4,525.0 | 4,676.7 |
| CGP LLC | 47.8 | 497.1 | 2.2 | 2.2 | 5.4 | 216.2 | 770.9 |
| Total | $ 197.1 | $ 1,212.2 | $ 1,793.5 | $ 2,351.8 | $ 8,473.7 | $ 9,561.0 | $ 23,589.3 |

_____
[(1)] Substantially all of these amounts are held by CGP LLC.

See Note 9 , " Debt ," for details on our debt outstanding and restrictive covenants related to certain of our borrowings. This detail includes, among other things, a table presenting details of our individual borrowings outstanding as of December 31, 2013 and 2012, with maturities by year, as well as discussion of recent changes in our debt outstanding and certain changes in the terms of existing debt for the year ended December 31, 2013.

Following the U.S. recession of late 2007 through 2009, we have observed that gaming activity has remained well below the pre-recession levels. In addition, new competition in certain regional markets has negatively affected "same store" volumes, while overall slot volumes trends continue to weaken in most markets. These factors have negatively affected our results of operations, and may continue to negatively affect our results of operations in the future. During periods of economic weakness and in the face of continued weak consumer spending on gaming, our revenues may decrease while many of our costs remain fixed and some costs even increase, resulting in decreased earnings. As a result, we have experienced substantial net losses since 2010, as well as operating losses in 2012 and 2013, resulting in a net stockholders' deficit of $3,122.0 million as of December 31, 2013. Further, we expect to experience operating and net losses in 2014 and beyond.

Our cash and cash equivalents, excluding restricted cash, totaled $2,771.2 million as of December 31, 2013 compared with $1,757.5 million as of December 31, 2012 . Cash and cash equivalents as of December 31, 2013 , includes $976.9 million held by CGP LLC, which is not available for our use to fund other Caesars operations or satisfy our obligations.

In addition to cash flows from operations, available sources of cash include amounts available under CEOC's current revolving credit facility. At December 31, 2013, the facility provided for up to $215.5 million , with $109.4 million maturing on January 28, 2014. As of March 1, 2014 the facility provided for $106.1 million , of which $9.6 million remained as available borrowing capacity. In addition, CERP had $269.5 million available on its revolving credit facility at December 31, 2013.

Each of the structures comprising Caesars Entertainment's consolidated financial statements have separate debt agreements with related restrictions on usage of their capital resources. CGP LLC is a variable interest entity that is consolidated by Caesars Entertainment. CAC is the managing member of CGP LLC and therefore controls all decisions regarding liquidity and capital resources of CGP LLC.

| **(Dollars in millions)** | | | **December 31, 2013** | | |
|---|---|---|---|---|---|
| | **CEOC** | **CERP** | **CGP LLC** | | **Parent** |
| Cash, cash equivalents, and short term investments [1] | $ 1,438.2 | $ 181.5 | $ 991.9 | $ | 159.6 |
| Revolver capacity [2] | 215.5 | 269.5 | — | | — |
| Less: revolver capacity committed to letters of credit | (100.5) | — | — | | — |
| Total Liquidity | $ 1,553.2 | $ 451.0 | $ 991.9 | $ | 159.6 |

_____

[1] Excludes restricted cash.

[2] At December 31, 2013, the CEOC revolver provided capacity up to $215.5 million , however $109.4 million of that revolver capacity matured on January 28, 2014 and available capacity is $106.1 million before the letter of credit commitments.

Restricted cash totaled $424.3 million as of December 31, 2013 . The current portion is primarily comprised of amounts related to interest payments on outstanding debt and amounts held to satisfy certain insurance program requirements. The non-current portion primarily represents funds reserved for ongoing development projects.

As a result of the restrictions from CEOC's borrowings, CERP Financing and other arrangements, the amount of restricted net assets of our consolidated subsidiaries held was $3.0 billion and $1.2 billion , as of December 31, 2013 and 2012 , respectively.

The amount of restricted net assets in our unconsolidated subsidiaries is not material to the financial statements.

Our operating cash inflows are typically used for operating expenses, debt service costs, working capital needs, and capital expenditures in the normal course of business. We experienced negative operating cash flows of $109.4 million in 2013, and we also expect to experience negative operating cash flows in 2014 and beyond.

As described more fully in Note 24 , " Subsequent Events ," we recently announced that CGP LLC will acquire certain assets from CEOC for $2,000.0 million in cash, net of assumed debt. The transaction is expected to close in the second quarter 2014. The net cash proceeds will impact the calculation of the senior secured leverage ratio ("SSLR") covenant going forward to the extent it reduces first lien debt or increases cash of CEOC.

