**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BOKF, N.A.,

               Plaintiff,

      v.

CAESARS ENTERTAINMENT CORPORATION,

            Defendant.

No. 1:15-cv-01561-SAS

Oral Argument Requested

**MEMORANDUM OF LAW OF CAESARS**
**ENTERTAINMENT CORPORATION IN OPPOSITION TO**
**BOKF, N.A'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 492-0020

FRIEDMAN KAPLAN
SEILER & ADELMAN LLP
7 Times Square
New York, NY 10036-6516
Telephone: (212) 833-1100
Fax: (212) 833-1250

*Attorneys for Caesars Entertainment Corporation*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 7

    I.    CEC and CEOC ....................................................................................................... 7

    II.    The Indenture and the Guarantee ...................................................................... 8

    III.    The Challenged Transactions............................................................................. 11

        A.    The May 2014 5% Stock Sale................................................................. 11

        B.    The May 2014 6% Stock Transfer ......................................................... 12

        C.    The August 2014 Unsecured Notes Transaction ............................... 12

    IV.    The Restructuring Support Agreement ............................................................ 13

APPLICABLE LEGAL STANDARDS FOR SUMMARY JUDGMENT ................. 14

ARGUMENT ......................................................................................................................... 15

    I.    The Undisputed Facts Do Not Demonstrate That the BOKF Holders Were
        "Impaired" Under the Decisions in *Marblegate*, *MeehanCombs*, and *Federated* ...... 15

        A.    There Are Material Factual Disputes Concerning Whether
            There Was an "Out-of-Court Restructuring" of the Notes ............................ 15

            1.    Under the Cases on Which Plaintiff Relies, the Court Must
                Assess Whether There Was an "Out-of-Court Restructuring"
                of the Holders' Notes ..................................................................... 16

            2.    Plaintiff Fails to Demonstrate That the Challenged Transactions
                "Collectively" Constituted an "Out-of-Court Restructuring".............. 19

            3.    Plaintiff Fails to Demonstrate That the Challenged Transactions
                Were Individual "Out-of-Court Restructurings" ................................ 20

        B.    The Undisputed Facts Do Not Establish That the BOKF Holders
            Were Practically "Impaired" by the Challenged Transactions ...................... 24

            1.    Plaintiff Must Establish CEOC's Insolvency at the Time
                 of Each of the Challenged Transactions ............................................. 25

2. In Any Event, Plaintiff Fails to Show Any Adverse Impact on the BOKF Holders' Practical Ability to Receive Payment............ 27

C. The BOKF Holders Could Not Have Been "Impaired" By the Release of a Guarantee That Did Not Provide Credit Support for the Notes............... 28

II. The BOKF Holders' Rights Were Not "Impaired" Under the TIA Because They Retained Their Legal Right to Payment Under the Indentures.......................... 30

III. The Motion Should Be Denied Because CEC Has Been Prevented From Acquiring Discovery Essential to its Opposition to the Motion ................................ 33

CONCLUSION.................................................................................................................. 34

Case 1:15-cv-01561-JSR   Document 44   Filed 07/24/15   Page 4 of 40


# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Antonios A. Alevizopoulos and Assocs., Inc.* v. *Comcast Int'l Holdings, Inc.*,
  100 F. Supp. 2d 178 (S.D.N.Y. 2000).......................................................................33

*In re Artha Mgmt., Inc.*,
  174 B.R. 671 (Bankr. S.D.N.Y. 1994).......................................................................24

*Bank of N.Y.* v. *First Millennium, Inc.*,
  607 F.3d 905 (2d Cir. 2010)......................................................................................32

*Brady* v. *UBS Fin. Servs., Inc.*,
  538 F.3d 1319 (10th Cir. 2008) ................................................................................31

*Federated Strategic Income Fund* v. *Mechala Grp. Jamaica Ltd.*,
  No. 99-cv-10517 (HB), 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999) ..........18, 25, 29

*Greylock Global Opportunity Master Fund Ltd.* v. *Province of Mendoza*,
  162 F. App'x 85 (2d Cir. 2006) ................................................................................31

*Greylock Global Opportunity Master Fund Ltd.* v. *Province of Mendoza*,
  No. 04-cv-7643 (HB), 2005 WL 289723 (S.D.N.Y. Feb. 8, 2005) ..........................30

*Klein* v. *Tabatchnick*,
  610 F.2d 1043 (2d Cir. 1979).....................................................................................24

*Marblegate Asset Mgmt.* v. *Educ. Mgmt. Corp.*,
  No. 14 Civ. 8584 (KPF), 2014 WL 7399041 (S.D.N.Y. Dec. 30, 2014)......................... *passim*

*Marblegate Asset Mgmt., LLC* v. *Educ. Mgmt. Corp.*,
  14-cv-8584 (KPF), 2015 WL 3867643 (S.D.N.Y. June 23, 2015)..........................6, 17, 22, 26

*MeehanCombs Global Credit Opportunities Funds, LP* v. *Caesars Entm't Corp.*,
  Nos. 14-cv-7091 (SAS), 14-cv-7973 (SAS), 2015 WL 221055 (S.D.N.Y. Jan.
  15, 2015) ..................................................................................................18, 26, 30

*Miller* v. *Wolpoff & Abramson, LLP*,
  321 F.3d 292 (2d Cir. 2003)........................................................................................33

*In re Northwestern Corp.*,
  313 B.R. 595 (Bankr. D. Del. 2004) ..........................................................................31

*Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago* v.
*Bank of New York Mellon*,
  914 F. Supp. 2d 422 (S.D.N.Y. 2012).......................................................................31

*In re Roblin Indus., Inc.*,
    78 F.3d 30 (2d Cir. 1996)........................................................................................24

*Sagendorf-Teal* v. *Cnty. of Rensselaer*,
    100 F.3d 270 (2d Cir. 1996)...................................................................................30

*Upic & Co.* v. *Kinder-Care Learning Ctrs., Inc.*,
    793 F. Supp. 448 (S.D.N.Y. 1992) ........................................................................32

*W. Heritage Ins. Co.* v. *Century Sur. Co.*,
    32 F. Supp. 3d 443 (S.D.N.Y. 2014) (Scheindlin, J.) ...........................................15

*YRC Worldwide Inc.* v. *Deutsche Bank Trust Co. Americas*,
    No. 10-2106-JWL, 2010 WL 2680336 (D. Kan. July 1, 2010) .............................31

## STATUTES, RULES AND REGULATIONS

15 U.S.C § 77ddd(a)(6)...............................................................................................30

15 U.S.C. § 77ppp(b) ...........................................................................................*passim*

Fed. R. Civ. P. 56(d) ........................................................................................6, 15, 33

17 CFR Part 210.3-10 .......................................................................................9, 10, 12

## OTHER AUTHORITIES

Edith S. Hotchkiss, et al., *Bankruptcy and the Resolution of Financial Distress*, in
2 *Handbook of Empirical Corporate Finance* 235 (Espen Eckbo ed., 2008)...............................19

El-Waleed A. Hamour, *Debt Restructuring in OIC Countries*, 21 J. Econ.
Cooperation 57 (2000) ........................................................................................19

Mark J. Roe, *The Voting Prohibition in Bond Workouts*, 97 Yale L.J. 232 (1987).....................23

Stuart C. Gilson, *Bankruptcy, Boards, Banks, and Blockholders: Evidence on
Changes in Corporate Ownership and Control When Firms Default*, 27 J. Fin.
Econ. 355 (1990)..................................................................................................23

iv

Caesars Entertainment Corporation ("CEC") respectfully submits this memorandum of law in opposition to the motion for partial summary judgment filed by Plaintiff BOKF, N.A. ("BOKF") (the "Motion").

## PRELIMINARY STATEMENT

Plaintiff's Motion mischaracterizes the important purposes of the transactions it challenges and the enormous benefits that the transactions provided to CEC's subsidiary Caesars Entertainment Operating Company, Inc. ("CEOC") and its creditors. Among other things, those transactions—part of a years'-long effort by CEC to improve CEOC's financial condition— enabled CEOC to obtain $1.75 billion in new loans and to reduce its debt by hundreds of millions of dollars. As a result of these and other transactions—including the earlier transactions that Plaintiff baselessly alleges "stripped" CEOC of valuable assets to defraud its creditors— CEOC had billions of dollars in liquidity, was paying its debts when due, and had no near-term maturities, and CEC's consolidated financial statements had received an unqualified opinion from its auditors. Far from impairing the noteholders' rights in violation of the Trust Indenture Act ("TIA") or constituting a nonconsensual "restructuring" of the debt they hold, these transactions were undertaken to avoid a restructuring and to allow CEOC to continue paying its creditors. Indeed, between the closing of the first of the challenged transactions and the end of 2014, CEOC paid more than $1.7 billion in principal and interest to its creditors, including the very noteholders that Plaintiff represents. By contrast, certain creditors have sought to impede these efforts to preserve CEOC's value—including creditors that held credit default swap positions on CEOC and stood to profit from a CEOC default.

