UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BOKF, N.A., solely in its capacity as successor Indenture Trustee for the 12.75% Second-Priority Senior Secured Notes due 2018,<br><br>        **Plaintiff,**<br><br>v.<br><br>**CAESARS ENTERTAINMENT CORPORATION,**<br><br>        **Defendant.** | Case No. 1:15-cv-01561 (SAS) |

**PLAINTIFF BOKF N.A.'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

                                                                                                                                           Page

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 1

      I.      THE TRUSTEE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE TERMINATION OF THE GUARANTEE WOULD MATERIALLY IMPAIR THE HOLDERS' RIGHT TO PAYMENT AT OR AFTER THE TIME OF MATURITY ............................................................ 1

            A.      CEC's Central Contention that Modification of the Indenture Is Required to Establish a Violation of Section 316(b) Is Wrong ................. 1

            B.      CEC's Speculation about the Future of CEOC and CEC Cannot Change the Conclusion that Removal of the Guarantee Would Impair Noteholders' Right to Receive Payment of the Notes Upon Maturity ......................................................................................................... 3

            C.      CEC Conflates Insolvency with Impairment to Argue that the Issuer Must be "Insolvent" at the Time of the Impairment of the Holders' Right to Payment ......................................................................... 5

            D.      CEC's Claim that There Is Not Any Impairment Because the Guarantee Provides No Credit Support Is Baseless ................................... 6

            E.      CEC Again Fails to Assert Any Valid Basis for Holding that Section 316(b) Protects Merely the Legal Right to Sue for Payment ........ 8

      II.     WHETHER A RESTRUCTURING HAS OCCURRED IS NEITHER MATERIAL NOR SUBJECT TO GENUINE DISPUTE .................................... 9

            A.      The TIA Does Not Contain a Restructuring Requirement, And Marblegate's Rationale for Applying One Here Is Inapplicable ............... 9

            B.      Even If a Restructuring Requirement Were Applicable, It Is Met Here ........................................................................................................... 10

                  1.      The Undisputed Facts Establish a Material Violation of Section 316(b) as a Matter of Law ............................................... 10

                  2.      A "Restructuring" Limitation Should Exclude Ordinary Business Transactions that Affect Holders Only Indirectly and Should Give Effect to the Broad Protections of Section 316(b) ............................................................................................ 11

                  3.      Each of the Guarantee Transactions Independently Establishes a Restructuring as a Matter of Law ........................... 12

      III.    RULE 56(D) DOES NOT PRECLUDE GRANT OF SUMMARY JUDGMENT ............................................................................................................ 15

CONCLUSION ............................................................................................................................. 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Brady v. UBS Fin. Servs., Inc.*,
   538 F.3d 1319 (10th Cir. 2008) ...............................................................................................9

*Cont'l Bank & Trust Co. of N. Y. v. First Nat'l Petroleum Trust*,
   67 F. Supp. 859 (D.RI. 1946)................................................................................................2, 5

*Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*,
   162 F. App'x 85 (2d Cir. 2006).................................................................................................9

*Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*,
   No. 04 Civ.7643, 2005 WL 289723 (S.D.N.Y. Feb. 8, 2005) ..................................................9

*JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*,
   264 F.3d 459 (4th Cir. 2001) ....................................................................................................4

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010)..................................................................................................7, 8

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp. ("Marblegate")*
   No. 14 Civ. 8584, 2014 WL 7399041 (S.D.N.Y. Dec. 30, 2014)....................2, 3, 9, 10, 11, 12

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp. ("Marblegate II")*
   No. 14 Civ. 8584, 2015 WL 3867643 (S.D.N.Y. June 23, 2015).........................2, 3, 10, 11, 12

*MeehanCombs Global Credit Opportunities Funds, LP, v. Caesars Entertainment Corp.*,Nos. 14 Civ.7091, 14 Civ.7973, 2015 WL 221055 (S.D.N.Y., Jan 15,
   2015) ....................................................................................................................3, 8, 9, 10, 11, 13

*Scheffer v. Civil Serv. Employees Ass'n, Local 828*,
   610 F.3d 782 (2d Cir. 2010).....................................................................................................4

*Upic & Co. v. Kinder-Care Learning Centers, Inc.*,
   793 F. Supp. 448 (S.D.N.Y. 1992)...........................................................................................4

*W.W.W. Associates, Inc. v. Giancontieri*,
   77 N.Y.2d 157 (N.Y. 1990) .....................................................................................................7

**Statutes**

11 U.S.C. § 1126...............................................................................................................................5

11 U.S.C. § 1129...............................................................................................................................5

15 U.S.C. § 77ppp(b) .......................................................................................................... passim

**Other Authorities**

17 C.F.R. § 210.3-10................................................................................................................ 7, 8[1]

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Trustee's Memorandum of Law in Support of Motion for Partial Summary Judgment, ECF 31.

