USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-27-15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

BOKF, N.A., solely in its capacity as successor
Indenture Trustee for the 12.75% Second-Priority
Senior Secured Notes due 2018,

                  Plaintiff,

                -against-

CAESARS ENTERTAINMENT CORPORATION,

                  Defendant.

**OPINION AND**
**ORDER**

**15-cv-1561 (SAS)**

------------------------------------------------------------- X

UMB BANK, N.A., solely in its capacity as Indenture
Trustee under those certain indentures, dated as of
June 10, 2009, governing Caesars Entertainment
Operating Company, Inc.'s 11.25% Notes due 2017;
dated as of February 14, 2012, governing Caesars
Entertainment Operating Company, Inc.'s 8.5%
Senior Secured Notes due 2020; dated August 22,
2012, governing Caesars Entertainment Operating
Company, Inc.'s 9% Senior Secured Notes due 2020;
dated February 15, 2013, governing Caesars
Entertainment Operating Company, Inc.'s 9%
Senior Secured Notes due 2020,

                  Plaintiff,

                -against-

CAESARS ENTERTAINMENT CORPORATION,

                  Defendant.

**15-cv-4634 (SAS)**

------------------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

BOKF, N.A. ("BOKF"), as successor Indenture Trustee, and UMB Bank, N.A. ("UMB"), as Indenture Trustee, bring these actions to enforce Caesars Entertainment Corporation's ("CEC") guarantees of roughly $7 billion in notes issued by Caesars Entertainment Operating Company ("CEOC").  Plaintiffs assert that CEC's guarantees became due and payable upon CEOC's filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Northern District of Illinois Bankruptcy Court on January 15, 2015.  CEC, however, claims that certain transactions entered into in May and August 2014 released its obligations under the guarantees.  Plaintiffs now move for partial summary judgment, seeking a declaration that the purported release of CEC's guarantees violates section 316(b)[1] of the Trust Indenture Act of 1939 (the "TIA").[2]  For the following reasons, plaintiffs' motions are DENIED.

## II.   BACKGROUND

### A.    The Indentures

BOKF is the successor Indenture Trustee under the Indenture dated

---

[1]    *See* 15 U.S.C. §§ 77ppp(b) ("section 316(b)").

[2]    *See id.* §§ 77aaa to 77bbbb.

April 16, 2010 (the "Indenture"), under which CEOC issued the 12.75% Second-Priority Senior Secured Notes due 2018.[3]  UMB is the Indenture Trustee under four First Lien Indentures — dated June 10, 2009 (due 2017), February 14, 2012, August 22, 2012 and February 15, 2013 (all three due in 2020) (together with the BOKF Indenture, the "Indentures") — that comprise approximately $6,345,000,000 of CEOC's recourse first lien bond debt (together with the 12.75% Second Priority Senior Secured Notes, the "Notes").[4]  CEC, the parent company of CEOC and a signatory to the Indentures as "Parent Guarantor," irrevocably and unconditionally guaranteed the obligations arising under the Indentures until payment in full of all of the guarantee obligations (the "Guarantee").[5]  The Indentures contain a release provision, providing that the Guarantee will terminate

---

[3]      *See* Plaintiff BOKF N.A.'s Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of Its Motion for Partial Summary Judgment ("BOKF 56.1") ¶¶ 1, 3.

[4]      *See* Plaintiff UMB Bank, N.A.'s Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of Its Motion for Partial Summary Judgment ("UMB 56.1") ¶ 1.  The provisions of all indentures at issue are identical in all material respects.  I will therefore reference the indentures for both plaintiffs as simply the "Indentures."  Additionally, most facts are identical in both plaintiffs' motions.  I will therefore cite only to BOKF's 56.1 statement unless otherwise necessary.

[5]      *See* BOKF 56.1 ¶¶ 1, 6–9.

upon the occurrence of certain events.[6]  The Indentures are qualified under and

governed by the TIA, and the Indentures state that if any provision of the

Indentures conflict with the TIA, the TIA controls.[7]

   **B.    CEC and CEOC**

         In January 2008, Apollo Global Management, LLC, TPG Global,

LLC, and their respective affiliates and co-investors acquired CEC in a leveraged

buyout transaction for $30.7 billion, funded through the issuance of approximately

$24 billion in debt; approximately $19.7 billion of which was secured by liens on

substantially all of CEOC's assets.[8]

         In its 2013 Annual Report, issued on March 17, 2014, CEC stated that

"[w]e do not expect that cash flow from operations will be sufficient to repay

CEOC's indebtedness in the long-term and we will have to ultimately seek a

restructuring, amendment or refinancing of our debt, or if necessary, pursue

additional debt or equity offerings."[9]  Over the past several years, CEOC and CEC

have undertaken numerous transactions, including over forty-five asset sales and

---

[6]      *See id.* ¶ 14 (citing section 12.02(c) of the Indenture, reproduced in
full at page 19).

[7]      *See id.* ¶¶ 9–11 (citing sections 6.07 and 13.01 of the Indenture).

[8]      *See id.* ¶¶ 17–18.

[9]      *Id.* ¶ 22.

capital market transactions, in order to manage their debt.[10]   These transactions

included moving certain CEOC assets to new affiliates formed in 2013 and early

2014.[11]

        In March 2014, CEC hired Blackstone Advisory Partners L.P. to

provide advice regarding certain financial and strategic alternatives for the

company.[12]   In an engagement letter dated August 12, 2014, but made effective as

of May 7, 2014, Blackstone agreed to provide financial advisory services to CEC

and its affiliates in connection with a possible restructuring of certain liabilities and

to assist in analyzing, structuring, negotiating, and effecting a restructuring.[13]

### C.    The Guarantee Transactions

        On May 6, 2014, CEC announced that CEOC planned to issue $1.75

billion in new "B-7" term loans (the "B-7 Transaction") under the first lien credit

agreement and to use the net proceeds to refinance existing indebtedness maturing

in 2015 and existing term loans.[14]   Also on May 6, 2014, CEC announced that in

connection with the B-7 Transaction, CEC sold five percent of CEOC's common

---

[10]     *See id.* ¶ 26.