From time to time, depending upon market, pricing, and other conditions, and on our cash balances and liquidity, we may seek to acquire or exchange notes or other indebtedness of the Company's subsidiaries through open market purchases, privately negotiated transactions, tender offers, redemption, exchange offers or otherwise, upon such terms and at such prices as we may determine (or as may be provided for in the indentures governing the notes), for cash or other consideration, including our common stock. In addition, we have considered and will continue to evaluate potential transactions to reduce net debt, such as debt for debt exchanges, debt for equity exchanges and other transactions.

==We do not expect that cash flow from operations will be sufficient to repay CEOC's indebtedness in the long-term and we will have to ultimately seek a restructuring, amendment or refinancing of our debt, or if necessary, pursue additional debt or equity offerings.==

Our ability to refinance or restructure our debt, or to issue additional debt or equity, will depend upon, among other things:

- The condition of the capital markets at the time, which is beyond our control,

- Our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, many of which are beyond our control; and

- Our continued compliance with the terms and covenants in our Credit Facilities, indentures and loan agreements that govern our debt.

Under CEOC's Credit Facilities, we are required to satisfy and maintain specified financial ratios. Specifically, our credit facilities require CEOC to maintain an SSLR of no more than 4.75 to 1.0, which is the ratio of its senior first priority secured debt to LTM Adjusted EBITDA - Pro Forma - CEOC Restricted. This ratio excludes up to $3,700.0 million of first priority senior secured notes and up to $350.0 million aggregate principal amount of consolidated debt of subsidiaries that are not wholly-owned. This ratio also reduces the amount of senior first priority secured debt by the amount of unrestricted CEOC cash on hand which was $1,450.2 million as of December 31, 2013. As of December 31, 2013, the SSLR was 4.52 to 1.0.

While we were in compliance with the terms and conditions of all of our loan agreements, including CEOC's Credit Facilities and indentures, as of December 31, 2013, in order to comply with the quarterly SSLR covenant under the CEOC Credit Facility in the future, we will need to achieve a certain amount of LTM Adjusted EBITDA - Pro-Forma - CEOC Restricted and/or reduced levels of total CEOC senior secured net debt (total senior secured debt less unrestricted cash). The factors that could impact the foregoing include (a) changes in gaming trips, spend per trip and hotel metrics, which we believe are correlated to consumer spending and confidence generally and spending by consumers for gaming and other entertainment activities, (b) our ability to effect cost savings initiatives, (c) our ability to complete asset sales, including the transaction described more fully in Note 24, (d) issuing additional second lien or unsecured debt, or project financing, (e) reducing net debt through open market purchases, privately negotiated transactions, redemptions, tender offers or exchanges, (f) equity issuances, (g) reductions in capital expenditures spending, or (h) a combination thereof.

In addition, under certain circumstances, CEOC's Credit Facilities allow us to apply cash contributions received by CEOC from CEC as an increase to LTM Adjusted EBITDA - Pro Forma - CEOC Restricted, if CEOC is unable to meet its SSLR covenant, in order to cure any breach.

Based upon our current operating forecast, the expected closing of the CEOC asset sale to CGP LLC described above, and our ability to achieve one or more of the other factors noted above, including our ability to cure a breach of the CEOC SSLR, in certain circumstances, with cash contributions from CEC, we believe that we will have sufficient liquidity to fund our operations and meet our debt service obligations and that we will continue to be in compliance with the CEOC SSLR covenant during the next twelve months.

Effective February 8, 2012, as the result of our initial public offering, our common stock trades on the NASDAQ Global Select Market under the symbol "CZR." The net proceeds from our initial public offering were approximately $15 million, taking into account expenses and underwriting commissions, and giving effect to the exercise of the underwriters' over-allotment option. In connection with the public offering, we effected a 1.742-for-1 split of our common stock.

In March 2012, we filed a prospectus with the SEC, as part of a registration statement, to sell shares of our common stock, up to a maximum aggregate offering price of $500.0 million, and, in April 2012, we entered into an equity distribution agreement whereby we may issue and sell up to 10.0 million shares of our common stock from time to time.

On September 25, 2013, Caesars entered into an underwriting agreement for the sale of 10.0 million shares of its common stock, par value $0.01 per share. The underwriter agreed to purchase the common stock from Caesars at a price of $19.40 per share, which resulted in $194.0 million of proceeds to Caesars before expenses. On September 27, 2013, the underwriter exercised its option to purchase 340,418 additional shares of common stock, resulting in approximately $6.6 million of additional proceeds to Caesars before expenses. These transactions closed on October 1, 2013, and resulted in $200.6 million of cash proceeds to Caesars before expenses.