In its pre-motion letter seeking leave to move for summary judgment, Plaintiff argued that summary judgment was appropriate because the undisputed evidence would show that (i) each of the three challenged transactions was a nonconsensual, out-of-court

"restructuring," and (ii) "at the time" the challenged transactions were undertaken CEOC was "unable" to pay its debts.  (BOKF Dkt. No. 18 at 1, 3.)  While noting that it "may well be that genuine issues of material fact preclude" summary judgment, the Court gave BOKF leave to make the Motion.  (BOKF Dkt. No. 20 at 2.)

Now, in its motion papers, Plaintiff has abandoned both of the central pillars of its argument.  Apparently recognizing that, despite the statements in its pre-motion letter, it cannot establish the absence of a genuine dispute of material fact on these points, Plaintiff now argues instead that it need not establish *either* that the challenged transactions were an out-of-court "restructuring," *or* that at the time of the transactions CEOC was unable to pay its debts.  Plaintiff also does not dispute on the Motion that the transactions released CEC's guarantee under the governing Indenture, or that the purpose of the guarantee, as understood by the market, was to allow consolidated financial reporting under SEC regulations rather than to provide credit support for the BOKF Notes.  (*See* BOKF Br. 1 n.2, 14-15.)

Unable to satisfy the standard established by the cases and its own pre-motion letter, Plaintiff instead urges the Court to hold that the right of a holder of debt "to receive payment" of principal and interest is automatically "impaired" in violation of Section 316(b) of the TIA by the release of a guarantee on that debt, even if (i) there has been no "restructuring" of the debt, (ii) the issuer is capable of repaying the debt at the time of the release (so long as it becomes insolvent later), and (iii) the release is expressly permitted by the terms of the governing indenture.  This sweeping theory of liability under Section 316(b) is unsupported by the statute or any case that Plaintiff cites, is contrary to the principal case on which Plaintiff relies, and, if adopted by the Court, would render unlawful innumerable routine and entirely proper corporate transactions whereby firms operate their businesses and manage their liabilities.  Indeed, in *Marblegate*, the principal case on which Plaintiff relies, the court explicitly rejected

2

the claim that releasing a guarantee always violates the TIA, recognizing that "[o]ne can imagine contexts" where indenture provisions allowing the release of guarantees can be "invoked without implicating Section 316(b)." *Marblegate Asset Mgmt.* v. *Educ. Mgmt. Corp.*, No. 14 Civ. 8584 (KPF), 2014 WL 7399041, at *20 (S.D.N.Y. Dec. 30, 2014) ("*Marblegate I*"). Moreover, releasing a guarantee is no different in principle from incurring senior debt or taking other routine actions that might affect junior creditors.

As noted, Plaintiff does not dispute on its Motion that, by the terms of the governing Indenture, *each* of the three challenged transactions was sufficient by itself to release the guarantee. (Indeed, although the Complaint asserts claims that the release of CEC's guarantee violated the Indenture, Plaintiff has not moved for summary judgment on those claims and does not seek a ruling on the interpretation of the terms of the Indenture.) Thus, Plaintiff cannot prevail if there exists a genuine dispute of material fact that *any* of the three transactions satisfied the TIA. As discussed below and as shown in an accompanying declaration, there is—at the very least—such a dispute as to *all three* transactions.

The Motions should be denied for the following reasons:

*First*, the undisputed facts do not demonstrate that the challenged transactions constituted an out-of-court "restructuring" of the BOKF Notes, as the cases Plaintiff relies upon require. In *Marblegate*, the court held that, to avoid "untrammeled judicial intrusion into ordinary business practice," a plaintiff asserting a claim under Section 316(b) must establish either explicit modification to "core terms" of an indenture—which Plaintiff does not even claim occurred here—or "an involuntary debt restructuring." 2014 WL 7399041, at *18-19. In *Marblegate,* there was little doubt that the challenged transactions amounted to a restructuring undertaken as a substitute for a bankruptcy filing. The transactions were mandated as part of a restructuring agreement signed by nearly all creditors and the defendants announced that they

3

were restructuring precisely because bankruptcy was not a viable option (they would have lost federal funding in the event of a bankruptcy filing). The *Marblegate* court expressly rejected the proposition urged by Plaintiff that the mere release of a guarantee violates Section 316(b). *See id.* at *20. Plaintiff's novel argument to the contrary is inconsistent with *Marblegate* and its own pre-motion letter, and is unsupported by any other case of which we are aware.

The purported evidence Plaintiff points to in an effort to establish that the challenged transactions were a restructuring at most creates a factual dispute that cannot be resolved on summary judgment. On the contrary, the evidence shows that none of these transactions was a restructuring. In contrast to *Marblegate* and the other cases on which Plaintiff relies, the challenged transactions did not involve any change in the governing Indenture, any coercive effort to induce noteholders to abandon their rights, or the elimination of any prospect of repayment. Those transactions increased liquidity and gave CEOC the time and tools to continue with its business plan. The only evidence on this Motion of any effort to "restructure" CEOC's debt concerns a *separate* and later negotiation with some of the company's creditors that culminated in a Restructuring Support and Forbearance Agreement entered into in December 2014, months after the challenged transactions closed. And, unlike *Marblegate*, none of the challenged transactions here was undertaken pursuant to the Restructuring Support Agreement.

*Second*, Plaintiff implicitly concedes that it cannot show on this Motion that CEOC was insolvent at the time of any of the challenged transactions, and it argues instead that no such showing is necessary. But in all of the cases upon which Plaintiff relies, the court concluded that the noteholders' right to recovery was impaired by the release of a guarantee only after determining that, at the time the guarantees were released, the issuer was or was alleged to be unable to repay its debts. The rule Plaintiff urges—that the TIA can be violated by the termination of a guarantee at a time that the issuer is able to pay its debts, if the issuer at some

undefined later time becomes insolvent—is contrary to these cases, would lead to the absurd result that a transaction entirely lawful and proper when it was undertaken can be deemed to violate the TIA retroactively, and would, as a consequence, make it impossible for businesses to determine the lawfulness of a planned transaction.  Plaintiff offers no evidence that CEOC was insolvent or unable to repay the BOKF Notes in May and August 2014, when the challenged transactions were undertaken—much less shows that there is no genuine issue of material fact—and for that reason alone the Motion should be denied.

Moreover, contrary to Plaintiff's unsupported assertion that its claim under CEC's guarantee represents the noteholders' "sole practical recourse" and "last remaining avenue to recovery" (BOKF Br. 13), it is far from clear that the noteholders would have significant recourse to CEC's assets even if its guarantee is reinstated, or that they would gain *more* from a judgment in their favor here than in CEOC's bankruptcy proceeding, given the BOKF Holders' projected recovery under the current proposed reorganization plan and CEC's limited market capitalization.  By contrast, in *Marblegate*, the Court held only that the TIA was violated by a transaction in which the release of a parent guarantee was an integral part of a transaction that removed all of the issuer's assets and thus eliminated any prospect of recovery.

*Third*, because it is uncontested for purposes of this Motion that CEC's guarantee did not and was not intended to provide credit support for the BOKF Notes, and because the guarantee was released in accordance with the terms of the Indenture, the release of the guarantee could not have "impaired" the noteholders' rights.  As the evidence shows, the guarantee was included in the Indenture to satisfy financial reporting requirements rather than to assure noteholders of repayment—a conclusion that is evident from the face of the Indenture, that is confirmed by a member of CEC's Board of Directors and statements by analysts, and that is consistent with market practice and understanding.

*Fourth*, although we recognize that the Court has concluded otherwise at the preliminary motion to dismiss stage in denying CEC's motion in the related *MeehanCombs* and *Danner* actions, we respectfully submit that the Motion should be denied because the BOKF Holders could not have been "impaired" where, as here, they retained their legal right to recover under the terms of the Indenture.  Whatever disputes there may be on the current record as to the BOKF Holders' *practical* ability to so, this fact alone warrants denial of the Motion.

*Finally*, the Motion should be denied (or a decision on it deferred) under Fed. R. Civ. P. 56(d) in light of CEC's inability to obtain timely and complete discovery from the noteholders of facts directly relevant to the Motion.  Among other things, CEC has expeditiously sought by subpoena to obtain information from the noteholders regarding the challenged transactions, their understanding of the scope and purpose of the guarantee, and the impact of the challenged transactions on their holdings.  A summary judgment before discovery is completed on Plaintiff's claim and the virtually identical claim for which UMB Bank, N.A. ("UMB") also seeks summary judgment—together seeking more than $7 billion in total, far in excess of CEC's market capitalization—would be grossly unfair to CEC, depriving it of the ability to gather the evidence it needs to defend against Plaintiff's claims.

***

In her most recent ruling in *Marblegate*, Judge Failla recognized the "potentially troubling implications" of her holding in rewarding holdouts, and the "arguable obsolescence" of the statute as she construed it "given the expense and complexity of modern bankruptcy." *Marblegate Asset Mgmt., LLC* v. *Educ. Mgmt. Corp.*, 14-cv-8584 (KPF), 2015 WL 3867643, at *13 (S.D.N.Y. June 23, 2015) ("*Marblegate II*").  The dramatic extension of the holding in that case that Plaintiff urges here would create even further mischief, with no warrant in the statute, the cases construing it, or any sensible policy.  The Motion should be denied.