**PRELIMINARY STATEMENT**

> *Notwithstanding any other provision of the indenture* to be qualified, *the right of any holder of any indenture security to receive payment* of the principal of and interest on such indenture security, *on or after the respective due dates* expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, *shall not be impaired* or affected without the consent of such holder . . . .

15 U.S.C. § 77ppp(b) (emphasis added).  CEC meticulously avoids quoting Section 316(b) *even once* throughout its 34-page opposition brief, ECF 44 ("Opp."), because the plain text of the statute is fatal to CEC's defenses.  In summary:

Modification of the indenture is not required to establish a TIA violation: impairment is prohibited "[n]otwithstanding" any indenture provisions that purport to allow it.  *See* Part I.A.[2]  Mere delay of the ability to receive payment that has become due is prohibited, regardless of potential additional recovery at some future date.  *See* Part I.B.  Impairment must be measured as of the due date, and not as of the time of the challenged transaction.  *See* Part I.C.  Section 316(b) protects not only the legal right to bring suit, but also the practical right to "receive payment."  *See* Part I.E.  Finally, the statute does not require that impairment result from a restructuring, *see* Part II.A., and even if it does, there was a restructuring here, *see* Parts II.B.1-3.

**ARGUMENT**

I.  **THE TRUSTEE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE TERMINATION OF THE GUARANTEE WOULD MATERIALLY IMPAIR THE HOLDERS' RIGHT TO PAYMENT AT OR AFTER THE TIME OF MATURITY**

    A.  **CEC's Central Contention that Modification of the Indenture Is Required to Establish a Violation of Section 316(b) Is Wrong**

The plain language of Section 316(b) unequivocally prohibits any non-consensual impairment of an indenture security holder's right to receive payment of principal and interest *or* a holder's right to sue to enforce such payment, regardless of the precise mechanism by which it

---

[2] All citations to "Part __" are to the sub-sections of the Argument section below.

is accomplished. *See* 15 U.S.C. § 77ppp(b); Trustee's moving brief, ECF 31 ("Br.") at 9, 10-13. The legislative history shows that Section 316(b) provides broad holder protections "even if the Act's authors did not anticipate precisely the mechanisms through which" the right may be impaired. *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.* ("*Marblegate II*"), No. 14 Civ. 8584, 2015 WL 3867643 at *11 (S.D.N.Y. June 23, 2015).[3]

CEC nevertheless permeates its Opposition with the faulty premise that impairment is only actionable under Section 316(b) if it is effected by an indenture amendment. *See* Opp. at 4 ("the challenged transactions did not involve any change to the governing Indenture."), 5 (the "guarantee was released in accordance with the terms of the Indenture"), 11 (same), 12-13 (none of the Guarantee Transactions were prohibited by the Indenture), 20 (none of the Guarantee Transactions amended the Indenture), 22 (same), 23 (same, twice), 32 (same, twice).[4]

The caselaw is fatal to CEC's argument. For example, the *Marblegate* court rejected CEC's premise not once, but twice. In *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.* ("*Marblegate*"), No. 14 Civ. 8584, 2014 WL 7399041 (S.D.N.Y. Dec. 30, 2014), the court observed that if the TIA protects only those rights set forth in an indenture, "the statute would prohibit nothing more than violations of the indenture contract, rendering it superfluous." *Id.* at *18. The court made no distinction between impairment through indenture amendment and automatic impairment: while impairment through indenture amendment "may run more squarely afoul" of the TIA, the automatic release of the parent guarantee pursuant to the existing indenture

---

[3] *Accord*, *Cont'l Bank & Trust Co. of N. Y. v. First Nat'l Petroleum Trust*, 67 F. Supp. 859, 871 (D.RI. 1946) (direction to trustee, permitted under the indenture, to postpone recovery of interest that has become due would violate Section 316(b)).