[11]     *See id.* ¶¶ 31–40.

[12]     *See id.* ¶ 29.

[13]     *See id.* ¶ 30.

[14]     *See id.* ¶¶ 42, 51–54.

stock to certain institutional investors (the "5% Stock Sale" and together with the B-7 Transaction, the "May 2014 Transaction").  According to CEC, because CEOC was no longer a wholly owned subsidiary, the Guarantee was automatically terminated under section 12.02(c)(i) of the Indentures.[15]  CEC stated that the B-7 Transaction lenders required the elimination of the Guarantee, and that the elimination provided enhanced credit support for the B-7 Transaction.[16]

On May 30, 2014, CEC authorized the CEOC Board to adopt a 2014 stock performance incentive plan, which enabled CEOC to grant shares of CEOC stock to its directors and officers (the "6% Stock Transfer"), which was announced on June 27, 2014.[17]  Also on June 27, CEC asserted that its Guarantee of the Notes had been released because CEOC elected to release the Guarantee under a separate Indenture provision that permits such an election once CEC's guarantee of all the "Existing Notes," as defined in the Indenture, had been released.[18]

On August 12, 2014, CEC announced a private refinancing transaction with certain holders of CEOC's 2016 and 2017 Notes, whereby CEOC

---

[15]     *See id.* ¶ 44.

[16]     *See id.* ¶¶ 45–46.

[17]     *See id.* ¶¶ 56–58.

[18]     *See id.* ¶¶ 15–16, 59–60.

purchased the holders' notes and the holders agreed to amend the indentures governing the 2016 and 2017 Notes to include (a) a consent to the removal, and acknowledgment of the termination, of the CEC guarantee within each indenture and (b) a modification of the covenant restricting disposition of "substantially all" of CEOC's assets to measure future asset sales based on CEOC's assets as of the date of the amendment (the "August Unsecured Notes Transaction").[19]  After the August Unsecured Notes Transaction closed, CEC announced that CEOC had provided notice to the Indenture Trustees, as well as other trustees for other secured notes, reaffirming its contention that CEC's Guarantee had been released at CEOC's election, first announced in June 2014.[20]

None of the noteholders represented by plaintiffs consented, or were afforded the opportunity to consent, to the May 2014 Transaction, the 6% Stock Transfer, or the August Unsecured Notes Transaction (collectively, the "Guarantee Transactions").[21]

In January 2015, CEOC and 172 of its subsidiaries filed voluntary

---

[19]     *See id.* ¶¶ 62–63.

[20]     *See id.* ¶¶ 64–65.

[21]     *See id.* ¶ 66; UMB 56.1 ¶ 64.

petitions under chapter 11 of the Bankruptcy Code.[22]  Under the terms of CEOC's proposed reorganization plan, the noteholders cannot recover the principal and interest due under the Indentures.[23]  The bankruptcy filing was an immediate Event of Default under the Indentures, and as a result, CEOC's and CEC's obligations under the Notes became due and owing.[24]  BOKF served CEC with a demand for payment on February 18, 2015, and CEC responded that it was not subject to the Guarantee.[25]

## III.   LEGAL STANDARD

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[26]  "A fact is material if it might affect the outcome of the suit under the governing law, and an

---

[22]    *See* BOKF 56.1 ¶ 70.

[23]    *See id.* ¶¶ 79–80; UMB 56.1 ¶ 74.

[24]    *See* BOKF 56.1 ¶¶ 74–75; UMB 56.1 ¶¶ 70–71.  CEC disputes that it has any obligations under these Notes, as it asserts that the Guarantees have been terminated.

[25]    *See* BOKF 56.1 ¶¶ 76–77.

[26]    *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[27]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle [it] to judgment as a matter of law."[28]  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts,"[29] and "may not rely on conclusory allegations or unsubstantiated speculation."[30]

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[31]  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

---

[27]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

[28]     *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

[29]     *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citations omitted).

[30]     *Id.* (quotation marks and citations omitted).

[31]     *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

of a judge.'"[32]

## IV.   APPLICABLE LAW

### A.   The Trust Indenture Act

The TIA provides that instruments to which it applies must be issued under an indenture that has been qualified by the Securities and Exchange Commission ("SEC").[33]  The requirements of such indentures are "designed to vindicate a federal policy of protecting investors."[34]

Section 316 of the TIA relates to collective action clauses.  For example, it is permissible for a majority of noteholders to direct the trustee to exercise its powers under the indenture or for not less than seventy-five percent of noteholders "to consent on behalf of the holders of all such indenture securities to

---

[32]   *Barrows v. Seneca Foods Corp.*, 512 Fed. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012)).

[33]   *See generally* 15 U.S.C. §§ 77eee-77ggg.  "A 'trust indenture' is a contract entered into between a corporation issuing bonds or debentures and a trustee for the holders of the bonds or debentures, which, in general, delineates the rights of the holders and the issuer."  *Upic & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 450 (S.D.N.Y. 1992).

[34]   *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 85 F.3d 970, 974 (2d Cir. 1996) (explaining that the law was "enacted because previous abuses by indenture trustees had adversely affected 'the national public interest and the interest of investors in notes, bonds[, and] debentures . . . .'") (quoting 15 U.S.C. § 77bbb(a)).

the postponement of any interest payment for a period not exceeding three years from its due date."[35]  Section 316(a)'s terms are permissive — meaning an indenture can expressly exclude such majority action.

However, section 316(b) is mandatory.  It states that:

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder, except as to a postponement of an interest payment consented to as provided in paragraph (2) of subsection (a) of this section, and except that such indenture may contain provisions limiting or denying the right of any such holder to institute any such suit, if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver, or loss of the lien of such indenture upon any property subject to such lien.[36]

Thus, section 316(b) acts to protect a bondholder's right to receive payment of both principal and interest.

Section 316(b) addressed earlier practices whereby majority bondholders — often controlled by insiders — used collective or majority action clauses to change the terms of an indenture, to the detriment of minority

---

[35]    15 U.S.C. § 77ppp(a).