(ii) obtain up to $75.0 million of extended revolving facility commitments with a maturity of January 28, 2017,

(iii) increase the accordion capacity under the CEOC Credit Facilities by an additional $650.0 million (which may be used, among other things, to establish extended revolving facility commitments under the CEOC Credit Facilities);

(iv) modify the calculation of the senior secured leverage ratio for purposes of the maintenance test under the CEOC Credit Facilities to exclude the February 2013 notes; and

(v) modify certain other provisions of the CEOC Credit Facilities.

*CERP Financing, Debt Covenant Compliance and Restrictions*

CMBS Financing - refinanced as part of CERP Financing

In connection with the Acquisition, eight of our properties (the "CMBS properties") and their related assets were spun out of CEOC to Caesars Entertainment. As of the Acquisition date, the CMBS properties were Harrah's Las Vegas, Rio, Flamingo Las Vegas, Harrah's Atlantic City, Showboat Atlantic City, Harrah's Lake Tahoe, Harveys Lake Tahoe and Bill's Lake Tahoe. The CMBS properties borrowed $6,500.0 million of CMBS financing (the "CMBS Financing"). The CMBS Financing was secured by the assets of the CMBS properties and certain aspects of the financing were guaranteed by Caesars Entertainment. On May 22, 2008, Paris Las Vegas and Harrah's Laughlin and their related operating assets were spun out of CEOC to Caesars Entertainment and became property secured under the CMBS mortgage loan and/or related mezzanine loans ("CMBS Loans"), and Harrah's Lake Tahoe, Harveys Lake Tahoe, Bill's Lake Tahoe and Showboat Atlantic City were transferred to CEOC from Caesars Entertainment as contemplated under the debt agreements effective pursuant to the Acquisition. The CMBS Financing was refinanced in October 2013 as described below.

Octavius/Linq Financing - refinanced as part of CERP Financing

On April 25, 2011, the Company, together with certain subsidiaries of CEOC comprised of Caesars Octavius, LLC; Caesars Linq, LLC; and Octavius Linq Holding Company, LLC (collectively the "Borrowers") entered into a credit agreement (the "Octavius/Linq Credit Agreement") pursuant to which the Borrowers incurred financing to complete the development of the Octavius Tower at Caesars Palace Las Vegas and the Linq project (the "Development"). The Octavius/Linq Credit Agreement provides for a $450.0 million senior secured term facility (the "Term Facility") with a six-year maturity, secured by all material assets of the Borrowers. The proceeds of the Term Facility were funded during the second quarter of 2011 and were classified as restricted cash until drawn to pay for costs incurred in the Development.

In October 2013, the Linq and Octavius Tower were transferred from CEOC to a CERP entity, and amounts outstanding under the Octavius/Linq Credit Agreement were refinanced as part of this CERP Financing transaction as described below.

==On October 11, 2013, we formed CERP from the prior CMBS Financing structure assets plus the addition of Linq and Octavius acquired from CEOC,== and (i) completed the offering of $1,000.0 million aggregate principal amount of their 8% first-priority senior secured notes due 2020 and $1,150 million aggregate principal amount of their 11% second-priority senior secured notes due 2021 (together with the 8% first-priority senior secured notes due 2020, the "Notes") and (ii) entered into a first lien credit agreement governing their new $2,769.5 million senior secured credit facilities, consisting of senior secured term loans in an aggregate principal amount of $2,500.0 million ("CERP Term Loans") and a senior secured revolving credit facility in an aggregate principal amount of up to $269.5 million . We refer to this new borrowing structure as CERP and the refinancing transaction as "CERP Financing."

The CERP Financing includes negative covenants, subject to certain exceptions, restricting or limiting the ability of CERP and operating companies under the CERP Financing to, among other things: (i) incur additional debt or issue certain preferred shares; (ii) pay dividends on or make distributions in respect of their capital stock or make other restricted payments; (iii) make certain investments; (iv) sell certain assets; (v) create liens on certain assets to secure debt; (vi) consolidate, merge, sell, or otherwise dispose of all or substantially all of their assets; (vii) enter into certain transactions with their affiliates; and (viii) designate their subsidiaries as unrestricted subsidiaries.

The CERP Financing also includes affirmative covenants that require the CERP properties to, among other things: (i) maintain its legal existence; (ii) maintain required insurance coverage; (iii) pay all taxes when due; (iv) furnish required financial statements and compliance certificates to the lenders; (v) furnish required written notices to the lenders; (vi) comply with all laws and regulations from applicable governmental authorities (including environmental laws); (vii) maintain all records and allow access to lenders upon request; (viii) use the proceeds in the manner set forth in the credit agreement; and (ix) maintain required debt ratings.