<u>STATEMENT OF FACTS</u>[1]

I.      <u>CEC and CEOC</u>

CEC and its subsidiaries, including CEOC, own, operate, or manage approximately 50 casinos in 14 U.S. states and five countries. (Sambur Decl. ¶ 3.) On January 28, 2008, investment funds affiliated with Apollo Global Management, LLC and TPG Capital, along with co-investors, acquired CEC (then known as Harrah's Entertainment) and its subsidiaries. (*Id.*) CEC is currently a publicly traded company with a market capitalization of less than $750 million. (*Id.*) CEOC filed for bankruptcy under Chapter 11 of the Bankruptcy Code on January 15, 2015. (*Id.*)

CEOC's bankruptcy stemmed from economic factors and industry trends unforeseen in 2008. (*Id.* ¶ 4.) These included the recession, changing consumer preferences, and increased competition resulting from a rise in the number of casinos in various states. (*Id.*) In response to these business challenges, CEC, CEOC, and other subsidiaries and affiliates of CEOC engaged in over 45 capital market transactions including asset sales, exchange and tender offers, debt repurchases, and loan re-financings. (*Id.*) These transactions were undertaken to inject cash into CEOC, to deleverage CEOC's balance sheet, and to extend outstanding debt maturities, all in an effort to position CEOC for an improved business environment. And they enabled CEOC to repay more than $8 billion of principal and interest to its creditors. (*Id.*)

Plaintiff alleges that certain of these transactions, undertaken in 2013 and 2014, "stripped" CEOC of valuable assets in order fraudulently to deprive creditors of recourse to them. (*See* BOKF Complaint ¶ 66; BOKF Br. 4-5; BOKF SMF ¶¶ 31-40.) These allegations are wrong, and Plaintiff has adduced no evidence to support them. Instead, the transactions were the

---

[1]    The facts and documents discussed in this opposition are provided in the accompanying declarations of David B. Sambur ("Sambur Decl.") and Philippe Adler ("Adler Decl."), and the accompanying expert declaration of James Gadsden ("Gadsden Decl.").

result of a good faith and appropriate process, provided CEOC with fair market value of the assets it sold (as attested by opinions of independent financial advisors), and provided billions of dollars that contributed to CEOC's ability to pay, since the beginning of 2013, more than $3.6 billion to its creditors.  (Sambur Decl. ¶ 6.)

## II.     The Indenture and the Guarantee

The BOKF Notes, like those at issue in UMB's motion, were among a number of debt issuances over the period from 2009 to 2012 that CEOC used to fund its operations or for debt exchanges.  Plaintiff is the Trustee for the holders of the BOKF Notes, which are governed by an indenture of nearly 200 pages which sets forth in detail the rights and obligations of CEOC, CEC, the Trustee, and the BOKF Holders.  These rights and obligations include those relating to CEC's guarantee (the "Guarantee"), which is set forth in Section 12 of the Indenture.

Under Section 12.02(c) of the Indenture, the Guarantee will "terminate and be of no further force or effect" upon one of three events:  (i) CEOC ceasing to be a "Wholly Owned Subsidiary" of CEC, defined to mean 100% owned by CEC (*see* Indenture § 1.01); (ii) CEOC's transfer of all or substantially all of its assets to an entity not 100% owned by CEC (or a merger with such an entity), provided that the transferee assumes CEOC's obligations; and (iii) CEOC's exercise of its defeasance options, or if its obligations under the Indenture are otherwise discharged.  The Indenture separately provided for a release of the Guarantee, upon CEOC's election, if CEC's guarantee on certain other types of indebtedness—including a group of previously issued CEOC notes defined as the "Existing Notes"—was released or discharged.

BOKF does not contend on its Motion (nor does UMB in its motion) that the conditions should be read conjunctively, such that each of them must occur in order for the Guarantee to be released.  To the contrary, BOKF assumes for purposes of its Motion (as does UMB) that the satisfaction of any one condition would be sufficient to release the Guarantee and

that the challenged transactions released CEC's guarantee under the governing Indentures, and it does not seek a ruling on the meaning of the terms of the Indenture.  (*See* BOKF Br. 1 n.2.)

Many analysts recognized that the Guarantee could be released through the sale of CEOC stock.  Thus, in October 2013, Goldman Sachs noted that "the parent guarantee" contained in the identically-worded indentures governing the UMB Notes "would be released if [CEC] were to sell part of the [CEOC] equity to a third party."  (Sambur Decl. Ex. C at 10.) *Covenant Review*, an independent trade publication specializing in the analysis of indentures and credit agreements, explained that if a third party "were to buy a sliver of CEOC's equity so that [CEOC] is no longer a wholly owned subsidiary of [CEC], then [CEC's] guarantee of [the] Notes would be automatically released."  (*Id.* Ex. B at 7.  *See also* Adler Decl. Ex. A.)  And in April 2014, J.P. Morgan observed that one of "three main ways to strip the guarantee" would be if CEOC ceased to be a wholly owned subsidiary of CEC, that it "continue[d] to expect [the guarantee] to be removed at any time," and that it "[did] not include any value from the guarantee in [its] recovery analysis."  (Sambur Decl. Ex. D at 1, 29.)

As these and other provisions of the Indenture make clear, the Guarantee was not intended to provide credit support for the BOKF Notes.  Nothing in the Indenture restricts CEC's ability to issue stock, incur further debt, sell assets, grant liens, issue dividends, or even declare bankruptcy, as would be expected if investors were intended to rely on CEC's credit to assure repayment.  (*See* Indenture §6.01.)  CEOC, on the other hand, is subject to *all* of these limitations.  (*See* Indenture §§ 4.03(a), 4.04(a)(i), 4.06(a), 4.12(a), 6.01(e).)  Rather, as the market understood, the Guarantee was included in the Indenture to comply with the financial reporting requirements of Rule 3-10 of SEC Regulation S-X.  (*See* Sambur Decl. ¶ 9; Gadsden Decl. ¶¶ 6, 15.)  Under that rule, rather than preparing and filing its own audited financial statements—a costly and time-consuming exercise—CEOC could rely on CEC's audited

financials so long as it was wholly owned by CEC and CEC guaranteed the debt obligations that CEOC was issuing.  *See* 17 CFR Part 210.3-10.  Consistent with this purpose, CEOC did not file its own audited financials with the SEC until after May 2014, when the CEC guarantee was released and it could no longer rely on CEC's financials under Rule 3-10.  (Sambur Decl. ¶ 9.)

The inclusion of parent guarantees in indentures for precisely this purpose—not as credit protection, but to facilitate financial reporting obligations—is a well-recognized feature of many bond offerings.  (*See* Gadsden Decl. ¶¶ 8-11.)  This was not a new construct even on the part of CEOC.  Indeed, in mid-2005—three years before the 2008 acquisition of CEC—Fitch Ratings noted that a parent-level guarantee existed on certain debt issued by CEOC's corporate predecessor to "allow[] [CEC] to file consolidated financial statements as a proxy for [CEOC]." (Sambur Decl. Ex. A at 1.)  Notes issued by CEOC prior to the acquisition of CEC in 2008 had included a guarantee on the part of CEC to facilitate financial reporting in order to avoid the cost and delay of preparing separate audited financial statements for CEOC.  (*Id.* ¶ 9.)

CEC issued subpoenas to BOKF and UMB Holders, seeking documents and deposition testimony concerning (among other things) their understanding of the nature of the Guarantee and the Indenture's release provisions.  (Adler Decl. ¶ 3.)  Four Holders moved to quash those subpoenas in the Delaware Court of Chancery, and on July 6, 2015, that motion was denied.  (*Id.* ¶¶ 12, 14.)  One of those Holders produced its first set of documents just two days ago, and the others have not produced any documents to date.  (*Id.* ¶ 17.)  Other BOKF Holders who did not join in that motion remain in the process of producing documents.  (*Id.* ¶¶ 7-9.) CEC separately subpoenaed seven additional UMB Holders shortly after the filing of the UMB Complaint in mid-June, but five of them filed a pre-motion letter seeking to quash those subpoenas and/or for a protective order.  (*Id.* ¶¶ 19-21.)  On July 23, 2015, the Court held a conference on that application, at which time it reserved decision but directed CEC to submit

10

revised subpoenas for the Court's review.  (*Id.* ¶ 22.)  The two other UMB Holders have refused to produce documents unless the UMB Holders who have sought to quash the subpoenas they received are unsuccessful.  (*Id.* ¶ 21.)  Given the materially identical language in the BOKF and UMB Indentures, discovery from any of the Holders is relevant to BOKF's claim.

Whatever value the Guarantee purportedly provided to the BOKF Holders initially, such value was extremely limited given CEC's resources at the time of the challenged transactions.  By the end of the first quarter of 2014, CEC guaranteed almost $17.5 billion of CEOC's debt, including the BOKF (and UMB) Notes.  (Sambur Decl. ¶ 11.)  At the time, CEC had only $174.6 million in cash, cash equivalents, and short term investments, and its market capitalization was approximately $2.6 billion.  (*Id.*)

## III.     **The Challenged Transactions**

The Motion challenges three transactions, undertaken respectively in May and August 2014, each of which independently resulted in a release of the Guarantee by the terms of the Indenture.   As described further below—and contrary to Plaintiff's assertion—these transactions provided substantial benefits to CEOC, including more than $2 billion in cash and debt relief, were undertaken as part of a broader, sustained effort over many years to improve CEOC's financial condition, and provided CEOC with the means to pay more than $1.7 billion to its creditors, including holders of BOKF (and UMB) Notes.  (Sambur Decl. ¶ 8.)