[4] CEC appears to retreat briefly from this position by stating that no amendment to core terms of the indenture is required *if* the transaction otherwise amounts to a restructuring, *see* Opp. at 3, 17-18, but quickly reverses itself and urges that a transaction must amend core terms to be considered a restructuring in the first place. *Id.* at 19-20.

terms also violates Section 316(b) where its *effect* is impairment of the holders' right to payment due to the issuer's inability to pay at maturity. *Id.* at *20 n.17.[5] *Marblegate II* was even more explicit in holding that "there is no reason to think that the [TIA] was targeted only at a particular method of restructuring—straightforward amendment"—as opposed to "an undesirable result" of allowing nonconsensual impairment. *Marblegate II*, 2015 WL 3867643 at *12. "The Trust Indenture Act, by protecting the individual's right to 'receive' the bargained-for principal and interest, is broad enough to prevent that result, whether carried out straightforwardly or circuitously." *Id.*

### B. CEC's Speculation about the Future of CEOC and CEC Cannot Change the Conclusion that Removal of the Guarantee Would Impair Noteholders's Right to Receive Payment of the Notes Upon Maturity

Section 316(b) prohibits "impairment" of the right to payment "*on or after the respective due dates* expressed in such indenture security." 15 U.S.C. § 77ppp(b) (emphasis added). CEOC's bankruptcy filing accelerated the due date to January 15, 2015, the date of that filing. SMF ¶¶ 12, 13, 71-75. The automatic stay provisions of Bankruptcy Code § 362 preclude the Noteholders from obtaining payment of the Notes, now due, from CEOC and its subsidiary guarantors who have also filed for bankruptcy. Accordingly, the Guarantee is the Noteholders' sole source of timely payment, and its purported elimination here would be, as it was in *Federated*, *Marblegate*, and *MeehanCombs,* a material impairment of the Noteholders' rights. *See* Br. at 10-13.

CEC nevertheless maintains that the purported elimination of the Guarantee does not impair the Noteholders' rights because (i) CEOC *may* some day propose a plan of reorganization

---

[5] Although it is immaterial for purposes of summary judgment, the Trustee does not admit, as CEC incorrectly contends (Opp. at 3), that the purported termination and release of the Guarantee are in fact consistent with the terms of the Indenture, specifically the language of Section 12(c).

3

that is more favorable to the Noteholders; and (ii) CEC *may* be unable to satisfy its obligations under the Guarantee in full in any event.  Opp. at 27-28.

Neither contention creates a genuine issue of material fact.  Most fundamentally, CEC's position ignores that the Noteholders are impaired by their inability to recover from CEC *now*, upon and after CEOC's bankruptcy and the resulting acceleration.  Section 316(b) prohibits any impairment of a holder's right to receive payment on or after the due date, including any postponement of that right, regardless of the precise mechanism (including acceleration) "under which the principal shall become due and owing."  *Upic & Co. v. Kinder-Care Learning Centers, Inc.*, 793 F. Supp. 448, 455 (S.D.N.Y. 1992) (failure to honor a repurchase option that accelerated the payment of principal amounts to impairment under Section 316(b)).  Therefore, the purported elimination of the Guarantee would remove the "safety net" that is now the Noteholders' sole currently available avenue for recovering principal that has become due. That constitutes impairment as a matter of law.

CEC's speculation as to some possible future ability of CEOC to repay the Notes cannot create a triable issue:  "[A] hypothetical possibility contingent on a series of future events whose likelihood of occurrence has not been demonstrated" cannot defeat summary judgment.  *Scheffer v. Civil Serv. Employees Ass'n, Local 828*, 610 F.3d 782, 791 (2d Cir. 2010) (granting summary judgment to plaintiffs because defendant could not refute existing injury to plaintiffs by reference to speculative benefit it may confer on plaintiffs in the future); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 466 (4th Cir. 2001) (speculation and conjecture as to how third parties may act do not defeat summary judgment).  Even putting aside the fact that CEOC cannot remedy retroactively the Noteholders' current inability to collect

principal, CEC's assertion is contingent upon a host of unknowns.[6]  CEC presents no evidence whatsoever to establish the likelihood of any of these events occurring.

CEC's second speculative assertion – that the Guarantee may now or in the future have less value because CEC may be unable to honor it in full – is equally immaterial.  Opp. at 27.  Every dollar recovered from CEC under the Guarantee would improve the Noteholders' position.  In any event, nothing in the TIA or the cases applying the TIA suggests that the holders' right to payment is protected *only* if it can be vindicated in full, and is not protected where it may lead to only partial recovery.  Such a limitation would withhold the TIA's protection from those holders whose issuers are distressed and who, therefore, need protection most.