[36]    *Id.* § 77ppp(b).

bondholders.[37]    As a result of section 316(b), an issuer cannot — outside of

bankruptcy[38] — alter its obligation to pay bonds without the consent of each

bondholder.[39]  In this way, section "316(b) was designed to provide judicial

scrutiny of debt readjustment plans to ensure their equity."[40]

---

[37]    *See MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entertainment Corp.* ("*MeehanCombs*"), Nos. 14 Civ. 7091, 14 Civ. 7937, 2015 WL 221055, at *3 n.31 (S.D.N.Y. Jan. 15 2015) (collecting cases).

[38]    *See, e.g.*, *In re Board of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 172 (2d Cir. 2008) ("'[I]t is self-evident that Section 316(b) could not have been intended to impair the capacity of a debtor and its creditors to restructure debt in the context of bankruptcy,' and '[t]he cases have uniformly recognized that reorganization proceedings in Chapter 11 are not within the purview of TIA Section 316(b).'") (quoting *In re Delta Air Lines, Inc.*, 370 B.R. 537, 550 (Bankr. S.D.N.Y. 2007), *aff'd*, 374 B.R. 516 (S.D.N.Y. 2007)).

[39]    *See In re Board of Directors of Multicanal S.A.*, 307 B.R. 384, 388-89 (Bankr. S.D.N.Y. 2004); Mark J. Roe, *The Voting Prohibition in Bond Workouts*, 97 Yale L.J. 232, 251 (1987) ("Only two events should change a company's obligation to pay its bonds.  Either *each* affected bondholder would consent to the alteration of the bond's terms, or a judge would value the company to determine that the firm was insolvent, eliminate the stockholders, and then reduce the express obligation to the bondholders.") (emphasis in original).

[40]    *Brady v. UBS Financial Services, Inc.*, 538 F.3d 1319, 1325 (10th Cir. 2008) (citing S. Rep. No. 76-248, at 26 (1939)); *see also id.* ("In practice, the provision tends to force recapitalizations into bankruptcy court because of the difficulty of completing a consensual workout."); George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings*, 14 Am. Bankr. Inst. L. Rev. 431, 433-37 (2006) ("Section 316(b) was adopted with a specific purpose in mind — to prevent out-of-court debt restructurings from being forced upon minority bondholders."); Roe, *The Voting Prohibition*, 97 Yale L.J. at 251 ("Congress and the SEC were aware that the holdout problem would frustrate some workouts, but the regulators wanted to impede workouts that took place outside of

### B.      Contract Interpretation

Under New York law, "[t]he court's function in interpreting a contract is to apply the meaning intended by the parties, as derived from the language of the contract in question."[41]  "[T]he best evidence of what parties to a written agreement intend is what they say in their writing.  Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[42]

"The question of whether a written contract is ambiguous is a question of law for the court."[43]  "Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."[44]  However, contract language is ambiguous if "the terms of the contract could suggest more than one meaning when viewed objectively by a

---

regulatory and judicial control.  The SEC *wanted* trust indenture legislation that would bring contractual recapitalizations under the jurisdiction of the federal bankruptcy court.") (emphasis in original).

[41]      *Marin v. Constitution Realty, LLC*, 11 N.Y.S.3d 550, 558–59 (1st Dep't 2015) (internal citations, quotations, and alterations omitted).

[42]      *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (internal citations and quotations omitted).

[43]      *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009).

[44]      *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000).

reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."[45]  "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing; evidence as to custom and usage is considered, as needed, to show what the parties' specialized language is fairly presumed to have meant."[46]

## V.  DISCUSSION

### A.  Impairment Under the TIA

In *MeehanCombs*, I rejected CEC's arguments that section 316(b) protected only a noteholder's *legal* right to receive payment when due.  Rather, I agreed with two other courts in this district that "when a company takes steps to preclude any recovery by noteholders for payment of principal coupled with the elimination of the guarantors for its debt, . . . such action . . . constitute[s] an 'impairment' . . . ."[47]  I continue to adhere to the view that section 316(b) protects a

---

[45]     *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).

[46]     *Id.* at 466–67.

[47]     *Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, No. 99 Civ. 10517, 1999 WL 993648, at *7 (S.D.N.Y. Nov. 2, 1999).

noteholder's practical ability, as well as the legal right, to receive payment when due.[48]  Specifically, I concluded, following the reasoning of two decisions from this District, that section 316(b) protects more than simply "formal, explicit modification of the legal right to receive payment" which would allow "a sufficiently clever issuer to gut the Act's protections."[49]  As explained in *Federated Strategic Income Fund*:

> By defendant's elimination of the guarantors and the simultaneous disposition of all meaningful assets, defendant will effectively eliminate plaintiffs' ability to recover and will remove a holder's "safety net" of a guarantor, which was obviously an investment consideration from the outset.  Taken together, these proposed amendments could materially impair or affect a holder's right to sue.  A holder who chooses to sue for payment at the date of maturity will no longer, as a practical matter, be able to seek recourse from either the assetless defendant or from the discharged guarantors.  It is beyond peradventure that when a company takes steps to preclude any recovery by noteholders for payment of principal coupled with the elimination of the guarantors for its debt, that such action . . . constitute[s] an "impairment" . . . [of] the right to sue for payment.[50]

---

[48]    *Accord Marblegate Asset Mgmt., LLC v. Education Mgmt. Corp.* ("*Marblegate II*"), No. 14 Civ. 8584, 2015 WL 3867643 (S.D.N.Y. June 23, 2015) (reviewing legislative history to conclude that section 316(b) protects against nonconsensual debt restructuring to protect a noteholder's right to receive payment).

[49]    *Marblegate Asset Mgmt. v. Education Mgmt. Corp.* ("*Marblegate I*"), 75 F. Supp. 3d 592, 613 (S.D.N.Y. 2014)

[50]    *Federated Strategic Income Fund*, 1999 WL 993648, at *7.