### A.     **The May 2014 5% Stock Sale**

On May 6, 2014, CEC and CEOC announced a transaction (the "B-7 Transaction") designed to repay CEOC's near-term maturities.  (Sambur Decl. ¶ 12.)  Under the B-7 Transaction, CEOC obtained $1.75 billion of new term loans, which were used to repay, among other things, nearly all outstanding notes that were set to mature before 2016.  (*Id.*)  As a condition of the new financing, however, the lenders who negotiated the transaction demanded

that CEC exercise its right under various indentures—including the BOKF and UMB Indentures—to release CEC's parent guarantee.  (*Id.* ¶ 14.)  Because of the benefits to CEOC of obtaining the new loans, CEC and CEOC assented to the lenders' conditions.  (*Id.*)

Accordingly, on May 5, 2014, CEC sold 5% of CEOC's stock to three unaffiliated investors for a total of $6.15 million (the "5% Stock Sale").  (*Id.* ¶ 15.)  The sale did not modify the Indenture, and the Indenture did not require any consent by the BOKF (or UMB) Holders. (*Id.*)  As a consequence of the sale, CEOC was no longer a "Wholly Owned Subsidiary" of CEC, and the Guarantee was released.  (*See id.*)  Following this transaction, under Rule 3-10 and the Indenture, CEOC began to file its own audited financial statements with the SEC.  (*Id.*)

### B.    The May 2014 6% Stock Transfer

Separately, on May 30, 2014, CEOC executed a transaction (the "6% Stock Transfer") in which it transferred approximately 6% of its stock to an employee benefit plan, causing CEC to thereafter own approximately 89% of CEOC.  (Sambur Decl. ¶ 16.)  Plaintiff claims this was an inappropriate "deal among the issuer and its insiders."  (BOKF Br. 24.)  In fact, however, the 6% Stock Transfer allowed CEOC to disperse ownership of its stock and thus facilitated the potential creation of a liquid and tradable equity currency for CEOC that could be used in future capital markets transactions and debt-for-equity exchanges.  (Sambur Decl. ¶ 16.)

As with the 5% Stock Sale, the 6% Stock Transfer did not modify the Indenture, and the Indenture required no consent by the BOKF (or UMB) Holders.  (*Id.* ¶ 17.)  The transfer independently resulted in the release of the Guarantee under Section 12.02(c)(i) of the Indenture (assuming, contrary to fact and law, that the 5% Stock Sale had not occurred or was ineffective).

### C.    The August 2014 Unsecured Notes Transaction

On August 12, 2014, CEOC, CEC, and certain noteholders (the "Participating Noteholders") representing a majority of CEOC's 6.50% Senior Notes due 2016 and 5.75%

Senior Notes due 2017 (together, the "2016 and 2017 Notes") entered into a Note Purchase and Support Agreement.   (Sambur Decl. ¶ 18.)   The transaction (the "August Unsecured Notes Transaction") was completed on August 22, 2014.   (*Id.*)   Under the transaction, the Participating Noteholders transferred to CEC and CEOC approximately $155.4 million of the 2016 and 2017 Notes and consented to amendments to the indentures governing the 2016 and 2017 Notes to remove CEC's guarantee on the 2016 and 2017 Notes.   (*Id.*)   In total, the transaction reduced CEOC's outstanding debt by $582 million, at a cost to CEOC of only $78 million.   (*Id.*)

As a consequence of the August Unsecured Notes Transaction, the Guarantee was released under the last paragraph of Section 12.02(c) of the Indenture.   That is because the transaction provided an independent basis for the release of CEC's guarantee of the 2016 and 2017 Notes, which were the last outstanding "Existing Notes" defined in the Indenture, as CEC's guarantee of the other "Existing Notes" had already been discharged or released.   (*Id.* ¶ 20.)

## IV.   **The Restructuring Support Agreement**

Over 2014, CEC and CEOC took action to enhance CEOC's overall financial condition and reposition CEOC for an improved gaming market.   (Sambur Decl. ¶ 21.)   As a result of the transactions and efforts discussed above, CEOC increased its cash reserves and decreased its debts.   (*Id.*)   CEOC had approximately $1.2 billion in liquidity at the end of the first quarter of 2014 and $2.2 billion at the end of the second quarter.   (*Id.*)   It was paying all of its debts when due and was in compliance with its debt covenants, and CEC had an unqualified opinion on its consolidated financial statements.   (*Id.*)

In September 2014, CEC announced that CEC and CEOC had executed non-disclosure agreements with certain senior creditors of CEOC.   (*Id.* ¶ 22.)   CEC had earlier attempted to engage creditor groups that included holders of CEOC's second lien debt—a constituency that included the BOKF Holders—but discussions eventually broke down.   (*Id.*)

13

CEC expects discovery to establish that CEOC's negotiations with its creditors were hampered by the fact that some of the large institutional investors that held its bonds also held positions in credit default swaps on CEOC and would have benefitted from a CEOC default. (Indeed, according to published reports, as of early 2015 CDS contracts outstanding on CEOC totaled more than $25 billion, the largest amount of any U.S. non-banking corporation. (*Id.*))

Despite these challenges, negotiations with CEOC's senior secured creditors led to a Restructuring Support and Forbearance Agreement (the "RSA"), originally dated December 19, 2014. (*Id.* ¶ 23.) The RSA sets forth the economic terms of a proposed plan for the reorganization of CEOC and the other debtor-affiliates. (*Id.*) If the proposed plan is approved, second lien noteholders will receive equity in the reorganized company. (*Id.*) Earlier this week, a deal was announced with holders of a significant amount of second lien CEOC debt that would, if it is supported by more than half of the relevant noteholders, provide a substantial improvement in their recovery. (*Id.* ¶ 25.)

The RSA is unrelated to the transactions that Plaintiff challenges here. In sharp contrast to the situation in *Marblegate*, where the transactions at issue were integral to a restructuring support agreement and undertaken pursuant to that agreement, the challenged transactions here were completed months before the RSA was entered into, and none of those transactions was undertaken pursuant to that agreement. (*Id.* ¶ 24.) Likewise—and again in contrast to *Marblegate*—none of the B-7 lenders at whose behest the CEC guarantee was released in May 2014 was even a party to the RSA. (*Id.*)

## APPLICABLE LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment may be granted "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment

as a matter of law.'" *W. Heritage Ins. Co.* v. *Century Sur. Co.*, 32 F. Supp. 3d 443, 448 (S.D.N.Y. 2014) (Scheindlin, J.) (quoting *Rivera* v. *Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 692 (2d Cir. 2012)).  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 448-49 (quoting *Windsor* v. *United States*, 699 F.3d 169, 192 (2d Cir. 2012)).  The Court may also deny or defer ruling on a motion for summary judgment under Fed. R. Civ. P. 56(d) if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."

## ARGUMENT

**I.    The Undisputed Facts Do Not Demonstrate That the BOKF Holders Were "Impaired" Under the Decisions in *Marblegate*, *MeehanCombs*, and *Federated***

Under *Marblegate*, *MeehanCombs*, and *Federated*, the Motion should be denied because Plaintiff has not shown that the BOKF Holders' right to receive payment has been practically "impaired" under Section 316(b).  *First*, Plaintiff has failed to demonstrate that there has been an "out-of-court restructuring" of the BOKF Holders' Notes.  *Second*, the undisputed facts do not show that the BOKF Holders were adversely affected by the challenged transactions. *Third*, there is no basis to find that the BOKF Holders' right to payment was "impaired" by the release of the Guarantee where, as here, the Guarantee did not entail credit support for the Notes.

### A.    There Are Material Factual Disputes Concerning Whether There Was an "Out-of-Court Restructuring" of the Notes

Plaintiff contends that "there is no need to consider whether any out-of court restructuring (or restructurings) occurred" (BOKF Br. 18), but that contention is contrary to the cases it relies upon, as well as a tacit concession that it cannot make the requisite showing on the current record.  Plaintiff contends in the alternative that the challenged transactions constituted an out-of-court "restructuring" either "collectively" or individually, but, as explained further

below, the standard Plaintiff urges is untethered from the cases, market practice, and any legitimate policy, and the undisputed facts do not reflect a "restructuring" in any workable sense.

>   1.   **Under the Cases on Which Plaintiff Relies, the Court Must Assess Whether There Was an "Out-of-Court Restructuring" of the Holders' Notes**

Contrary to Plaintiff's argument, it cannot prevail on the Motion without showing that each of the challenged transactions was a "restructuring" of the BOKF Notes.

In *Marblegate I*, the plaintiffs sought to enjoin a proposed restructuring pursuant to a Restructuring Support Agreement that contemplated two paths to a reorganization of the financially distressed corporate defendants: (1) an exchange offer in which noteholders would exchange their notes for equity, amounting to approximately a 33% recovery of value; or (2) if unanimous support of the creditors and participation in the exchange offer could not be obtained, an "Intercompany Sale" in which secured lenders would foreclose on "substantially all" of the defendants' assets, and a parent guarantee on the plaintiffs' notes would be removed, leaving no source for any recovery on the plaintiffs' notes.  2014 WL 7399041, at *6-7.  The RSA had all of the hallmarks of what would take place in a judicial bankruptcy setting—a wholesale reconstitution of the defendants' capital structure—but as the court explained, bankruptcy was not "a viable option or a credible threat" because the defendants would have lost federal funding, which provided the vast majority of their revenue.  *Id.* at *1, 21.