> **C.    CEC Conflates Insolvency with Impairment to Argue that the Issuer Must be "Insolvent" at the Time of the Impairment of the Holders' Right to Payment**

Ignoring the unambiguous statutory language that prohibits *impairment*, CEC insists that the Trustee must establish not only the fact of the impairment, but also that CEOC was *insolvent at the time, or as a result, of each of the Guarantee Transactions*.  Opp. at 25.  This argument is a red herring.  Impairment is not limited only to situations when the issuer is rendered insolvent.  *See, e.g., Cont'l Bank & Trust Co. of N. Y.*, 67 F. Supp. at 863 (attempts to postpone payment of interest violate Section 316(b) where the issuer had sufficient income to pay interest when due).  To hold otherwise would permit impairment by issuers who are able but simply unwilling to pay.

Consistent with this principle, solvency, or more precisely, the issuer's ability to pay, becomes relevant only if it bears on impairment.  Here, the removal of the Guarantee would be an impairment because CEOC is protected by the automatic stay, regardless of whether it is able to pay.  *See* Part II.B.

---

[6] *E.g.*, (i) a submission of a revised plan (ii) with sufficient creditor support, in the form of an RSA or otherwise, (iii) that would provide for materially better treatment for second lien debt, (iv) that is also feasible based on CEOC's resources, (v) and that otherwise can and will be confirmed.  *See, e.g.,* 11 U.S.C. §§ 1126, 1129.

Moreover, impairment must be evaluated as of the date the payment becomes due. 15 U.S.C. § 77ppp(b) (prohibiting "impairment . . . . on or after the respective due date"). There is no *requirement* that the issuer be unable to pay at the time of the challenged transactions. Instead, the courts properly focus on whether a transaction resulted or would result in impairment of the right to receive payment *at a later* date, when payment would become due. Br. at 15.

CEC contends that it would be absurd to hold that a transaction can violate the TIA if the issuer subsequently becomes insolvent. Opp. at 26. But a transaction today that results in *impairment* of the ability to be paid at some later date is still prohibited. Contrary to CEC's dire predictions, there is no risk of retroactively exposing "countless routine transactions" as potential TIA violations "long after the fact." *Id.* at 26. It is not routine transactions that will trigger scrutiny, but rather those that do or are reasonably likely to impair holders. In any event, Congress balanced protection of security holders' rights against the need for market certainty by prohibiting impairment as of the due date, even if the due date would not occur for some time. The rationale for doing so is apparent: requiring an impairment to occur at the time of a challenged transaction would create an enormous loophole in Section 316(b). To put it in the factual context of this case, in CEC's view, a parent guarantor and a subsidiary issuer could avoid their obligation to certain holders simply by carefully timing the stripping of the guarantee to occur days or weeks before the issuer becomes unable to pay. The law does not countenance such elevation of form over substance to avoid Section 316(b) broad protection from any kind of noteholder impairment whatsoever.

> D. **CEC's Claim that There Is Not Any Impairment Because the Guarantee Provides No Credit Support Is Baseless**

CEC contends that the stripping of the Guarantee "could not have" impaired the

Noteholders' right to payment because, incredibly, the Guarantee "*had nothing to do with that right.*" Opp. at 28-29 (emphasis added).

First, CEC claims that the Guarantee was not intended to provide credit support because it "could be released through the sale of CEOC stock" pursuant to the terms of the Indenture. Opp. at 9. But this is just another instance of CEC's erroneous insistence that the TIA only applies if there is an explicit amendment to an indenture's terms. *See* Part I.A above.

CEC's second argument is that despite the plain language of the Indenture, the Guarantee provision means something other than what it says. To bolster this theory, CEC offers purported expert testimony and other extrinsic evidence to show that the true intent of the Guarantee was "merely to facilitate" filing by CEC and CEOC of combined audited financial statements pursuant to SEC Regulation S-X (17 C.F.R. Part 210), *see* Gadsden Declaration, ECF 42 ("Gadsden Decl.") ¶ 16, and not to provide "financial recourse for payment of the Notes," *id.* ¶ 7.