In *MeehanCombs*, I stated that "the Complaint's plausible allegations that the August 2014 Transaction stripped plaintiffs of the valuable CEC Guarantees leaving them with an empty right to assert a payment default from an insolvent issuer are sufficient to state a claim under section 316(b)."[51]  Here, however, I must decide several questions left open by *MeehanCombs*. Namely, what must plaintiffs prove to demonstrate an impairment that violates section 316(b)?  Plaintiffs contend that there are only two elements: "(i) an impairment of a security holder's right to receive payment (ii) without the holder's consent."[52]  Thus, they assert that because the Guarantees were purportedly stripped without their consent, CEC's actions violated section 316(b).

CEC responds with several arguments.  *First*, CEC contends that, in order to violate section 316(b), the alleged impairment must be either: (1) an amendment of a core term of the debt instrument or (2) a restructuring of the noteholders' debt.  *Second*, CEC asserts that the impairment should be evaluated as of the time of each transaction — that is, plaintiffs must prove that CEOC was insolvent at the time the Guarantees were terminated, leaving the noteholders with no ability to recover as of the time of the transaction.  Related to this argument,

---

[51]     *MeehanCombs*, 2015 WL 221055, at *5.

[52]     Plaintiff BOKF N.A.'s Memorandum of Law in Support of Its Motion for Partial Summary Judgment ("BOKF Mem.") at 16–17.

CEC asserts that the Guarantees were never intended to provide credit support, and therefore the release of a Guarantee that provided no real value to noteholders cannot be an impairment. *Finally*, CEC argues that there are genuine disputes of material fact as to whether the challenged transactions were, either individually or collectively, a restructuring of the noteholders' debt, and that CEC has been prevented from pursuing discovery essential to its opposition.

As described more fully below, I conclude that in order to prove an impairment under section 316(b), plaintiffs must prove either an amendment to a core term of the debt instrument, or an out-of-court debt reorganization.[53] The alleged impairment, however, must be evaluated as of the date that payment becomes due, because it is only then that the bondholders' right to payment has been affected by certain actions and/or transactions undertaken by issuers or guarantors.

### 1. The Nature of the Guarantee

I begin by addressing the nature of the Guarantee. CEC asserts that

---

[53] The term "reorganization" has been defined as follows: "A process designed to revive a financially troubled or bankrupt firm. A reorganization involves the restatements of assets and liabilities, as well as holding talks with creditors in order to make arrangements for maintaining repayments. Reorganization is an attempt to extend the life of a company facing bankruptcy through special arrangements and restructuring in order to minimize the possibility of past situations reoccurring." Reorganization Definition, Investopedia.com, www.investopedia.com/terms/r/reorganization.asp (last visited Aug. 26, 2015).

the noteholders cannot have been practically impaired by the release of the

Guarantee because the Guarantee was never intended to provide credit support for

the Notes.  Rather, CEC contends that the Guarantee was included in the Indenture

only as a regulatory device to comply with Rule 3-10 of SEC Regulation S-X.

This regulation would allow CEOC to rely on CEC's audited financials rather than

preparing and filing its own audited financial statements.[54]  Plaintiffs respond that

the Guarantee language in the Indenture is unambiguous: it provides for an

unequivocal guarantee by CEC.  Thus, any extrinsic evidence regarding the

purported intent of the Guarantee is inadmissable under New York law.

Section 12.01(a) of the Indenture spells out the terms of the

Guarantee:

> Each Guarantor hereby jointly and severably, *irrevocably and unconditionally guarantees . . . the full and punctual payment when due*, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, premium, if any, or interest on in respect of the Notes and all other monetary obligations of the Issuer under this Indenture and the Notes . . . .[55]

---

[54]    *See* Memorandum of Law of Caesars Entertainment Corporation in Opposition to BOKF, N.A.'s Motion for Partial Summary Judgment ("Opp. Mem.") at 9–10 (citing 17 C.F.R. Part 210.3-10).

[55]    BOKF 56.1 ¶ 6 (emphasis added).  The language in the UMB Indenture is substantively identical. *See* UMB 56.1 ¶ 8.

 Additionally, section 12.01(g) provides that "[e]ach Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations."[56]  The release of the Guarantee is governed by section 12.02(c) of the Indenture, which provides that CEC

> shall be deemed to be released from all obligations . . . upon:
>     (i) the Issuer ceasing to be a Wholly Owned Subsidiary of Harrah's Entertainment;
>     (ii) the Issuer's transfer of all or substantially all of its assets to, or merger with, an entity that is not a Wholly Owned Subsidiary of Harrah's Entertainment in accordance with Section 5.01 and such transferee entity assumes the Issuer's obligations under this Indenture; and
>     (iii) the Issuer's exercise of its legal defeasance option or covenant defeasance option under Article VIII or if the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture.[57]

Finally, the Indenture provides that the TIA governs the Indenture and controls in the event of an inconsistency between the TIA and the Indenture: "If and to the extent that any provision of this Indenture limits, qualifies or conflicts with the duties imposed by . . . Sections 310 to 318 of the TIA, inclusive, such imposed duties . . . shall control."[58]

 CEC contends that several provisions of the Indenture indicate that the

---

[56]    BOKF 56.1 ¶ 6; UMB 56.1 ¶ 10.

[57]    BOKF 56.1 ¶ 14; UMB 56.1 ¶ 15.

[58]    *See* BOKF 56.1 ¶ 11 (quoting section 13.01 of the Indenture).

Guarantee was not intended to provide credit support.  *First*, it asserts that the Guarantee could be released under any one of the three conditions listed above — that is, CEC reads the release provisions disjunctively, rather than conjunctively, as the "and" would suggest.  As such, the Guarantee could be easily terminated by unilateral action on CEC's part.  Relying on the release provisions of the Indenture — as well as extrinsic evidence of third-party analyses of the release provisions — CEC contends that the Guarantee was intended to be nothing more than a "guarantee of convenience" to facilitate regulatory filings.  *Second*, CEC argues that it has been prevented from obtaining discovery as to, *inter alia*, whether the noteholders believed the Guarantee provided genuine credit support.  Thus, CEC argues that there is a genuine dispute of material fact as to whether the release of the Guarantee impaired the noteholders' right to payment.