The court in *Marblegate rejected* the proposition that releasing a guarantee invariably violates Section 316(b).  To the contrary, the court explained that "[o]ne can imagine contexts where those clauses [permitting the guarantee to be released] would be invoked without implicating Section 316(b)."  *Id.* at *20.  The court similarly reasoned that, while "releases of guarantees through automatic or majority-vote provisions are commonplace in the bond market,"

it "would not have to condemn widespread market practice in order to find that the release of the Parent Guarantee violates the [TIA] in this context." *Id.* at \*17 n.14.

The court recognized the danger of permitting noteholders "to attack any transaction based on a standardless 'ability to receive payment test'" that could require evaluating "whether a proposed investment in a new widget factory is likely to erode an issuer's financial stability and thus negatively affect a bondholder's ability to receive payment." *Id.* at \*18. Instead, based in part on indications in the legislative history that the court believed reflected an intent "to force bond restructurings into bankruptcy" absent unanimous noteholder consent, the court adopted a "limiting principle": that in the absence of explicit modifications to "core term[s]" of an indenture, the right to payment under Section 316(b) is violated "*only*" in the case of "an involuntary debt restructuring." *Id.* at \*18-19 (emphasis added).

On the facts presented in that case, the *Marblegate* court concluded on plaintiffs' motion for a preliminary injunction that there was "little question" that there was an "out-of-court restructuring," since there was a Restructuring Support Agreement that explained the company was engaged in a "restructuring," and the exchange offering circular stated that it would "restructure" the defendants' indebtedness. *Id.* at \*19. In a subsequent decision, following the closing of the transaction and having converted the earlier hearing into a trial on the merits, the court explained that although the Intercompany Sale did "not formally alter [plaintiffs'] right to payment on their Notes, it was unequivocally designed to ensure that they would receive no payment if they dissented"—leaving them with a "Hobson's choice: take the common stock, or take nothing." *Marblegate II*, 2015 WL 3867643, at \*2, 13.

Both *MeehanCombs* and *Federated* are in accord that there is no violation of Section 316(b) absent an amendment of a core term or a restructuring. In *MeehanCombs*, this Court followed *Marblegate I*, and—accepting the plaintiffs' allegations as true at the motion-to-

dismiss stage that, among other things, the August Unsecured Notes Transaction was part of a "plan . . . to push CEOC into bankruptcy"—concluded that the August Unsecured Notes Transaction constituted an "out-of-court debt restructuring" of the plaintiffs' notes.   *See MeehanCombs Global Credit Opportunities Funds, LP* v. *Caesars Entm't Corp.*, Nos. 14-cv-7091 (SAS), 14-cv-7973 (SAS), 2015 WL 221055, at *2, 5 (S.D.N.Y. Jan. 15, 2015).   Likewise, in *Federated*, the court enjoined a proposed transaction that "clearly state[d]" that it was "part of a corporate and financial restructuring of the [issuer] and its subsidiaries" in which virtually all of the issuer's assets would be transferred to other entities and the guarantee of the plaintiffs' notes would be eliminated.   *Federated Strategic Income Fund* v. *Mechala Grp. Jamaica Ltd.*, No. 99-cv-10517 (HB), 1999 WL 993648, at *4 (S.D.N.Y. Nov. 2, 1999).

Plaintiff contends that the *Marblegate* court was "concerned with opening the floodgates to TIA claims involving 'ordinary' corporate actions that might have only minimal indirect effect on holders," and argues that the rationale is irrelevant here because the challenged transactions are not "ordinary corporate actions that may have only minimal or indirect effect" on the BOKF Holders but, rather, would "directly and completely eliminate an important and valuable legal right."  (BOKF Br. 17-18.)  But there is no support in *Marblegate* or any of the other cases Plaintiff cites—much less the text of the TIA—for the distinction that Plaintiff seeks to draw, or for the proposition that any corporate action that neither amends the core economic terms of an indenture nor constitutes a "restructuring" can nevertheless be held to violate the TIA.  Nor is there any content to the "ordinary corporate actions" distinction Plaintiff attempts to create.  Adopting such a test would make it impossible to administer the TIA, or for issuers and creditors to understand their rights and obligations.  On the contrary, the courts Plaintiff cites concluded that the challenged transactions violated the TIA only after concluding that the transactions—involving both the release of a guarantee and actions that allegedly eliminated

18

plaintiffs' practical ability to recover—constituted a "restructuring."   Indeed, the very purpose of the "limiting principle" that the *Marblegate* court adopted was to draw lines between transactions that violate the statute and those that do not.

### 2.   Plaintiff Fails to Demonstrate That the Challenged Transactions "Collectively" Constituted an "Out-of-Court Restructuring"

Plaintiff argues in the alternative that the challenged transactions "collectively constitute a restructuring" because their "practical effect" was "too harsh and oppressive for them to be anything but a prohibited restructuring."  (BOKF Br. 18, 20.)  This argument is circular and conclusory, is contrary to the cases and market understanding of the term "restructuring," and, if accepted, would result in an entirely unworkable standard.

Both academic literature and the market generally understand the term "restructuring" in the context of debt to refer to transactions that—in contrast to those here—involve a change in the material economic terms of the underlying instrument.  *See, e.g.*, Stuart C. Gilson, *Bankruptcy, Boards, Banks, and Blockholders: Evidence on Changes in Corporate Ownership and Control When Firms Default*, 27 J. Fin. Econ. 355, 357 (1990) (defining debt restructuring as "a transaction in which the firm's debt contracts are amended on one of the following terms: (i) promised interest or principal payments on the debt are reduced; (ii) the debt's maturity is extended; or (iii) creditors are given equity securities in the firm").[2]  Likewise, the International Swaps and Derivatives Association has, for over a decade, defined

---

[2]   *See also* Edith S. Hotchkiss, et al., *Bankruptcy and the Resolution of Financial Distress*, in 2 *Handbook of Empirical Corporate Finance* 235, 249 (Espen Eckbo ed., 2008) (defining debt restructuring as "a transaction in which an existing debt contract is replaced by a new debt contract with a reduction in the required interest or principal payments or an extension of maturity, or exchanged for common stock or securities convertible into common stock"); El-Waleed A. Hamour, *Debt Restructuring in OIC Countries*, 21 J. Econ. Cooperation 57, 58 (2000) (defining debt restructuring as "any action by a creditor that officially alters the terms established for repayment in a manner that provides a reduction in the near-term debt service obligations" (quoting Thomas M. Klein, *External Debt Management: An Introduction* 208 (World Bank Technical Paper No. 245 1994)) (internal quotation marks omitted)).

"restructuring" to refer only to cases in which there are specified changes to an underlying obligation (such as changes in interest, principal, or maturity date) that are "not expressly provided for under [its] terms." (*See* Adler Decl. Exs. B and C § 4.7 (definitions of "Restructuring" in ISDA Credit Derivatives Definitions as of 2003 and 2014).) In *Marblegate*, for example, creditors were put in a position where they had no choice but to accept modifications of their debt instruments that constituted a restructuring under this definition.

The evidence here does not show that any of the challenged transactions, much less all of them, constituted a restructuring of the BOKF Notes under any credible definition. As discussed above, none of them involved changing the Indenture or deprived the BOKF Holders of any ability to recover on their Notes. And a definition of "restructuring" beyond this well-settled meaning would call into question under Section 316(b) countless routine corporate acts—for example, taking on senior debt; selling assets; paying dividends; undertaking an acquisition; embarking on a new business venture; or refinancing debt senior to the holders' debt. Any of these activities can have the same "practical effect" that Plaintiff alleges exists here because they can lessen or even eliminate the issuer's ability to repay debtholders' claims.

### 3.   Plaintiff Fails to Demonstrate That the Challenged Transactions Were Individual "Out-of-Court Restructurings"

Plaintiff alternatively contends that the challenged transactions were each out-of-court "restructurings." (BOKF Br. 20.) Plaintiff makes no effort to define what properly constitutes a debt "restructuring" and instead simply offers a series of selectively-chosen quotations and conclusory arguments. As discussed below, the undisputed facts do not demonstrate that *any* of the challenged transactions—much less all of them—was a restructuring.

*First*, Plaintiff points to documents in which, it contends, "CEC, CEOC, and CEC Advisors" allegedly characterized the challenged transactions as "restructurings." (BOKF Br.