CEC's "evidence" is inadmissible and does not create issues of material fact because the Guarantee language in the Indenture is unambiguous: it provides for an unequivocal guarantee by CEC. *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("[A] written agreement that is complete, clear and unambiguous on its face must be interpreted according to the plain meaning of its terms without the aid of extrinsic evidence") (citations omitted). The alleged "purpose" of the Guarantee is irrelevant, and "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing," *Id.* at 466, *citing W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, (N.Y. 1990). While evidence as to custom and usage in the industry may sometimes be "considered, as needed, to show what the parties' specialized language is fairly presumed to have meant," it cannot be used to vary the parties' intent as

7

expressed in an unambiguous writing. *Law Debenture Trust Co. of New York*, 595 F.3d at 466-7 (citations omitted). Therefore, the proffered declaration is inadmissible for the purposes of modifying the unambiguous Guarantee language of the Indenture that on its face provides the Noteholders with immediate recourse against CEC. SMF ¶¶ 6, 7.

Moreover, the very Regulation S-X on which CEC relies is fatal to CEC's argument that the Guarantee does not "assure noteholders of payment." Opp. at 5. Regulation S-X permits consolidated reporting only when the parent's guarantee of the wholly-owned subsidiary obligations is "full and unconditional." 17 C.F.R. § 210.3-10(b)(2). CEC asserts that the phrase "full and unconditional" means something other than what it says and does not equate to credit support. *See* Gadsden Decl. ¶ 6 at n.6, ¶ 9 at n.9, ¶ 13. The reality, however, is the exact opposite – Regulation S-X defines a "full and unconditional" guarantee to mean a guarantee that *provides holders with immediate recourse against the parent guarantor*:

> A guarantee is "full and unconditional," if, when an issuer of a guaranteed security has failed to make a scheduled payment, *the guarantor is obligated to make the scheduled payment immediately and, if it doesn't, any holder of the guaranteed security may immediately bring suit directly against the guarantor for payment of all amounts due and payable.*

17 C.F.R. § 210.3-10(h)(2) (emphasis added). In other words, a fully enforceable guarantee that permits the holders to recover from the parent immediately upon non-payment by the subsidiary-issuer is the price for invoking Regulation S-X. It is impossible to take advantage of the regulation without providing holders recourse against the parent.

### E. CEC Again Fails to Assert Any Valid Basis for Holding that Section 316(b) Protects Merely the Legal Right to Sue for Payment

CEC insists that Section 316(b) protects only the legal right to seek payment, and not the practical right to receive it, Opp. at 30-33, despite this Court's rejection of that argument. *See MeehanCombs Global Credit Opportunities Funds, LP*, v. *Caesars Entertainment Corp.*, Nos. 14

Civ.7091, 14Civ.7973, 2015 WL 221055 at *4, *5 n.50 (S.D.N.Y., Jan 15, 2015).

*Marblegate II* is in accord: "Ordinary principles of statutory interpretation suggest that the first clause [of Section 316(b)] cannot be repetitive of the second, lest the disjunctive 'or' be disregarded . . . . [T]o interpret Section 316(b) as protecting merely the right to sue for payment, and not any substantive right to *receive* such payment, would be unfaithful to the text and the drafting history." *Marblegate II*, 2015 WL 3867643 at *11 (emphasis in original) (citations omitted). Moreover, the two facially inapposite decisions CEC cites do not rebut *MeehanCombs* and *Marblegate II*.[7]  There is no reason to revisit the legal-right-only issue.

## II.   WHETHER A RESTRUCTURING HAS OCCURRED IS NEITHER MATERIAL NOR SUBJECT TO GENUINE DISPUTE

### A.   The TIA Does Not Contain a Restructuring Requirement, And *Marblegate's* Rationale for Applying One Here Is Inapplicable

Section 316(b) requires only two elements to establish a statutory violation: (i) an impairment of a holder's right to receive payment when due (ii) without such holder's consent. Br. at 16-17.  The *Marblegate* court introduced an additional requirement of restructuring as a limiting principle to avoid prohibition of ordinary business transactions that have only an indirect impact on the holders.

This case does not involve such routine transactions that may indirectly impact holders

---

[7] The indenture at issue in *Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*, No. 04 Civ.7643, 2005 WL 289723 (S.D.N.Y. Feb. 8, 2005), and *Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*, 162 F. App'x 85 (2d Cir. 2006), was exempt from the TIA, Opp. at 30, and concerned a *contractual* provision which, according to one of the parties, was based on the language of Section 316(b).  The decisions did not consider the TIA, and instead applied principles of contract interpretation completely divorced from the actual text of the statute, its legislative history, and the caselaw applying it.