These arguments fail under the most basic rule of contract construction — where the language of an agreement is unambiguous, courts must enforce the agreement according to the agreement's plain language:  "'[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity.'"[59]  Here, the language of the Guarantee is "clear, unequivocal and unambiguous" and

---

[59]     *Law Debenture Trust Co.*, 595 F.3d at 468 (quoting *Greenfield*, 98 N.Y.2d at 569–70).

therefore must be "enforced according to its terms."[60]   The Indenture states that

CEC "irrevocably and unconditionally guarantees . . . the full and punctual

payment when due."[61]   Nothing in the remaining language of section 12.01(a) casts

any ambiguity upon the clear language indicating that the Guarantee is indeed one

that provides a promise of full payment in the event that CEOC was unable to

fulfill its payment obligations.  Further, there is no indication from any other

section of the Indenture that the Guarantee was put in place merely to facilitate

regulatory filings.  Thus, the plain language of the Guarantee section indicates that

it provided credit support.

Additionally, nothing in the release provisions creates an ambiguity.

Whether or not the release provisions are read conjunctively or disjunctively,[62] the

mere fact that CEC could be released from the Guarantee under certain

circumstances says little about the nature of the Guarantee itself.  That is, simply

because a Guarantee may be easily terminated — assuming that CEC could

terminate it by unilateral action and by causing any one of three conditions to occur

— does *not* indicate that the Guarantee was something other than an

---

[60]      *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007).

[61]      BOKF 56.1 ¶ 6; UMB 56.1 ¶ 8.

[62]      The parties have not briefed this issue, and I need not decide the issue
here.

"unconditional[] guarantee[] [of] . . . full and punctual payment when due."[63]

Finally, the Indenture also included a provision stating that any obligations that arise under the TIA control in the event that any provision conflicts with the TIA. Though I do not today decide this issue, there is no dispute that, whatever the release provision allowed, it cannot provide CEC with a path to impair noteholders' rights under section 316(b). In other words, if, in taking actions allowed under the release provision of the Indenture, CEC violated noteholders' rights to payment under section 316(b), then the release was invalid as a matter of law. Moreover, the fact that plaintiffs consented to the provision by agreeing to the Indenture is of no moment. Though all parties to the Indenture are sophisticated — and no doubt were represented by sophisticated attorneys — signatories to a contract cannot consent to violate the law.[64] That is, it is undisputed that plaintiffs consented to *a* release provision, which is not, in and of itself, a violation of the TIA. But plaintiffs could not have known, *ex ante*, the transactions that would occur or whether those transactions would, in fact, violate the TIA. If the transactions that triggered the release of the Guarantee — even

---

[63]     *Id.*

[64]     *See, e.g.*, *Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838, 843 (2d Cir. 1952) ("[I]t is clear that a contract which violates the laws of the United States and contravenes the public policy as expressed in those laws is unenforceable.").

assuming that they did not violate the terms of the Indenture — violate the TIA, then plaintiffs' consent to the release provision cannot be a consent to the Guarantee Transactions.

CEC supports its argument with third-party analyst reports and expert declarations that understand the Guarantee to merely facilitate financial reporting obligations, and not to provide credit support. But in the face of an unambiguous contract, this evidence is inadmissible. A court may only consider evidence of custom and usage where "parties have used contract terms which are in common use in a business or art and have a definite meaning understood by those who use them, but which convey no meaning to those who are not initiated into the mysteries of the craft . . . . Proof of custom and usage does not mean proof of the parties' subjective intent . . . ."[65] But there are no specialized terms used in the Guarantee provision that would necessitate looking to extrinsic evidence of custom and usage. Rather, CEC appears to argue that, while the language of the Indenture unambiguously spells out a guarantee of credit support, the parties all understood that the Guarantee was essentially meaningless. This is exactly the type of extrinsic evidence of subjective intent that is inadmissible under New York law: "'[e]vidence outside the four corners of the document as to what was really

---

[65]   *Law Debenture Trust Co.*, 595 F.3d at 466 (internal quotations omitted).

intended but unstated or misstated is generally inadmissible to add to or vary the writing.'"[66]

Finally, further discovery would not lead to admissible evidence that could create a genuine issue of material fact.  CEC seeks discovery relating to the noteholders' understanding of the Guarantee.  As discussed above, such evidence is inadmissable where the language of the contract is unambiguous.

### 2.   Plaintiffs Must Prove Either an Amendment of a Core Term of the Debt Instrument or an Out-of-Court Debt Reorganization

Although I conclude that the Guarantee unambiguously provided credit support, the mere release of the Guarantee, standing alone, does not prove an impairment under section 316(b).  Plaintiffs argue that the release of the Guarantee without their consent is "the kind of transaction that Section 316(b) was designed to prohibit."[67]  But this proposition sweeps too broadly.  The case on which plaintiffs rely for this proposition recognizes that a guarantee release clause could, in some contexts, be invoked without violating section 316(b).[68]  Although the plain language of the TIA prohibits any impairment to a noteholder's right to

---

[66]   *Id.* (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).

[67]   BOKF Mem. at 20.

[68]   *See Marblegate I*, 75 F. Supp. 3d at 615–16.

payment, plaintiffs' broad reading of the statute would allow "untrammeled judicial intrusion into ordinary business practice."[69]  Thus the question remains as to what plaintiffs must prove to establish an impairment.

The issue before Judge Failla in *Marblegate II* was whether a debt restructuring violated section 316(b) when it did not modify any indenture term explicitly governing the right to receive interest or principal on a certain date, yet left bondholders no choice but to accept a modification of the terms of their bonds.[70]  That is, if bondholders did not accept a modification, there would be no formal alteration of the dissenting noteholders' right to payment; however, the transaction at issue was "unequivocally designed to ensure that they would receive no payment if they dissented from the debt restructuring."[71]  Judge Failla exhaustively reviewed the legislative history of section 316(b) to conclude that it was designed to prevent a "nonconsensual majoritarian debt restructuring."[72]  Notably, Judge Failla did not need to go beyond that conclusion, because the facts

---

[69]    *Id.* at 614.