20-22.)  In fact, none of the documents indicate that *any* of the challenged transactions were regarded as "restructurings" of the BOKF Notes under the TIA or for any other purpose.  Thus, for example, Plaintiff points to language in the First Day Memorandum ("FDM") filed on behalf of CEOC that refers broadly to "45 asset sales and capital markets transactions" having been undertaken "in an effort to restructure and manage" the debt of "Caesars."  (BOKF Br. 21; Silfen Decl. Ex. A at 2, 31.)  But this pleading was filed by *CEOC*, not CEC; the quotation refers to "restructur[ing] *and manag[ing]*" debt, and does not characterize each of the 45 transactions at issue as "restructurings"; and, contrary to Plaintiff's claim that "[e]ach of the [challenged] [t]ransactions" was described in the FDM (BOKF Br. 21), there is no reference to the 6% Stock Transfer, and the 5% Stock Sale is mentioned only as part of a discussion of the B-7 Transaction (*see* Silfen Decl. Ex. A at 35).  Plaintiff cites nothing in the FDM indicating that CEC ever believed that *the BOKF Notes* were being "restructured."

        The other documents Plaintiff cites similarly do not show that CEC ever characterized any of the challenged transactions as restructurings.  Thus, Plaintiff cites an amendment to a transaction agreement effectuating a sale of certain CEOC properties that does not describe a *debt* restructuring of any sort (as opposed to an organizational restructuring resulting from the sale), let alone a restructuring of the *BOKF Holders'* debt.  (*See* BOKF SMF ¶ 38; Silfen Decl. Ex. F, Ex 2.1 thereto, at 1.)  Likewise, the first of two engagement letters with CEC's financial advisor merely refers to advice on "financial and strategic alternatives" and does not describe a single transaction, much less the challenged transactions (Silfen Decl. Ex. D), and the second letter was effective May 7, 2014—two days *after* the 5% Stock Sale—and is similarly devoid of any reference to any particular transaction (*see* Silfen Decl. Ex. E).  In any event, merely engaging an advisor in contemplation of "restructuring" some aspect of a company's organizational or capital structure does not establish that the *Holders'* debt has been restructured.

*Second*, Plaintiff's argument that the 5% Stock Sale was a restructuring because it was done in connection with the B-7 Transaction is meritless.  (*See* BOKF Br. 23-24.)  Plaintiff points to a statement in *Marblegate I* that the release of the parent guarantee in that case would "allow[] one class of creditors, with company assistance, to force a debt reorganization onto another class of creditors."  2014 WL 7399041, at *20 n.17.  But the snippet Plaintiff quotes ignores the central features of the transaction at issue in *Marblegate*—that it was designed to induce consent to the defendants' exchange offer, and that it involved, in addition to the release of a guarantee, the disposition of all of the issuer's assets, leaving it an empty shell.  *See Marblegate II*, 2015 WL 3867643, at *2.  The *Marblegate* court itself made clear that the release of the guarantee on the plaintiffs' notes could be legitimately invoked by those same secured creditors "in a genuinely adversarial attempt to safeguard some recovery against a company they have come to regard as unable to pay its debts."  *Marblegate I*, 2014 WL 7399041, at *20.  If anything, that is what occurred in the B-7 Transaction:  Third parties were willing to lend CEOC $1.75 billion in new term loans in order to pay down junior debt only if CEC exercised its rights to release its guarantee on other creditors' debt, including the BOKF (and UMB) Notes.  In short, the undisputed facts show nothing more than a routine corporate transaction—one undertaken in an effort to *improve* CEOC's financial condition—that included the release of a guarantee on the BOKF Holders' debt by means permitted by the Indenture.

*Third*, Plaintiff argues that the 6% Stock Transfer is an "impermissible restructuring for the same reason that the 5% Stock Sale is one" because it is "indistinguishable . . . both in its impairing effect and the mechanism by which that effect was accomplished."  (BOKF Br. 24.)  Plaintiff provides no explanation for that conclusory assertion, nor could it, since the "mechanism" of the 6% Stock Transfer bears no resemblance to that earlier transaction.

Plaintiff also contends that the 6% Stock Transfer involved purported "insider machinations" of the sort that were of supposed concern to the SEC prior to the passage of the TIA.  (BOKF Br. 25 (citing Mark J. Roe, *The Voting Prohibition in Bond Workouts*, 97 Yale L.J. 232, 234 (1987)).)  In fact, the SEC's concern was that "insiders could gain control of a bond issue and destroy it for the insiders' benefit" by using (or acquiring) holdings *in the company's bonds* to modify the governing payment terms—because "[a]s long as the insiders owned a greater percentage of the [company's] stock than of the bonds, forgiveness of bond repayment would be profitable for them."  Roe, 97 Yale L.J. at 251.  But Plaintiff does not contend, much less offer evidence, that any of the recipients of the 6% Stock Transfer held any of the BOKF Notes (or any CEOC notes), much less that they used any such holdings to modify the Indenture, or that they sought to do so because the benefit of their stock holdings would outstrip losses on the notes.  Plaintiff's theory apparently could call into question any number of grants of stock to employee benefit plans.  And, by Plaintiff's logic, a claim under Section 316(b) could be brought years after the fact any time an issuer transfers stock to its employees as part of a performance incentive plan, provided simply that the company had issued debt under an indenture providing for the release of a guarantee if the issuer is no longer wholly owned by the guarantor.

*Finally*, Plaintiff's contention that *MeehanCombs* and *Marblegate* require this Court to conclude that the August Unsecured Notes Transaction constituted a "restructuring" of the Holders' Notes is similarly deficient.  To start, and as Plaintiff concedes, nothing about that transaction modified any of the terms of the Indenture at issue here—something that was not the case in *MeehanCombs*.  Plaintiff contends that this fundamental difference is "without legal significance."  (BOKF Br. 23.)  But as discussed above, the fact-intensive nature of the *Marblegate* decisions show otherwise, and this Court's decision on CEC's motion to dismiss in *MeehanCombs* necessarily accepted the plaintiffs' allegations as true in finding that the August

23

transaction was a debt restructuring. None of these decisions holds that the mere release of a guarantee under an indenture's terms constitutes a "restructuring" of the underlying notes.

**B.    The Undisputed Facts Do Not Establish That the BOKF Holders Were Practically "Impaired" by the Challenged Transactions**

While recognizing that it must demonstrate that the "effect" of the release of the Guarantee was to "impair" the BOKF Holders' "practical ability to receive payment" (BOKF Br. 10), Plaintiff offers no evidence to establish that CEOC was insolvent or unable to repay its debts at the time of the challenged transactions. Indeed, as discussed above (p. 13), the evidence is to the contrary. At or about the time of the challenged transactions, CEOC had billions of dollars in liquidity, was in compliance with debt covenants, and was paying its debts when due, and CEC's consolidated financial statements, including CEOC, had an unqualified opinion from its auditors. (Sambur Decl. ¶ 21.) In any event, determining whether a company is insolvent prior to a bankruptcy filing is inherently an issue of fact unsuited to summary judgment. *See, e.g.*, *In re Artha Mgmt., Inc.*, 174 B.R. 671, 679 (Bankr. S.D.N.Y. 1994) ("Proving valuation for the purposes of insolvency at the time of a transfer is a fact specific inquiry such that summary judgment on the issue is inappropriate"). As the Second Circuit has explained, "a finding on the issue of insolvency often depends upon the factual inferences and conclusions of expert witnesses which, when controverted, do not lend themselves readily to summary judgment resolution," *Klein* v. *Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979), and "[w]henever possible, a determination of insolvency should be based on seasonable appraisals or expert testimony," *In re Roblin Indus., Inc.*, 78 F.3d 30, 38 (2d Cir. 1996).

Apparently recognizing that it is unable to establish on the Motion that CEOC was insolvent at the time of the challenged transactions, Plaintiff attempts to establish an impairment of the Holders' rights through a sleight of hand—by claiming that it does not need to

show that CEOC was insolvent "at the time the termination occur[red]," but simply that the Guarantee was released *at some point* and that CEOC *later* became insolvent.  (BOKF Br. 15.)

        As explained below, there is not a single case that supports Plaintiff's proposed expansion of Section 316(b), and the rule it urges, if accepted, would result in an extraordinary and inappropriate expansion of liability under the TIA and yet another entirely impractical rule of liability.  In any event, it is far from clear on the record that the challenged transactions adversely affected the BOKF Holders *at all* or, as Plaintiff claims, that the Guarantee is their "sole practical recourse" and "last remaining avenue to recovery" under the notes.  (*Id.* at 13.)

### 1.    Plaintiff Must Establish CEOC's Insolvency at the Time of Each of the Challenged Transactions

        Contrary to Plaintiff's contention, there is nothing in *Marblegate*, *MeehanCombs*, or *Federated* that suggests that this Court can find a violation of Section 316(b) without, at a minimum, finding that CEOC was insolvent at the time or as a result of the challenged transactions.  On the contrary, the courts in all three cases found a violation of the TIA only in the context of a transaction that constituted a debt "restructuring" involving a contemporaneously insolvent issuer (or, in *MeehanCombs*, allegations as to both), and none of them suggest that Plaintiff can prevail without establishing both—much less *either*—of these things.

        Thus, in *Federated*, the Court enjoined a tender offer undertaken as part of a restructuring that would have resulted in the "elimination of the [issuer's] guarantors and the simultaneous disposition of all meaningful assets"—which, "[t]aken together," would have impaired the noteholders' rights because they would be unable to "seek recourse from either the asssetless defendant or from the discharged guarantors."  1999 WL 993648, at *7.  Likewise, in *MeehanCombs*, this Court concluded that it was "plausible" on the basis of plaintiffs' allegations concerning the August Unsecured Notes Transaction that they had been left with "an empty right

to assert a payment default *from an insolvent issuer*."  2015 WL 221055, at *5 (emphasis added).