CEC cites only one other decision not already distinguished or rejected in *MeehanCombs*.  That case, *Brady v. UBS Fin. Servs., Inc.*, 538 F.3d 1319 (10th Cir. 2008), similarly did not address the scope of protection of the right to receive payment and was concerned instead with a holder's ability to bring suit in light of *res judicata* and statute of limitations concerns.

by weakening the issuer's financial condition. This is a case of a financially troubled issuer and its parent who engaged in numerous large transactions to restructure and manage their debt. SMF ¶ 26. As part of these transactions, CEOC and CEC purportedly stripped the Guarantee, and shortly thereafter, CEOC filed for bankruptcy. The result was an elimination of the Noteholders' ability to obtain payment from either CEOC or CEC. *See generally* Br. at 17-18.

### B. Even If a Restructuring Requirement Were Applicable, It Is Met Here

Even if a restructuring requirement were applicable, it is readily met as a matter of law on the undisputed record before the Court. The *Marblegate* court anticipated that the restructuring requirement "might produce close, difficult cases," *Marblegate*, 2014 WL 7399041 at *19, but this is not one of them.

#### 1. The Undisputed Facts Establish a Material Violation of Section 316(b) as a Matter of Law

Even if restructuring were an implied element of a TIA violation, a restructuring occurred here. *Four* separate decisions in this District conclude that attempts to eliminate a parent guarantee that would leave holders with no practical ability to recover payment from the issuer upon maturity violate Section 316(b). *See* Br. at 19-20. Indeed, *MeehanCombs Global Credit Opportunities Funds, LP*, 2015 WL 221055 (2015) specifically addresses CEC's attempts to release its guarantee of CEOC's debts. To the extent restructuring was deemed to be a requirement, it was found to have occurred on the facts present here: a release of a guarantee in the context of an issuer unable to pay at maturity.

CEC expressly acknowledges this conclusion: "[T]he courts Plaintiff cites concluded that the challenged transactions violated the TIA only after concluding that the transactions – *involving both the release of a guarantee and actions that allegedly eliminated plaintiffs' practical ability to recover* – constituted a restructuring."). Opp. at 18-19 (emphasis added).

10

Nevertheless, it urges that neither *Marblegate* nor *MeehanCombs* support a finding of restructuring here. CEC suggests that in rejecting the proposition that "releasing a guarantee invariably violates Section 316(b)," *Marblegate* must have reasoned that impairment alone is not enough unless the impairment results from some specific type of restructuring transaction. Opp. at 16. Yet the court's focus, consistent with the text of Section 316(b), was on the overall impact on the holders' right to recover rather than on the nature of the transactions by which the right was impaired. *See, e.g.,* Marblegate, 2014 WL 7399041 at *20 (noting that the transaction at issue "operates, in context, to effect a complete impairment"); *id.* at *20 n.17 (the precise mechanism by which this was accomplished is not "material").

CEC's attempt to distinguish *MeehanCombs* similarly fails. CEC stresses that the *MeehanCombs* decision was on a motion to dismiss and therefore accepted the truth of all of the plaintiffs' allegations. However, CEC is unable to identify a *single* fact relevant to whether a restructuring occurred that is genuinely disputed here. For example, even if *MeehanCombs* accepted plaintiffs' allegations that the stripping of the guarantee "was a part of a plan to push CEOC into bankruptcy," Opp. at 17-18, CEC does not explain how this fact would be material to whether an *out-of-court* restructuring occurred. In any event, CEOC's bankruptcy is now an undisputed reality. SMF ¶¶ 70-72; CEC Rule 56.1 Response, ECF 39 ("SMF Resp.") ¶¶ 70-72.

### 2. A "Restructuring" Limitation Should Exclude Ordinary Business Transactions that Affect Holders Only Indirectly and Should Give Effect to the Broad Protections of Section 316(b)

CEC acknowledges that the cases have found "restructuring" to encompass transactions involving both the release of a guarantee and elimination of plaintiffs' recourse against the issuer. *See* Opp. 18-19. Nothing more is needed to decide this case. This definition of restructuring flows logically from the *Marblegate* decision and the legislative history of Section 316(b). It also is consistent with the problem *Marblegate* was trying to avoid: "untrammeled

11

judicial intrusion into *ordinary business practice*," such as investments in various business enterprises. *Marblegate*, 2014 WL 7399041 at *18-19 (emphasis added). At the same time, the standard is broad enough and flexible enough to give effect to the intent of Section 316(b) to proscribe the impairment of the holders' right to receive payment, regardless of the specific or clever mechanism by which it is accomplished. *See* Part I.A; Br. at 9-10.