[70]    *See Marblegate II*, 2015 WL 3867643, at *3.

[71]    *Id.* at *2.  Importantly, the transaction effected a restructuring of only the debt of *consenting* noteholders.  Dissenting noteholders retained their *right* to payment under their indentures, but were left with no practical ability to receive payment.

[72]    *Id.* at *11.

of that case left "little question that [the transaction at issue was] precisely the type of debt reorganization that the Trust Indenture Act is designed to preclude."[73]

Here, all parties agree that no term of the Indenture was amended. It is indisputable that if CEOC had unilaterally adjusted the amount of principal or interest it would pay on a note, that would be an impairment under section 316(b). Similarly, renegotiating a debt obligation with a majority of noteholders to the detriment of a nonconsenting minority *under the same indenture* would be an impairment. Here, however, neither of those straightforward violations of section 316(b) have occurred. Rather, plaintiffs argue that by allegedly exercising its rights under the release provisions contained in the Indenture, CEC impaired plaintiffs' rights as prohibited by the TIA because it affected their practical ability to receive payment on the Notes. By contrast, CEC argues that its actions were permitted by the Indenture and did not violate the TIA, even if plaintiffs' ability to receive payment was indirectly affected. Therefore, this Court must interpret section 316(b) to determine what actions, beyond the detrimental amendment of core terms of an indenture, constitute an impairment under the TIA.

I begin with the plain language of section 316(b), which states that "the right of any holder of any indenture security to receive payment of the

---

[73]     *Id.* at *12.

principal of and interest on such indenture security, on or after the respective due dates . . . , *or* to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder . . . ."[74]  The use of the disjunctive "or" lends support to the conclusion that section 316(b) protects *both* the right to sue for payment as well as the substantive right to receive such payment.[75]

The legislative history of the section confirms this reading, and also illuminates the broader purpose of section 316(b).  A 1936 SEC report provided the impetus for the TIA.[76]  This report discussed the problems minority bondholders faced, including reorganizations conducted outside the supervision of a judicial or administrative process.[77]  The TIA went through several iterations,

---

[74]     15 U.S.C.§ 77ppp(b) (emphasis added).

[75]     *See Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) ("To read the next clause, following the word 'or,' as somehow repeating that requirement, even while using different words, is to disregard what 'or' customarily means.  As we have recognized, that term's ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings.") (internal quotations omitted).

[76]     *See* 15 U.S.C. § 77bbb(a).

[77]     *See* Securities and Exchange Commission, Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees, Part VI: Trustees Under Indentures 63–64, 150 (1936).

accompanied by testimony and debate in the Senate and House.  This testimony indicated a concern with protecting minority bondholders' rights against a majority forcing a non-assenting minority into a debt-readjustment plan.  The Senate's report in 1938, which largely reiterated the testimony of then-SEC Chairman William O. Douglas, stated that the predecessor provision to section 316(b) would

> prohibit provisions authorizing . . . a majority to force a non-assenting security holder to accept a reduction or postponement of his claim for principal . . . .  Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this prohibition . . . .  This prohibition does not prevent the majority from binding dissenters by other changes in the indenture or by a waiver of other defaults, and the majority may of course consent to alterations of its own rights.[78]

The final version of the text of section 316(b) was significantly revised from previous versions.  The significant differences were (1) instead of providing discretion to the SEC, the TIA set out mandatory indenture provisions; and (2) the addition of the language providing for a right to receive payment in addition to the right to institute suit.[79]  However, the understanding of section 316(b) remained the same: "Evasion of judicial scrutiny of the fairness of debt-readjustment plans is prevented by this prohibition."[80]

---

[78]     S. Rep. No. 75-1619, at 19 (1938).

[79]     *See Marblegate II*, 2015 WL 3867643, at *9.

[80]     *Id.* (quoting 1939 House Hearings at 31).

Thus, the legislative history makes clear the purpose of the right enunciated in section 316(b): to protect minority bondholders against debt reorganizations resulting from a majority vote, outside of judicial supervision. This reading tracks the plain language of the statute, giving effect to both clauses — the right to institute suit, as well as the right to receive payment. It also provides an important limitation on the right. Broadly understood, as plaintiffs urge, the right enumerated in section 316(b) would prevent *any* corporate action that had any effect on a noteholder's ability to receive payment. An interpretation of section 316(b) that requires plaintiffs to prove either an amendment to a core term of the debt instrument or an out-of-court debt reorganization — in keeping with the purpose underlying the provision — allows for corporate flexibility while protecting minority bondholders against being "forced to relinquish claims outside the formal mechanisms of debt restructuring."[81]

Taking this purpose into account, as well as the plain language of the statute, I reject CEC's contention that plaintiffs must establish a restructuring of their particular debt. There is no question that, had CEC attempted to restructure the plaintiffs' debt by amending a core term of the Indenture without their consent, that action would violate the TIA. But, as in *Marblegate*, an impairment may also

---

[81]     *See id.* at 12.

occur where a company restructures debt arising under *other* notes, in the context of an out-of-court reorganization, leaving some noteholders with an unaltered formal right to payment, but no practical ability to receive payment.  For example, it might be that taking on new debt, where the new investors require as a condition of their investment that the rights of existing bondholders be altered — in other words, the terms of the B-7 Transaction — constitutes an out-of-court reorganization that impairs bondholders' rights under the TIA.