The plaintiffs in *MeehanCombs* and *Danner* had specifically alleged that CEOC was insolvent *at the time* of that transaction—allegations that the Court necessarily accepted as true on a motion to dismiss.  *See* Complaint for Declaratory Relief and Damages in *MeehanCombs* v. *Caesars Entm't Corp.*, dated Sept. 3, 2014, No. 14-cv-7091-SAS, Dkt. No. 1 (the "First MeehanCombs Complaint") at ¶ 56 (alleging that CEOC was "insolvent" as of March 2014); Class Action Complaint in *Danner* v. *Caesars Entm't Corp.*, dated Oct. 2, 2014, No. 14-cv-7973-SAS, Dkt. No. 1 (the "First Danner Complaint") at ¶¶ 42, 43 (same).  Likewise, as Plaintiff concedes, *Marblegate* "analyzed attempts to strip a guarantee in the context of *an insolvent issuer*." (BOKF Br. 11 (emphasis added).)  There, as the court concluded, elimination of the parent guarantee was "inextricably intertwined" with a sale of "substantially all" of the issuer's assets, which would "operate[], in context, to effect a complete impairment of dissenters' right to receive payment." *Marblegate I*, 2014 WL 7399041, at *7, 15, 20; *see also Marblegate II*, 2015 WL 3867643, at *1 (noting that noteholders who dissented from the Restructuring Support Agreement would "be left with no assets as security for [their] claims").

   The implications of Plaintiff's novel theory that a transaction can violate the TIA if the issuer *subsequently* becomes insolvent demonstrate its absurdity.  Under its theory, if an issuer becomes insolvent at *some* point, *earlier* corporate activities can then support a claim under Section 316(b) so long as the plaintiff can allege that those earlier activities impaired the holders' ability to receive payment upon maturity.  That would entail retroactively exposing countless routine transactions that companies undertake without the unanimous consent of their creditors—such as raising senior debt or other new funds; exchange offers for existing debt; ordinary sales of assets; or new investments—as potential violations of the TIA long after the fact, even if the issuer was able to repay the debt at issue at the time that they occurred.  The

result would be precisely the "untrammeled judicial intrusion into ordinary business practice" that the *Marblegate* court sought to avoid.  *See Marblegate I*, 2014 WL 7399041, at *19.

### 2. In Any Event, Plaintiff Fails to Show Any Adverse Impact on the BOKF Holders' Practical Ability to Receive Payment

Even if Plaintiff did not need to show that CEOC was insolvent at the time of the challenged transactions, it has nonetheless failed to demonstrate that there is no genuine issue of fact concerning its contention that the "*effect*" of the challenged conduct impaired the BOKF Holders' "*practical* ability to receive payment" (BOKF Br. 10 (emphasis in original).)

*First*, it is far from clear that the Guarantee, even before it was released in May 2014, was a realistic source of recovery.  At the time, CEC guaranteed over $17 billion of CEOC's debt—far more than its $174.6 million in cash, cash equivalents, and short term investments, or $2.6 billion market capitalization.  (Sambur Decl. ¶ 11.)

On the other hand, there is substantial evidence that any diminution in the prospect of repayment resulting from release of the Guarantee was actually offset by *improvements* in the prospect of repayment by virtue of enhancements to CEOC's financial condition.  In particular, the B-7 Transaction that precipitated the 5% Stock Sale allowed CEOC to pay debts maturing before 2016 and provided relief on its debt covenants.  (*See id.* ¶¶ 12-13.) Likewise, the 6% Stock Transfer facilitated the listing of CEOC stock on an exchange, with the potential to create a liquid and tradable equity currency for CEOC to enable future capital markets transactions and debt-for-equity exchanges (*id.* ¶ 16), while the August Unsecured Notes Transaction resulted in a $582 million reduction in CEOC's debt (*id.* ¶ 18).

*Second*, Plaintiff offers no support for its claim that the Guarantee is the BOKF Holders' "sole practical recourse," and that loss of the Guarantee would "destroy any remaining prospect of meaningful recovery."  (BOKF Br. 2; *see also id.* at 12).)   Indeed, UMB

acknowledges that the plan contemplated by the RSA is merely a "proposed" one and that there is "no certainty" regarding the recovery that the UMB Holders may ultimately receive.  (UMB Br. 16.)  It is entirely possible that another plan will be presented to the Bankruptcy Court, with different distributions based on, among other things, different contributions by CEC (Sambur Decl. ¶ 26), and it is thus far from clear whether any of the BOKF Holders will receive more or less in the CEOC bankruptcy proceedings than through a claim under the Guarantee on CEC's limited resources.  Indeed, as noted, just days ago, a deal was announced with certain second lien noteholders that would, if it is supported by more than half of the relevant noteholders, provide the BOKF Holders with a substantial improvement in their recovery.  (*Id.* ¶ 25.)

### C.   The BOKF Holders Could Not Have Been "Impaired" By the Release of a Guarantee That Did Not Provide Credit Support for the Notes

Far from disputing that the Guarantee was never intended to provide credit support for the notes, Plaintiff does not contest it for purposes of the Motion.  (*See* BOKF Br. 14.)  That position, standing alone, requires denial of the Motion.

Establishing that the scope of the Guarantee encompassed credit support for the BOKF Notes is necessary in order for Plaintiff to prevail on its claim.  Indeed, that is exactly what BOKF pled in its complaint—that there was a "commitment" by CEC to "unequivocal[ly]" guarantee the BOKF Notes and that its "purpose" was to provide credit support for CEOC. (BOKF Complaint ¶¶ 1, 127.)  UMB likewise pled that the guarantee on the UMB Notes was designed to "reassur[e]" the Holders "that, in the event of CEOC's default or insolvency, their notes would be backed by the Guarantee and CEC's assets" (UMB Complaint ¶ 2).  BOKF does not provide any support for its contentions in its Motion (and neither does UMB in its motion).

The BOKF Holders' right to receive payment, however, could not have been "impaired" where, as here, the Guarantee had nothing to do with that right.  As discussed above

(*see supra* pp. 9-10), that fact is evident from the face of the Indenture, the testimony of a witness with personal knowledge of the issuance of the BOKF (and UMB) Notes, and the market's understanding.  (*See* Sambur Decl. ¶¶ 9-11; Gadsden Decl. ¶¶ 15-16.)

There is no support in the law for Plaintiff's contention that "the nature" of the Guarantee is "immaterial."  (BOKF Br. 14.)  The *Federated* court observed that the guarantee at issue "was obviously an investment consideration from the outset," 1999 WL 993648, at *7, and the *MeehanCombs* decision addressed complaints in which the plaintiffs had, like BOKF (and UMB), alleged that the guarantee provided credit support for the relevant notes.  *See* First MeehanCombs Complaint at 2 (alleging that guarantee was "critical credit support for the Notes"); First Danner Complaint ¶ 28 (alleging that removal of guarantee "gutted" the "irreducible core" of plaintiff's investment—the right to payment of the notes at issue).

Although *Marblegate I* declined to find that cautionary language in the relevant offering memorandum about the limited scope of the parent guarantee should be dispositive, there were two key differences:  First, one of the plaintiffs' representatives testified that he had not "accord[ed] [the language] much weight," 2014 WL 7399041, at *4, while here, Plaintiff does not dispute that the purpose and scope of the Guarantee was entirely understood by the BOKF Holders.  Second, the Court explained that while the plaintiffs "may have been warned that modifications were possible . . . they were not told that they could be forced to accept a wholesale abandonment of their right to receive payment," *id.* at *20—a finding contingent on the specific factual context, in which the court concluded that the plaintiffs were being coerced into agreeing to give up their rights as noteholders in exchange for the proposed equity.  *See id.* at *6-7.  Nothing in *Marblegate* suggests that the TIA can be violated where a guarantee can be released at any time precisely because it does not serve as a financial recourse to noteholders.

## II.    The BOKF Holders' Rights Were Not "Impaired" Under the TIA
## Because They Retained Their Legal Right to Payment Under the Indentures

In *MeehanCombs*, this Court declined to follow cases holding that Section 316(b)

protects only a noteholder's *legal* right—rather than its practical *ability*—to obtain payment.  *See*

2015 WL 221055, at *4-5.  The Court instead followed the reasoning of *Marblegate I*, in which

the court relied on legislative history to "confirm[] a broad reading" of the statute, on the basis of

its view that "the text of Section 316(b) lends itself to multiple interpretations."  *See* 2014 WL

7399041, at *16.  We respectfully submit, however, that this Court should revisit the issue.[3]

The Second Circuit has made clear that the language at issue in Section 316(b)

does not prohibit acts that might merely affect a holder's practical ability to receive payment.  In

*Greylock Global Opportunity Master Fund Ltd.* v. *Province of Mendoza*, No. 04-cv-7643 (HB),

2005 WL 289723 (S.D.N.Y. Feb. 8, 2005), the District Court reviewed an indenture that

contained language materially identical to that contained in Section 316(b), and concluded over

the plaintiff's challenge that the language did not require unanimous consent for proposed

amendments that would have eliminated covenants restricting the issuer's ability to incur liens

on its assets or revenues and to take on additional debt, and that would have revoked the issuer's

waiver of sovereign immunity.  *See id.* at *2, 4-5 & n.3.  The decision was appealed, and

although the TIA did not technically apply to the debt in question—because it had been issued by

a sovereign and was therefore exempt from the statute, *see* 15 U.S.C § 77ddd(a)(6)—the

defendant explained that the language of the indenture provision was in fact derived from

Section 316(b) and that the language had "never been construed to limit out-of-court debt

---

[3]    Reconsideration of this issue is not precluded by the "law of the case doctrine."  To begin with, the Court's prior ruling concerned the *MeehanCombs* and *Danner* proceedings, not *BOKF* (or *UMB*).  In any event, the doctrine is "discretionary" and "does not limit a court's power to reconsider its own decisions prior to final judgment."  *Sagendorf-Teal* v. *Cnty. of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996) (internal quotation marks omitted).

restructurings that do not change the basic payment terms of the debt or the right to sue for non-payment." *See* Brief of Defendant-Appellee, *Greylock Global Opportunity Master Fund Ltd.* v. *Province of Mendoza*, No. 05-1414-CV (2d Cir. Aug. 10, 2005), 2005 WL 6072067, at *23-24.