In cases where there is not both a release of a guarantee and holders' practical inability to recover from the issuer, the inquiry into whether there was a restructuring may be more fact-intensive than it need be here. Although such a definition is not needed here, it must still comport with the legislative history and case law interpreting the TIA.[8]

### 3. Each of the Guarantee Transactions Independently Establishes a Restructuring as a Matter of Law

Even if each Guarantee Transaction were required to constitute a "restructuring," the Trustee has satisfied such a requirement by offering undisputed, admissible evidence. CEC offers no material, genuinely disputed facts to rebut that showing. For example, the Trustee cites statements in the First Day Memorandum as evidence of out-of-court restructuring by "Caesars"; "Caesars" is defined to include CEC and CEOC. SMF ¶¶ 26-28, Br. at 21. CEC does not attempt to refute the facts contained in those statements. Rather, it contends that the statements were made by CEOC and not CEC, and cannot be imputed to CEC. Opp. at 21. However, statements by 89%-owned, tightly controlled subsidiary of CEC, *see* SMF ¶ 40; SMF Resp. ¶ 40, are probative of the fact that the transactions were part of a restructuring or restructurings,

---

[8] CEC's proposed definitions, made for different purposes than interpretation of the TIA, do not comport with these requirements. For example, all of CEC's proposed definitions *explicitly require* an amendment of the "underlying instrument" with respect to such key terms as the amount of principal and interest due and the date of maturity. *See* Opp. at 19-20 (urging that restructuring requires, among other things, reduction of "interest or principal payments on the debt," extension of debt maturity, exchange of securities for equity, or "reduction in near-term debt service obligations"). As shown above, such requirements have been roundly rejected by the courts. *See* Parts I.A, I.E; Br. at 9-10.

12

especially since CEOC was a party to the transactions.  In any event, CEC's denial that it made the statements does not mean they are not true.

CEOC also contends that CEC's May, 2014 Form 8-K, quoted in SMF ¶ 38, proves nothing.  Opp. at 21.  That document, however, contains a quote from the transaction documents for CEOC's transfer of property to CGP stating that "the Caesars Parties will effectuate a restructuring." SMF ¶ 38.  That is evidence, again unrefuted, that there was an ongoing process of restructuring taking place.  And whether the restructuring was of the Noteholders' particular debt is immaterial, if the effect of the restructuring(s) nevertheless was to impair the Noteholders.  CEC's other responses likewise relate to the meaning of the quoted statements or inferences that may or may not be drawn from them.  Such denials do not create a genuine issue of material fact or preclude the Court from drawing its own legal conclusions from them.  CEC similarly fails to refute the Trustee's arguments with respect to each of the Guarantee Transactions:

The August Unsecured Notes Transaction.  CEC again raises its fallacious argument, *see* Part I.A above, that there is no TIA violation without an indenture amendment.  Opp. at 23.  CEC also asserts that the Court should ignore its own decision in *MeehanCombs* because that decision accepted as true some unspecified facts that CEC claims may be disputed here.  *Id.* That claim is refuted in Part II.B.1 above.  *See generally* Br. at 22-23.

The May 2014 Transaction.  The Trustee has offered sufficient evidence to show that this transaction, including the 5% Stock Sale, was a "restructuring."  CEC tries to refute this showing by attempting to distinguish this case from *Marglegate* and arguing that the transaction was merely another routine corporate transaction.  Opp. at 22.  But CEC's admission that CEC transferred 5% of its CEOC stock to CEC insiders, investors who "held equity in CEC or CEOC

13

debt" belies this contention. SMF Resp. Counterstatement ¶ 32; Opp. at 12, 22. Accordingly, the purported stripping of the Guarantee did not result from a "genuinely adversarial" act by third parties. Opp. at 22. Moreover, CEC used the value of the Guarantee as credit support to fund a refinancing that, among other things, pre-paid obligations to other insiders. SMF ¶¶ 43, 46, 53-55; SMF Resp. ¶¶ 43, 46, 53-55. CEC's assertion that it could not have obtained new loans and paid off its own insiders without stripping the Guarantee, Opp. at 22, does not vindicate these self-dealings. Nor does it change the fact that the transaction impaired the Noteholders without their consent, regardless of whether or not it was intended to improve CEOC's financial condition, as CEC contends. *id.*[9] *See generally* Br. at 23-24.