> **3.    There Is a Genuine Dispute of Material Fact as to Whether the Guarantee Transactions Were an Out-of-Court Reorganization**

The remaining question is whether the Guarantee transactions were an out-of-court reorganization.  CEC asserts that plaintiffs must establish CEOC's insolvency at the time of each challenged transaction — that is, the transaction must involve a termination of the Guarantee in the context of an insolvent issuer, which would have the effect of a complete impairment of the noteholders' right to receive payment *at the time of the transaction*.  The plain language of section 316(b) does not support CEC's argument: "the right of any holder . . . to receive payment . . . *on or after the respective due dates* . . . shall not be impaired . . . ." Thus the statute measures impairment as of the date payment is due — the language necessarily requires a court to examine whether, as of the due date, a

30

noteholder's right to payment has been impaired.[82]  Further, using CEC's narrow reading, a company could too easily skirt the requirements of section 316(b) by stripping a guarantee in one transaction and then, in separate but related transactions, effect a company-wide debt restructuring, leaving noteholders with "an empty right to assert a payment default from an insolvent issuer."[83]

CEC notes that without a requirement that an issuer be insolvent at the time of the transaction, ordinary corporate activities would potentially violate the TIA.  That is, if an issuer became insolvent at *any* point, earlier corporate activities could support a claim under section 316(b) so long as the plaintiff alleges that those earlier activities impaired the noteholders' rights to receive payment.  This would expose "countless routine transactions that companies undertake without the unanimous consent of their creditors — such as raising senior debt or other new funds; exchange offers for existing debt; ordinary sales of assets; or new investments — as potential violations of the TIA . . . ."[84]  But examining the transactions as a whole to determine whether they *collectively* constitute an

---

[82]     Of course, nothing would prevent a plaintiff seeking prospective, declaratory relief from bringing an action and proving an impairment as of the time of the transaction.

[83]     *MeehanCombs*, 2015 WL 221055, at *5.

[84]     Opp. Mem. at 26.

impermissible out-of-court reorganization in violation of the noteholders' rights under section 316(b) allows the Court to avoid defendants' parade of horribles.  A routine transaction that, after examination with a full record, is unrelated to a a reorganization but nevertheless resulted in a noteholder receiving a reduced payment would not violate section 316(b).

To make the point crystal clear, I explain this reasoning in the context of the instant lawsuits.  At the time that CEC was released from the Guarantee — and for the purposes of this motion only plaintiffs concede that the Guarantee has been stripped – CEOC (the issuer) was not yet insolvent and was not yet unable to pay on notes which (by the way) were not yet due to be paid.  At that moment, it cannot be said the plaintiffs rights were impaired because they could not know whether CEOC would be in a stronger position to ultimately meet its obligations under the Indentures as a result of the Guarantee Transactions than it would have been otherwise.  It is only at the time *that payment was required* — here CEOC's chapter 11 filing and its proposed reorganization plan — that plaintiffs' rights became impaired as a result of the stripping of the Guarantee.  Thus, it is only as of that moment in time that a court can evaluate whether the Guarantee stripping violated the TIA because the action was taken as part of an out-of-court reorganization without the consent of the plaintiff bondholders.

32

Nonetheless, under this standard, plaintiffs have not met their burden of demonstrating that there is no genuine dispute of material fact as to whether the Guarantee Transactions effected a nonconsensual debt restructuring.  As discussed above, the purported termination of the Guarantees must be in the context of a debt reorganization.  Thus, the transactions must be analyzed as a whole to determine if the overall effect was to achieve a debt restructuring that impaired plaintiffs' right to payment.

In light of this, summary judgment is inappropriate at this stage where, as here, there is a genuine dispute as to whether the challenged transactions, either individually or collectively, were an out-of-court reorganization and the record has not yet been fully developed.  CEC raises questions as to whether the transactions were "routine corporate transaction[s] . . . undertaken in an effort to *improve* CEOC's financial condition"[85] or whether the transactions were undertaken as part of a plan to accomplish an out-of-court restructuring of all CEOC debt.[86]  With the benefit of full discovery, the factfinder may examine all evidence related to these transactions to determine whether a restructuring occurred

---

[85]     *Id.* at 22.

[86]     To be clear, the Court is not importing an intent requirement into section 316(b) where none exists.  Rather, the evidence related to the transactions must be examined to determine what the overall *effect* of the transactions was — a debt restructuring or a series of routine corporate transactions.

— *i.e.*, did the transactions involve the restatement of assets and liabilities, did CEOC hold talks with creditors in order to make arrangements for maintaining repayments, and did the transactions attempt to extend the life of a company facing bankruptcy through special arrangements and resturucturing?

Nevertheless, only *limited* discovery is permitted to allow the parties to develop the record with regard to these transactions.  Defendants have requested discovery related to (1) whether the challenged transactions were a restructuring; (2) whether the noteholders' prospects for recovery were adversely affected by the challenged transactions; and (3) "whether the [noteholders] believed the Guarantee provided genuine credit support."[87]  Defendants may pursue only the first and second avenues of the requested discovery.  As discussed above, the parties' subjective intent or understanding of the Guarantee is irrelevant and inadmissible in the face of unambiguous contractual language.

### B.    Certification Under 28 U.S.C. § 1292(b)

I am keenly aware that this Order addresses several questions of unresolved law, and may have serious implications for corporate entities.  I therefore *sua sponte* certify this Order for an interlocutory appeal pursuant to 28

---

[87]    *Id.* at 34.  I have reworded the requests articulated by CEC in their Memorandum of Law because those requests are broader than the discovery I am permitting, as stated above.

U.S.C. § 1292(b).[88]  The Second Circuit has yet to address three threshold issues

that would be decisive for this litigation:  *First*, what rights does section 316(b) of

the TIA protect?  Does it protect noteholders' *practical* rights to principal and

interest, as this Court and several others have held, or only their *legal* rights, as

other courts have concluded?  *Second*, assuming that section 316(b) protects more

than a bare legal right, what is the appropriate standard to assess impairment?

Must plaintiffs show that a nonconsensual out-of-court restructuring occurred?  If

so, must there be an amendment to the debt instrument itself?  *Third*, as of when

(and how) should the impairment be evaluated?  Must a court evaluate each

transaction separately at the time it was undertaken?  Or is the impairment to be

evaluated as of the date for demand of payment?  May a court consider multiple

transactions collectively?