In a summary affirmance, the Second Circuit affirmed, holding that "the structure and plain language of the Indenture make clear" that "majority consent is sufficient to amend the terms of the Indenture except in four specified instances" and that the language in the indenture tracking Section 316(b) did not "create a fifth exception" that would "preclude . . . an amendment that might—*in some practical sense*—affect a bondholder's ability to recover payment." *Greylock Global Opportunity Master Fund Ltd.* v. *Province of Mendoza*, 162 F. App'x 85, 86-87 (2d Cir. 2006) (emphasis added).[4]   The Second Circuit's interpretation is consistent with other decisions holding or otherwise observing that Section 316(b) "applies to the holder's *legal* rights and not the holder's *practical* rights to the principal and interest itself." *In re Northwestern Corp.*, 313 B.R. 595, 600 (Bankr. D. Del. 2004) (emphasis in original).  *Accord Brady* v. *UBS Fin. Servs., Inc.*, 538 F.3d 1319, 1326 n.9 (10th Cir. 2008) (quoting *Northwestern* with approval); *Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago* v. *Bank of New York Mellon*, 914 F. Supp. 2d 422, 432 (S.D.N.Y. 2012) (citing *Northwestern* and dismissing Section 316(b) claim on ground that plaintiffs failed to respond to defendant's argument that Section 316(b) "only prevents non-consensual impairments to certificateholders' right to demand payment of interest and principal"), *aff'd in part and rev'd in part*, 775 F.3d 154 (2d Cir. 2014); *YRC Worldwide Inc.* v. *Deutsche Bank Trust Co. Americas*, No. 10-2106-JWL, 2010 WL 2680336, at *7 (D. Kan. July 1, 2010) (following *Northwestern*).

---

[4]   CEC recognizes this summary order is not controlling authority but respectfully submits that the Second Circuit's review of materially identical language to that contained in Section 316(b) is highly persuasive guidance.

Plaintiff's contention that the release of the Guarantee in a manner consistent with the terms of the Indenture violates Section 316(b) is also inconsistent with the historical understanding of the statute as merely "prohibiting majority bondholders from collusively agreeing to modify the bond's payment terms." *Bank of N.Y.* v. *First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010). As the courts have made clear, the provision prohibits "modification by majority securityholder vote of any core term of the indenture, i.e., one affecting a securityholder's right to receive payment of the principal of or interest on the indenture security on the due dates for such payments." *Upic & Co.* v. *Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 452 (S.D.N.Y. 1992). It is undisputed that no such modification occurred here.

An interpretation of Section 316(b) that applies to any action that affects a noteholder's "practical" ability to recover risks subjecting to judicial scrutiny ordinary corporate transactions such as raising new debt or selling assets. Overlaying this with the requirement that any "restructuring" without unanimous creditor support must take place in a judicial bankruptcy setting does not resolve this problem and, in fact, has the effect of forcing into bankruptcy (with the attendant disruption a bankruptcy filing entails) transactions that would usually be accomplished through out-of-court agreements with creditors and of providing even the smallest holdout with leverage to frustrate or block those efforts. Judge Failla noted precisely these "troubling implications" of her ruling in *Marblegate II*, as well as the problematic results of encouraging otherwise unnecessary bankruptcy filings. In light of the cases cited above and these acknowledged policy concerns, we respectfully submit that the Court should reconsider its ruling in *MeehanCombs* and hold that only changes to the core economic terms of a debt instrument can give rise to a claim under Section 316(b). Should the Court so hold, that would

provide an independent and dispositive basis upon which to deny the Motion.[5]

### III. The Motion Should Be Denied Because CEC Has Been Prevented From Acquiring Discovery Essential to its Opposition to the Motion

Under Federal Rule of Civil Procedure 56(d), where a party opposing summary judgment has had insufficient opportunity to gather facts necessary to its opposition, it may defeat summary judgment by filing a declaration explaining (1) the information it seeks and how it will be obtained; (2) how a genuine issue of material fact will be raised by that information; (3) the efforts that have been made to obtain the information; and (4) why those efforts were unsuccessful. *Antonios A. Alevizopoulos and Assocs., Inc.* v. *Comcast Int'l Holdings, Inc.*, 100 F. Supp. 2d 178, 185 (S.D.N.Y. 2000) (Scheindlin, J.) (interpreting Fed. R. Civ. P. 56(f), the predecessor to Fed. R. Civ. P. 56(d)).  Summary judgment cannot and should not be granted unless the nonmoving party has "had the opportunity to discover information that is essential to [its] opposition." *Id.* at 182 (quoting *Trebor Sportswear Co., Inc.* v. *The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989)) (internal quotation marks omitted).  Thus, a court should defer its decision on summary judgment so long as the nonmoving party "reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion."  *Miller* v. *Wolpoff & Abramson, LLP*, 321 F.3d 292, 303 (2d Cir. 2003) (internal quotation marks omitted).

Here, CEC sought documents and depositions from 15 BOKF and UMB Holders on topics relating to CEC's guarantee and the challenged transactions.  Four moved to quash those subpoenas in Delaware.  Although that motion was denied two-and-a-half weeks ago, one of these Holders began its production just two days ago, while the others have produced nothing to date.  (Adler Decl. ¶ 17.)  Of the 11 other Holders CEC subpoenaed, thus far documents have

---

[5]   In addition to the arguments made in text that the Court should reconsider its decision on these issues in denying CEC's motions to dismiss in the *MeehanCombs* and *Danner* cases, CEC incorporates by reference the relevant arguments made in the memoranda in support of those motions. (*See* No. 14-cv-7091-SAS, Dkt. No. 17 at 13-15, Dkt. No. 23 at 5-8.)

been produced by only three BOKF Holders, only one of whom has completed its production. (*Id.* ¶¶ 7-9.)  A fourth BOKF Holder has produced no documents to date.  (*Id.* ¶ 9.)  Of the remainder—seven UMB Holders—five filed a pre-motion letter with the Court seeking to quash the subpoenas and/or for a protective order, and in a conference on July 23, 2015, the Court directed CEC to submit revised subpoenas to the Court.  (*Id.* ¶¶ 19-22.)  The other two informed CEC that they will not produce documents unless the UMB Holders who have sought to quash their subpoenas are unsuccessful.  (*Id.* ¶ 21.)  No depositions have taken place.  (*Id.* ¶¶ 18, 23.)

   The information sought is specifically directed at genuine issues of material fact—including, among other things, as to whether the challenged transactions were viewed as any sort of "restructuring" of the notes at issue here and in UMB's motion; whether the BOKF Holders' prospects for recovery under their notes were adversely affected by the challenged transactions, given when and at what price they acquired their holdings, or, instead, whether they may actually gain *more* in CEOC's bankruptcy; and whether the Holders believed the Guarantee provided genuine credit support, contradicting Plaintiff's contentions that the BOKF Holders' right to receive payment was "impaired" by release of the Guarantee.  (*Id.* ¶¶ 3-4.)  CEC has made good faith and diligent efforts to obtain information from recipients of the subpoenas.  (*Id.* ¶¶ 6-19.)  That the BOKF and UMB Holders have objected or otherwise delayed in producing documents should not be allowed to prejudice CEC's ability to defend against the present motions—motions brought in the midst of discovery and, in the case of UMB, less than two weeks after the filing of its complaint—that seek a finding of liability on more than $7 billion worth of claims.

## CONCLUSION

   For the reasons set forth above, the Motion should be denied.

Dated:  New York, New York
       July 24, 2015

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____/s/ Lewis R. Clayton_____

  Lewis R. Clayton
  Michael E. Gertzman
  Jonathan H. Hurwitz
  Ankush Khardori
  1285 Avenue of the Americas
  New York, New York 10019-6064
  (212) 373-3000
  lclayton@paulweiss.com

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

By: _____/s/ Eric Seiler_____

  Eric Seiler
  Philippe Adler
  Jason C. Rubinstein
  7 Times Square
  New York, New York 10036-6516
  (212) 833-1100

*Attorneys for Caesars Entertainment Corporation*