The 6% Stock Transfer. CEC again incorrectly insists that an indenture amendment was required. Opp. at 23 ("Plaintiff does not contend . . . . that any of the recipients of the 6% Stock Transfer . . . . used [their Notes] to modify the Indenture"). CEC also disputes that the 6% Stock Transfer was indistinguishable from the 5% transfer in its mechanism and impairing effect, *id.* at 22, even though it admits that both transactions purportedly resulted in the striping of the Guarantee by transferring CEOC stock from CEC to insiders. SMF ¶ 44; SMF Resp. ¶ 44; Opp. at 12. *See generally* Br. at 24-25.

Finally, CEC argues that the 6% Stock Transfer was simply part of a routine performance incentive plan. Opp. at 23. But while performance incentive plans may or may not be common, this transaction occurred in the midst of numerous other restructuring transactions, the effect of which was to strip the Guarantee for the benefit of equity holders and other creditors. There is ample unrefuted evidence from which the court could infer that the 6% Stock Transfer was part of a restructuring that impaired the Noteholders.

---

[9] This argument is itself an admission that the transaction was a restructuring of CEOC's financial obligations.

14

## III. RULE 56(D) DOES NOT PRECLUDE GRANT OF SUMMARY JUDGMENT

CEC identifies three discrete categories of information it claims *may* raise issues of fact. Adler Decl. ¶ 4. None has any potential to do so whatsoever. First, CEC seeks discovery of whether the Noteholders viewed any of the Guarantee Transactions as a "restructuring." *Id.* ¶ 4. But, to the extent the inquiry is relevant (and it is not), whether a restructuring has occurred is an issue of law to be determined by this Court. On the face of the statute, the entirety of Section 316(b) analysis is purely objective and makes no reference to subjective intent (and certainly not the subjective intent of holders of the security that was impaired, in contrast to the intent of the issuer and guarantor scheming to effect the impairment). Br. at 9. Second, CEC seeks information about the time and price at which the Noteholders purchased the Notes to ascertain whether an impairment has occurred or whether the Noteholders may actually be better off recovering from CEOC under the plan of reorganization rather than from CEC under the Guarantee. *Id.* As explained in Part I.B, however, impairment is established as a matter of law regardless of any speculative recovery the Noteholders may one day receive from CEOC, and CEC has failed to offer any evidence of the likelihood of such recovery in any event. Finally, CEC seeks discovery of whether the Noteholders believed the Guarantee "provided genuine credit support." *Id.*; Opp. at 34. However, the language of the Guarantee is unambiguous and susceptible of interpretation as a matter of law; the Noteholders' subjective view is simply irrelevant. *See* Part I.D.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court grant is motion for summary judgment on Count V of the Complaint and award such other and further relief as the Court deems proper.

                                            Respectfully submitted,

Dated: New York, New York         */s/ Andrew I. Silfen*
       August 7, 2015                    Andrew I. Silfen, Esq. (AS-1264)
                                        Mark B. Joachim, Esq. (MJ-5324)
                                        Michael S. Cryan, Esq. (MC-4887)
                                        ARENT FOX LLP
                                        1675 Broadway
                                        New York, NY  10019-5820
                                        Tel:    (212) 484-3900
                                        Fax:    (212) 484-3990
                                        Email: andrew.silfen@arentfox.com
                                                     mark.joachim@arentfox.com
                                                     michael.cryan@arentfox.com

                                        -and-

                                        Ralph A. Taylor, Jr., Esq. (*admitted pro hac vice*)
                                        Jackson D. Toof, Esq. (*admitted pro hac vice*)
                                        ARENT FOX LLP
                                        1717 K Street, N.W.
                                        Washington, D.C. 20006
                                        Tel:    (202) 857-6000
                                        Fax:    (202) 857-6395
                                        Email: ralph.taylor@arentfox.com
                                                     jackson.toof@arentfox.com

                                        *Attorneys for BOKF, N.A., solely in its capacity as successor Indenture Trustee under the Indenture*