It is a "basic tenet of federal law to delay appellate review until a final

judgment has been entered."[89]  However, a court, in its discretion, may certify an

interlocutory order for appeal if the order "[1] involves a controlling question of

law [2] as to which there is substantial ground for difference of opinion and [3] that

---

[88]    *See Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*, 85
F.3d 44 (2d Cir. 1996) (accepting interlocutory appeal certified by district court
*sua sponte*); *Wisdom v. Intrepid Sea-Air Space Museum*, 993 F.2d 5, 6–7 (2d Cir.
1993) (same).

[89]    *Koehler v. Bank of Bermuda, Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996).

35

an immediate appeal from the order may materially advance the ultimate termination of the litigation."[90]   Interlocutory appeals are presumptively disfavored, and are only warranted in "extraordinary cases where appellate review might avoid protracted and expensive litigation . . . ."[91]

This is the unusual case in which certification is appropriate.   An interlocutory appeal is in the interests of all parties, and will ensure judicial economy.   There are billions of dollars riding on this decision — BOKF and UMB together seek more than $7 billion, which is "far in excess of CEC's market capitalization."[92]   CEOC has already filed for bankruptcy, and — given the amount at stake — a decision in plaintiffs' favor would likely open the door to a bankruptcy filing by CEC.

The question of the correct interpretation of section 316(b) is a controlling issue of law.   It is a "'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record."[93]   A

---

[90]      28 U.S.C. § 1292(b).

[91]      *Consub Delaware LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007).

[92]      Opp. Mem. at 6.

[93]      *In re Worldcom, Inc.*, No. M-47, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003).

controlling issue of law for the purposes of section 1292(b) includes not only those issues that will resolve the action in its entirety, but those that are dispositive in other respects, such as whether a claim exists as a matter of law.[94]  The correct construction of section 316(b) is dispositive in this respect, and is therefore a controlling issue of law.  Moreover, it will materially advance the ultimate termination of the litigation.  Understanding whether plaintiffs may assert a claim under section 316(b) — and if so, what the correct standard for assessing an impairment is — will enable the parties either to avoid a protracted and most likely exorbitantly expensive trial entirely, or to avoid trying the same claim twice under different standards.

Finally, the brewing circuit split and the range of views expressed by district and bankruptcy courts indicate that there is substantial ground for difference of opinion on the correct interpretation of section 316(b).  As noted above, three courts in this district have concluded that section 316(b) protects noteholders' practical right to payment.[95]  Another court in this district, as well as

---

[94]    *See* 19 Moore's Federal Practice § 203.31 (Matthew Bender 3d ed. 2013) (collecting Second Circuit cases).

[95]    *See MeehanCombs*, 2015 WL 221055, at *4–5; *Marblegate I*, 75 F. Supp. 3d at 611–15; *Federated Strategic Income Fund*, 1999 WL 993648, at *7.  A notice of appeal has been filed in *Marblegate II*.  As that case involves some of the same legal issues, an appellate court may wish to consolidate the appeals.  *See* Notice of Appeal, Dkt. No. 80 in *Marblegate Asset Management, LLC v.*

courts elsewhere, have concluded that section 316(b) protects only noteholders'
legal rights.[96]  Further, whether an impairment requires a nonconsenual out-of-
court restructuring, and the standard under which to evaluate the challenged
transaction, are questions that only this Court and Judge Failla have addressed.
These issues are almost certain to arise again, and without guidance from an
appellate court, the divide in the correct interpretation of section 316(b) will likely
only deepen.  These issues are therefore appropriate for certification.

Nevertheless, I do *not* certify this Order for appeal as an alternative to
proceeding.  The parties are expected to remain on schedule, and the Court is ready
to proceed, at the conclusion of discovery on September 30, with full summary
judgment or a bench trial.  It may be that the contract interpretation issue related to
the release provision — which the parties have not briefed for this motion — will
be dispositive.

---

*Education Mgmt. Corp.*, No. 14 Civ. 8584.

[96]      *See In re Northwestern Corp.*, 313 B.R. 595, 600 (Bankr. D. Del.
2004) ("[Section 316(b)] applies to the holder's *legal* rights and not the holder's
*practical* rights to the principal and interest itself.") (emphasis in original); *Brady
v. UBS Financial Services, Inc.*, 538 F.3d 1319, 1326 n.9 (10th Cir. 2008) (quoting
*Northwestern*); *YRC Worldwide Inc. v. Deutsche Bank Trust Co. Americas*, No. 10
Civ. 2106, 2010 WL 2680336, at *7 (D. Kan. July 1, 2010) (following
*Northwestern*).  *See also UPIC & Co.*, 793 F. Supp. at 456 (noting that while
section 316(b) guarantees a "procedural" right to commence an action for
nonpayment, it does not "[a]ffect or alter the substance of a noteholder's right to
payment").

38

## VI. CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED. I hereby certify an interlocutory appeal from this Order pursuant to 28 U.S.C. § 1292(b). The Clerk of Court is directed to close these motions (Docket Nos. 30, 35 in 15-cv-1561; Docket Nos. 27, 35, 37 in 15-cv-4634). A conference is scheduled for October 7, 2015 at 3:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
August 27, 2015

**- Appearances -**

**For Plaintiff BOKF, N.A.:**

Mark Joachim, Esq.
Andrew Silfen, Esq.
Michael S. Cryan, Esq.
Arent Fox LLP (New York)
1675 Broadway
New York, NY 10019
(212) 484-3929

**For Plaintiff UMB Bank, N.A.:**

David A. Chrichlow, Sr., Esq.
Rebecca Kinburn, Esq.
Karen B. Dine, Esq.
Katten Muchin Rosenman, LLP
575 Madison Avenue
New York, NY 10022
(212)-940-8800

**For Defendant Caesars Entertainment Corporation:**

Lewis R. Clayton, Esq.
Michael E. Gertzman, Esq.
Jonathan H. Hurwitz, Esq.
Ankush Khardori, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Eric Seiler, Esq.
Philippe Adler, Esq.
Jason Rubinstein, Esq.
Friedman Kaplan Seiler & Adelman LLP
7 Times Square

New York, NY 10036
(212) 833-1100