**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| BOKF, N.A., solely in its capacity as successor Indenture Trustee for the 12.75% Second-Priority Senior Secured Notes due 2018, | : | Case No. 1:15-cv-01561 (SAS) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CAESARS ENTERTAINMENT CORPORATION, | : | |
| | : | |
| Defendant. | : | |

---

| | | |
|---|---|---|
| UMB BANK, N.A. solely in its capacity as Indenture Trustee under those certain indentures, dated as of June 10, 2009, governing Caesars Entertainment Operating Company, Inc.'s 11.25% Notes due 2017; dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020; dated August 22, 2012, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020; dated February 15, 2013, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020, | : | Case No. 1:15-cv-04634 (SAS) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CAESARS ENTERTAINMENT CORPORATION, | : | |
| | : | |
| Defendant. | : | |

---

# PLAINTIFFS' OPPOSITION TO DEFENDANT CAESARS ENTERTAIMENT CORPORATION'S MOTION *IN LIMINE*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     THE COURT SHOULD DENY CEC MIL NO.1 BECAUSE EVIDENCE RELATING TO THE "PROPERTY TRANSACTIONS" IS RELEVANT AND ADMISSIBLE ......... 2

     A.     Evidence Relating to the "Property Transactions" is Relevant to the Question of Restructuring. .................................................................................................. 4

     B.     The Facts of the Property Transactions are Not in Dispute and Will Not Confuse the Jury or Cause Delay. ...................................................................................... 5

II.     THE COURT SHOULD DENY CEC MIL NO. 2 BECAUSE CEC FAILS TO IDENTIFY SPECIFIC EVIDENCE TO BE EXCLUDED. ................................................. 7

III.     THE COURT SHOULD DENY CEC MIL NO. 3 BECAUSE CEC WAS PERMITTED TO TAKE DISCOVERY ON NOTEHOLDERS' RELIANCE ON THE PARENT GUARANTEE. ............................................................................................................. 8

IV.     THE COURT SHOULD DENY CEC MIL NO. 4 AND ALLOW EVIDENCE CONCERNING POTENTIAL REVISIONS TO SECTION 316(B) OF THE TIA. ....... 10

     A.     The Evidence is Both Relevant and Not Unduly Prejudicial. ............................... 10

     B.     The Lobbying Evidence is Outside of the Scope of the *Noerr-Pennington* Doctrine. ............................................................................................................. 11

     C.     Evidence of Lobbying Is Likewise Admissible Pursuant to Rule 407. ................ 13

V.     THE COURT SHOULD DENY CEC MIL NO. 5 BECAUSE THE COURT HAS ALREADY RULED THAT THE PARENT GUARANTEE PROVIDED CREDIT SUPPORT FOR THE NOTEHOLDERS. ............................................................................. 14

     A.     The Law of the Case Doctrine Precludes CEC From Introducing Evidence to Vary the Plain Meaning of the Parent Guarantee. ...................................................... 15

     B.     CEC's Proffered Evidence Consists of Purported Parties' and Nonparties' Subjective Interpretation of the Indentures and is Inadmissible to Interpret Section 12.02(c)(i)-(iii) of the Indentures. ...................................................................... 16

     C.     CEC's Proposed Evidence is Not Relevant to the Trustees' Breach of the Duty of Good Faith and Fair Dealing or BOKF's Intentional Interference with Contractual Relations Claim, and any Marginal Relevance is Outweighed by the Danger of Undue Prejudice. .................................................................................................. 19

CONCLUSION .................................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Fiber Techs. Trust v. J & L Fiber Servs., Inc.*,
  No. 1:07-CV-1191, 2015 WL 1472015 (N.D.N.Y. Mar. 31, 2015) ........................................9

*Alexander v. Nat'l Farmers Org.*,
  687 F.2d 1173 (8th Cir. 1982) ........................................................................................11

*Arlio v. Lively*,
  474 F.3d 46 (2d Cir. 2007)..............................................................................................22

*BOKF N.A. v. Caesars Entm't Corp.*,
  Nos. 15-cv-1561 (SAS), 15-cv-4634 (SAS), 2015 WL 5076785 (S.D.N.Y.
  Aug. 27, 2015) ..................................................................................................... *passim*

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  186 F.3d 781 (7th Cir. 1999) ..........................................................................................12

*Cann v. Ford Motor Co.*,
  658 F.2d 54 (2d Cir. 1981)..............................................................................................13

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*,
  257 F. Supp. 2d 751 (S.D.N.Y. 2003)..............................................................................16

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384, 663 N.E.2d 289 (1995)...........................................................................20

*Ford v. Schmidt*,
  577 F.2d 408 (7th Cir. 1978) ..........................................................................................14

*George v. Celotex Corp.*,
  914 F.2d 26 (2d Cir. 1990)..............................................................................................10

*Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  No. 96-CV-7874 (RWS), 2002 WL 826956 (S.D.N.Y. May 1, 2002)....................................17

*Hamilton v. Accu-tek*,
  935 F. Supp. 1307 (E.D.N.Y. 1996) ............................................................................11, 12

*Hernandez v. Amcord, Inc.*,
  156 Cal. Rptr. 3d 90 (Ct. App. 2013) ..............................................................................12

*Hernandez v. NJK Contractors, Inc.*,
    No. 09-CV-4812 RER, 2015 WL 1966355 (E.D.N.Y. May 1, 2015) ...................................... 9

*Household Goods Carriers Bureau v. Terrell*,
    452 F.2d 152 (5th Cir. 1971) ................................................................................................ 11

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*,
    889 F.2d 1274 (2d Cir. 1989) ............................................................................................... 18

*InterDigital Commc'ns Corp. v. Nokia Corp.*,
    407 F. Supp. 2d 522 (S.D.N.Y. 2005) ................................................................................ 20

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009) ................................................................................................ 17

*JA Apparel Corp. v. Abboud*,
    682 F. Supp. 2d 294 (S.D.N.Y. 2010) ................................................................................ 18

*Kronos, Inc. v. AVX Corp.*,
    81 N.Y.2d 90, 612 N.E.2d 289 (1993) ............................................................................... 21

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010) ................................................................................................ 18

*In re LightSquared Inc.*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) ................................................................................ 20

*Malone* v. *Microdyne Corp.*,
    26 F.3d 471 (4th Cir. 1994) ................................................................................................ 14

*MDC Corp. v. John J. Harland Co.*,
    228 F. Supp. 2d 387 (S.D.N.Y. 2002) ................................................................................ 21

*Mobileye, Inc. v. Picitup Corp.*,
    928 F. Supp. 2d 759 (S.D.N.Y. 2013) ................................................................................ 14

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*,
    937 F. Supp. 276 (S.D.N.Y. 1996) ..................................................................................... 16

*Ndremizara v. Swiss Re Am. Holding Corp.*,
    93 F. Supp. 3d 301, 315 (S.D.N.Y. 2015) ..................................................................... 8, 15

*New W., L.P. v. City of Joliet*,
    491 F.3d 717 (7th Cir. 2007) .............................................................................................. 12

*New York v. Adamowicz*,
    932 F. Supp. 2d 340 (E.D.N.Y. 2013) ............................................................................... 16

*Richards v. City of New York*,
433 F. Supp. 2d 404 (S.D.N.Y. 2006)...................................................................16

*Sorenson v. Bridge Capital Corp.*,
52 A.D.3d 265, 861 N.Y.S.2d 280 (2008) .............................................................20

*SR International Business Insurance Co. v. World Trade Center Properties, LLC*,
467 F.3d 107 (2d Cir. 2006)............................................................................17, 18

*UMB Bank, N.A. v. Caesars Entertainment Corporation*,
Case No. 1:15-cv-04634-SAS...............................................................................1

*United Mine Workers of Am. v. Pennington*,
381 U.S. 657 (1965)....................................................................................11, 12

*United States v. Alvarez*,
541 F. App'x 80 (2d Cir. 2013) .............................................................................10

*United States v. Cline*,
188 F. Supp. 2d 1287 (D. Kan. 2002)......................................................................7

*United States v. Ozsusamlar*,
428 F. Supp. 2d 161 (S.D.N.Y. 2002)......................................................................3

*United States v. Quintieri*,
306 F.3d 1217 (2d Cir. 2002)................................................................................16

*Washington v. Kellwood Co.*,
105 F. Supp. 3d 293, 328 (S.D.N.Y. 2015)............................................................11

*Wechsler v. Hunt Health Sys., Ltd.*,
No. 94 CIV. 8294(PKL), 2003 WL 21998980 (S.D.N.Y. Aug. 22, 2003)..............7

*Werner v. Upjohn Co.*,
628 F.2d 848 (4th Cir. 1980) ................................................................................13

*Wolfe v. McNeil-PPC, Inc.*,
No. CIV.A. 07-348, 2012 WL 38694 (E.D. Pa. Jan. 9, 2012) ...............................12

**Statutes**

The Trust Indenture Act of 1939, Section 316(b).........................................1, 3, 10, 13

**Other Authorities**

Fed. R. Civ. P. 37 ........................................................................................................................9

Fed. R. Evid. 401 ...................................................................................................................3, 10

Fed. R. Evid. 402 ...................................................................................................................3, 22

Fed. R. Evid. 403 ...........................................................................................................3, 10, 22

Fed. R. Evid. 407 .................................................................................................................13, 14

## INTRODUCTION

Plaintiffs[1] in the above-captioned Actions[2] respectfully submit this memorandum of law in opposition to the motion *in limine* filed by Defendant, Caesars Entertainment Corporation ("CEC").

CEC's motion *in limine* contains five parts. *See generally* Mem. of Law of Caesars Entertainment Corporation in Supp. of its Mot. *In Limine*, *BOKF* ECF No. 93 ("CEC Mem."). In Part I, CEC requests that this Court exclude evidence of various transactions that CEC and CEOC undertook to strip CEOC of its valuable assets ("CEC MIL No. 1"). *Id.* at 4-8. In Part II, CEC asks that the Trustees be precluded from offering any evidence regarding finances and operations of Apollo and TPG (the "Sponsors") and all evidence of the Sponsors' transactions not including CEOC, CEC, or related entities ("CEC MIL No. 2"). *Id.* at 9-11. Part III requests an order precluding the Trustees from introducing evidence that the Noteholders relied on CEC's guarantee of the Notes (the "Parent Guarantee"), ostensibly because this Court disallowed CEC from obtaining discovery on the parties' "irrelevant and inadmissible" subjective intent or understanding of the Parent Guarantee ("CEC MIL No. 3"). *Id.* at 11-13. In Part IV, CEC admits that it engaged in a lobbying effort to retroactively amend Section 316(b) of the TIA to escape

---

[1] Plaintiffs are (i) BOKF, N.A. ("BOKF"), solely in its capacity as successor Indenture Trustee for the 12.75% Second-Priority Senior Secured Notes due 2018 (the "Second Lien Notes") and (ii) UMB Bank, N.A. ("UMB," and together with BOKF, the "Trustees"), solely in its capacity as Indenture Trustee under those certain indentures, dated as of June 10, 2009, governing the Caesars Entertainment Operating Company, Inc.'s ("CEOC's") 11.25% Notes due 2017; dated as of February 14, 2012, governing CEOC's 8.5% Senior Secured Notes due 2020; dated August 22, 2012, governing CEOC's 9% Senior Secured Notes due 2020; dated February 15, 2013, governing CEOC's 9% Senior Secured Notes due 2020 (the "First Lien Notes," and together with the Second Lien Notes, the "Notes").

[2] *BOKF, N.A. v. Caesars Entertainment Corporation*, Case No. 1:15-cv-01561-SAS (the "*BOKF* Action") and *UMB Bank, N.A. v. Caesars Entertainment Corporation*, Case No. 1:15-cv-04634-SAS (the "*UMB* Action"), are referred to collectively as the "Actions." For convenience, references to court filings will be to those made in the *BOKF* Action, cited as "*BOKF* ECF No. ____."

potential liability in these (and other) actions, but asks that the Trustees be precluded from informing the jury about these efforts ("CEC MIL No. 4"). *Id.* at 13-17. Finally, CEC seeks an affirmative order allowing it to introduce evidence of CEC's, nonparties', and purported experts' analyses of the Indentures to argue that the Parent Guarantee did not provide credit support— evidence that contradicts the law of this case and that this Court has previously declared to be inadmissible as including only uncommunicated subjective intent. CEC claims the evidence should be admitted despite this Court's prior rulings to the contrary because it is allegedly relevant to nearly all of its defenses in these Actions ("CEC MIL No. 5"). *Id.* at 17-21.

The Trustees will separately address each part of CEC's motion *in limine* in order. For the reasons that follow, the Trustees respectfully request that the Court deny each and every part of CEC's motion *in limine*.

## ARGUMENT

I.   **THE COURT SHOULD DENY CEC MIL NO. 1 BECAUSE EVIDENCE RELATING TO THE "PROPERTY TRANSACTIONS" IS RELEVANT AND ADMISSIBLE.**

CEC's attempt to exclude evidence of the so-called "Property Transactions"[3] is a transparent attempt to preclude the Trustees from presenting relevant evidence on the question of

---

[3] CEC defines the "Property Transactions" to include: (i) the January 2008 leveraged buyout in which Apollo, TPG, and other co-investors acquired CEC (the "LBO"); (ii) the Fall 2003 transaction in which CEOC sold two properties—Octavius Tower and Project Linq—to Caesars Entertainment Resort Properties (the "CERP Transaction"); (iii) the Fall 2013 transaction in which CEOC sold its interest in Planet Hollywood Resort & Casino in Las Vegas and the Horseshoe Baltimore, as well as the properties' 50% management fees, to Caesars Growth Partners, LLC (the "Growth Transaction"); (iv) transactions involving Caesars Interactive Entertainment (the "CIE Transactions"); the Spring 2014 transaction in which CEOC sold its interest in four Las Vegas Properties, including 50% of the management fees, to CGO (the "Four Property Transactions"); and (v) the Spring 2014 joint venture, Caesars Enterprise Services, LLC (the "CES Transaction"). CEC Mem. at 5. The Trustees note that CEC actually engaged in dozens of restructuring transactions between 2011 and 2014, which implicitly are included in CEC's definition of Property Transaction. Therefore, the Trustees define "Property Transactions" more broadly, to include all restructuring transactions relevant to this case.

restructuring for purposes of Section 316(b) of the Trust Indenture Act ("TIA"). CEC asserts that the Property Transactions are irrelevant because the only three transactions at issue are those in which CEC purported to release the Parent Guarantee of the Notes—the May 2014 sale of 5% of CEOC stock to investors, the May/June 2014 grant of 6% of CEOC's stock through a purported employee performance incentive plan, and the August 2014 transaction in which certain CEOC unsecured Noteholders consented to an amendment of their indentures to, among other things, remove CEC's guarantee. CEC Mem. at 4.

The Trustees, however, contend that restructuring transactions date back to at least October of 2013, when CEC began addressing CEOC's deteriorating financial state through sales of its major assets and other activities. In addition, the focus of the January 2008 leveraged buyout is relevant to provide background for the various restructuring transactions. Because the TIA analysis set out by the Court turns, in part, on the fact question of whether Caesars was engaged in a restructuring, evidence of the Property Transactions is relevant[4] and admissible evidence of a restructuring.

The Trustees intend to introduce the evidence of the Property Transactions to show that these transactions were undertaken to generate cash and extend the "runway" for CEOC to buy time to improve its financial condition. Under the express terms of the Court's August 27, 2015 decision, CEC's efforts to extend the runway are supportive of an ongoing restructuring. *See BOKF N.A. v. Caesars Entm't Corp.*, Nos. 15-cv-1561 (SAS), 15-cv-4634 (SAS), 2015 WL

---

[4] Federal Rules of Evidence ("FRE") provide that "[i]rrelevant evidence is not admissible," and define "relevant evidence" as having "any tendency to make a fact more or less probable than it would be without the evidence" and being "of consequence in determining the action." FRE 401, FRE 402. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FRE 403. A court will exclude evidence on a *motion in limine* only if it is "clearly inadmissible on all potential grounds." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2002).

5076785, at *11 (S.D.N.Y. Aug. 27, 2015). Therefore, the salient relevant facts the Trustees would establish as a part of their TIA claim would be that the Property Transactions have occurred and generated cash to provide CEC or CEOC with liquidity.

However, the Trustees need not, and do not intend to, present as part of their TIA claim evidence that the Property Transactions were unfair, illegal, or inequitable.[5] Thus CEC's fears of prejudice on that score are misplaced. Moreover, CEC cannot dispute that the Property Transactions transpired and generated cash for CEOC, and thus there is no risk of confusion or delay in presentation of the Property Transactions evidence

> **A.      Evidence Relating to the "Property Transactions" is Relevant to the Question of Restructuring.**

As this Court held on August 27, 2015 in deciding the Trustees' Motion for Partial Summary Judgment on the question of whether CEC's purported Parent Guarantee release violated the TIA, "[t]he transactions must be analyzed as a whole to determine if the overall effect was to achieve a debt restructuring that impaired plaintiffs' right to payment." *BOKF N.A.*, 2015 WL 5076785, at *11. Evaluating the transaction "as a whole to determine whether they *collectively* constitute an impermissible out-of-court reorganization" in violation of the TIA averts any risk that "routine transactions" will be examined as potential violations of the TIA. *Id*. Among specific factors to be considered in determining whether a restructuring occurred is whether "the transactions attempt[ed] to extend the life of a company facing bankruptcy." *Id*.

The purported removal of CEC's Parent Guarantee did not occur in a vacuum, and the Property Transactions are directly relevant to the question of whether an overleveraged CEOC

---

[5] While only a narrow set of facts underlying the Property Transactions is relevant to the TIA claim, the Trustees reserve the right to argue that some or all of the Property Transactions breached CEC's covenant of good faith and fair dealing as alleged in BOKF complaint Count VII and UMB complaint Count VI. *See* Part V below. The Trustees also reserve all rights to pursue claims related to the good faith and fairness of the Property Transactions in other actions.

engaged in one or a series of out-of-court restructurings to alleviate its dismal financial situation. When viewed collectively, the Property Transactions together with the three transactions that CEC claims removed its Parent Guarantee demonstrate that—as CEOC's financial health declined—CEC monetized CEOC's casino and resort properties as well as CEOC's intellectual property assets, while simultaneously engaging in a series of debt transactions. Together, these corporate actions are directly relevant to the question of whether Caesars undertook a restructuring.

CEC contends that the Trustees' expert on debt reorganizations, Martha Kopacz, "does not factor the Property Transactions at all into her analysis of whether CEOC was engaged in a reorganization." CEC Mem. at 8. This is simply wrong. Ms. Kopacz relies on and explains the key Property Transactions that CEOC undertook to provide it with money and time as part of the basis for her opinion that Caesars was engaged in a restructuring. Expert Report of Martha E.M. Kopacz ("Kopacz Rpt.") ¶¶ 65, 82-85. This evidence is not only relevant to these Actions, it is precisely the fact evidence the Court has requested in its August 27, 2015 Opinion and Order denying summary judgment based on the existence of a dispute as to material facts.

**B.      The Facts of the Property Transactions are Not in Dispute and Will Not Confuse the Jury or Cause Delay.**

The introduction of evidence of the Property Transactions will not confuse or prejudice the jury. The Trustees do not expect to address the propriety of the Property Transactions as a part of their proof that a TIA violation has occurred. Rather the Trustees will only seek to introduce evidence sufficient to establish that the transactions occurred, and that they were

entered into with the intent of extending CEOC's runway, as testified to by CEC and CEOC witnesses. There is no concern that the jury might be prejudiced on this basis.[6]

CEC's concerns about unnecessary delay are also misplaced. CEC does not (and cannot) dispute that the Property Transactions transpired. Indeed, the Property Transactions were memorialized in CEC's and CEOC's public filings with the Securities and Exchange Commission. Further, CEC and CEOC employees, along with those of its Sponsors, have consistently testified in their depositions that these events occurred, and CEC has admitted to the same in its responses to the Trustees' discovery requests and in briefing (*see* BOKF's Statement of Undisputed Material Facts, BOKF ECF No. 33, ¶¶ 18, 26-28, 31-41; CEC's Local Civil Rule 56.1 Response, BOKF ECF No. 39, Response to Statement of Material Facts ¶¶ 18, 26-28, 31-41 & Counter-Statement of Material Facts ¶¶ 6-8). Thus, there will be no need for CEC to present "extensive evidence" about these transactions. *See* CEC Mem. at 8.

Finally, the Trustees' evidence regarding the Property Transactions will not muddy the evidence related to the three transactions that purportedly released CEC's Parent Guarantees. Rather, such evidence will merely paint the broader context underlying CEC's purported release of the Parent Guarantees. Indeed, Ms. Kopacz's will testify that the Trustees need not delve into the specifics of the various Property Transactions in order to prove their relevance to the question of restructuring. Kopacz Rpt. ¶ 7. For the foregoing reasons, CEC's MIL No. 1 should be denied.

---

[6] The Trustees believe evidence of CEC's good faith is irrelevant to the restructuring issues. If, however, CEC introduces evidence of its good faith with respect to the restructuring issues, the Trustees reserve the right to introduce evidence to dispute CEC's "good faith" evidence.

## II.   THE COURT SHOULD DENY CEC MIL NO. 2 BECAUSE CEC FAILS TO IDENTIFY SPECIFIC EVIDENCE TO BE EXCLUDED.

Part II of CEC's motion *in limine* asks the Court to broadly exclude, without specificity, (1) "all evidence regarding the financial condition of [the Sponsors]," as well as (ii) exclusion of "all evidence concerning [the Sponsors] in transactions <u>not</u> involving CEOC, CEC, or related entities." CEC Mem. at 9 (emphasis added). As to CEC's first argument, the Trustees state that they do not intend to present at trial evidence of the Sponsors' finances or business practices to the extent those finances and business practices have no relevance to CEC, CEOC, or any other related entity. Similarly, as to CEC's second argument, the Trustees do not expect to offer evidence of the Sponsors' transactions not involving CEOC, CEC, or related entities.[7]

Nevertheless, CEC's MIL No. 2 fails to provide any specificity of what it seeks to exclude. "A district court is well within its discretion to deny a motion *in limine* that fails to identify the evidence with particularity or to present arguments with specificity." *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 CIV. 8294(PKL), 2003 WL 21998980, at *3 (S.D.N.Y. Aug. 22, 2003) (quoting *United States v. Cline*, 188 F. Supp. 2d 1287, 1292 (D. Kan. 2002)). That is the situation here, and the Court should not issue a broad exclusionary order in a vacuum. Accordingly, the Trustees respectfully request that the Court deny Part II of CEC's motion *in limine* and address CEC's specific objections, if any, by trial objection with respect to proffered evidence.[8]

---

[7] As shown in Part I above, the Trustees do expect to offer evidence of the "Property Transactions," that are the subject of Part I of this Opposition. Under CEC's definition, the "Property Transactions" do involve CEOC, CEC, or their related entities. CEC Mem. at 2, 5.

[8] The Trustees, however, reserve the right to offer evidence regarding the Sponsors' finances or business practices if CEC introduces such evidence or otherwise opens the door on these issues.

III.  **THE COURT SHOULD DENY CEC MIL NO. 3 BECAUSE CEC WAS PERMITTED TO TAKE DISCOVERY ON NOTEHOLDERS' RELIANCE ON THE PARENT GUARANTEE.**

CEC asks that the Trustees be precluded from introducing evidence "to the effect that any of the holders of the Notes actually relied on the [Parent] Guarantee in purchasing and holding the Notes" because, CEC contends, it was prevented from acquiring discovery to test this contention. CEC Mem. at 11. CEC's argument mischaracterizes the Court's prior rulings, which precluded discovery into the Noteholders' *subjective interpretation* of the unambiguous Parent Guarantee provision, rather than into their *reliance* on the Parent Guarantee for credit support.

In August 2015, this Court ruled conclusively that the Parent Guarantee is not, as CEC still stubbornly contends, merely one of convenience. *See BOKF, N.A.*, 2015 WL 5076785, at *6-8. Rather, "the plain language of the Guarantee section indicates that it provided full credit support" and is "a promise of full payment in the event that CEOC was unable to fulfill its payment obligations." *Id.* at *7. Parol evidence, including "whether the noteholders' believed the Guarantee provided genuine credit support" was properly determined to be inadmissible to vary the Indentures' plain terms. *Id.* at *6-8. Accordingly, the Court did not permit CEC to conduct discovery to elicit such parol evidence as to the meaning of the Parent Guarantee. *Id.* at *12 ("[T]he parties' subjective intent or understanding of the Guarantee is irrelevant and inadmissible in the face of unambiguous contractual language.").

The Court's ruling that the Parent Guarantee unambiguously provided credit support is the "law of the case," and evidence of the Noteholders' subjective interpretation of the meaning of the Parent Guarantee is inadmissible. *See, e.g.*, *Ndremizara v. Swiss Re Am. Holding Corp.*, 93 F. Supp. 3d 301, 315 (S.D.N.Y. 2015) ("[A]s a general matter [the court] will adhere to its own decision [made] at an earlier stage of the litigation."); *see also* Mem. in Supp. Pls.' Joint Omnibus Motion *in Limine* ("Omnibus Mem."), No. 1, *BOKF* ECF No. 90, at 2-8; *infra* § V.A.

While the Trustees do not believe that CEC's motion seeks to exclude evidence that the Noteholders' ultimate recovery was affected by CEC's purported stripping of the Parent Guarantee, for the avoidance of doubt, such evidence would be both relevant and admissible. The Trustees have the right to introduce relevant, non-prejudicial evidence on matters as to which CEC was not expressly denied discovery. The Court *expressly* permitted CEC to conduct discovery on (among other topics) "whether the noteholders' prospects for recovery were adversely affected by the challenged transactions," as this was relevant to the Trustees' claim under the TIA. *BOKF, N.A.*, 2015 WL 5076785, at *12. Accordingly, the Noteholders should be permitted to testify about whether their prospects for recovery on their Notes were diminished by the actions CEC took to strip CEOC of its assets and remove the Parent Guarantee. *See Hernandez v. NJK Contractors, Inc.*, No. 09-CV-4812 RER, 2015 WL 1966355, at *30 (E.D.N.Y. May 1, 2015) (sanction under Federal Rule of Civil Procedure 37 of exclusion of evidence not warranted where defendants had opportunity to conduct discovery regarding plaintiffs' evidence); *Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, No. 1:07-CV-1191 LEK/DEP, 2015 WL 1472015, at *6 (N.D.N.Y. Mar. 31, 2015) (denying motion to strike where parties had opportunity to test contention during discovery).

Such evidence would not be offered to prove the meaning of the Parent Guarantee, which has already been determined as a matter of law. Rather, it would demonstrate that the Noteholders relied, or were entitled to rely, on the Parent Guarantee for credit support, and that CEC's actions diminished the Noteholders' prospects for recovery on the Notes. CEC was not

denied discovery on this subject, and the Noteholders should not be prohibited from testifying on whether they relied on the Parent Guarantee.[9] Accordingly, CEC MIL No. 3 should be denied.

## IV.     THE COURT SHOULD DENY CEC MIL NO. 4 AND ALLOW EVIDENCE CONCERNING POTENTIAL REVISIONS TO SECTION 316(B) OF THE TIA.

The Court should allow evidence concerning efforts by CEC, its affiliates, and/or its agents to amend Section 316(b) of the TIA. The reasons CEC has provided for the exclusion of this evidence are unavailing. CEC's efforts to amend the TIA are relevant, not unduly prejudicial, and outside the scope of *Noerr-Pennington* doctrine. Moreover, CEC's effort to change the law is not a "subsequent remedial measure" intended to prevent future harm, but is instead a transparent attempt to shield itself from the consequences of its own improper actions.

### A.     The Evidence is Both Relevant and Not Unduly Prejudicial.

Evidence concerning efforts by CEC, its affiliates, and/or its agents to amend Section 316(b) of the TIA is relevant to the Trustees' allegations that CEC acted in bad faith to frustrate the purpose of the Indentures and the Parent Guarantee. That evidence is directly relevant to BOKF's Count VII and UMB's Count VI. *See* FRE 401.

FRE Rule 403 permits the Court to exclude unfairly prejudicial relevant evidence, but "the exclusion of probative evidence is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d Cir. 1990). Prejudice is "unfair" only if it "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Alvarez*, 541 F. App'x 80, 85 (2d Cir. 2013) (alteration in original). CEC has not shown that this is such an extraordinary situation that calls for such a remedy. Courts have allowed evidence of lobbying to be admitted to provide a larger

---

[9] CEC MIL No. 5 seeks to reargue the meaning and purpose of the Parent Guarantee. That issue is addressed in Part V below.

context of a transaction. *See, e.g.*, *Household Goods Carriers Bureau v. Terrell*, 452 F.2d 152, 158 (5th Cir. 1971) (admitting evidence of defendant's lobbying to "show the 'purpose and character of the transactions under scrutiny,' to rebut the insinuations put into evidence by the defendants"); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1193 (8th Cir. 1982) (admitting evidence of lobbying which went to show that defendant "acted in concert with the intent to eliminate competition"). CEC's argument that admitting the evidence "could distract and confuse the jury, and elicit an emotional response, causing them to base their decision on something other than the material evidence in the case," CEC Mem. at 14, is conclusory and insufficient. *See, e.g.*, *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 328 (S.D.N.Y. 2015) (denying motion to omit evidence where moving party failed "articulate anything but the conclusory suggestion that [the evidence] would not be relevant").

### B.   The Lobbying Evidence is Outside of the Scope of the *Noerr-Pennington* Doctrine.

The *Noerr-Pennington* doctrine arose in the context of antitrust claims based entirely on evidence of lobbying—a circumstance entirely inapposite to the case at hand. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669 (1965) ("reject[ing] an attempt to base a Sherman Act conspiracy on evidence consisting *entirely* of activities of competitors seeking to influence public officials") (emphasis added). Even if one were to extend the *Noerr-Pennington* doctrine outside the antitrust context it would still fail to apply in this case, because CEC's lobbying is being used as evidence of wrongdoing and bad faith, not as the sole factual predicate for the claim. In *Pennington*, the question presented to the Court was whether a jury "was free to find an illegal conspiracy based *solely* on the [lobbying]." *Id.* (emphasis added).

CEC argues that "*Noerr–Pennington* has been extended by analogy to protect petitioning activity challenged under other federal statutes." *Hamilton v. Accu-tek*, 935 F. Supp. 1307, 1317

(E.D.N.Y. 1996). However, both of the cases CEC cites outside the antitrust context are factually dissimilar to the case at hand. *Id.; New W., L.P. v. City of Joliet*, 491 F.3d 717 (7th Cir. 2007). *Hamilton* involved gun manufacturers lobbying about the federal regulation of hand guns, 935 F. Supp. at 1313-16, and *New West* involved a city lobbying HUD not to renew a federal subsidy for an apartment complex, 491 F.3d at 719. Moreover, while *Hamilton* recognized the *Noerr-Pennington* protection against premising liability entirely on lobbying activity, the court in that case explicitly held that evidence of lobbying may be relevant and admissible when offered together with other probative evidence. *Hamilton*, 935 F. Supp. at 1321 ("A core principle of the *Noerr–Pennington* doctrine is that lobbying alone cannot form the basis of liability, although such activity may have some evidentiary value."). This distinction is key, as the Trustees do not premise any liability directly on CEC's lobbying of Congress, but rather intend to rely on it as evidence of knowledge and bad faith.

CEC admits, as it must, that it is "'within the province of the trial judge to admit' evidence of efforts to influence public officials, 'if [s]he deemed it *probative and not unduly prejudicial.*'" CEC Mem. at 15 (quoting *Pennington*, 381 U.S. at 670 n.3 (quoting FRE 403)). Put another way, "while a corporation's petitioning of government officials may not itself form the basis of liability, evidence of such petitioning activity may be admissible if otherwise relevant to show the purpose and character of other actions of the corporation." *Hernandez v. Amcord, Inc.*, 156 Cal. Rptr. 3d 90, 104 (Ct. App. 2013). "The *Noerr-Pennington* doctrine is not a rule of evidence." *Id.*; *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 789 (7th Cir. 1999) (finding that the district court "erred in treating the doctrine as a rule of evidence that forbids the introduction of evidence"); *Wolfe v. McNeil-PPC, Inc.*, No. CIV.A. 07-348, 2012 WL 38694, at *6 (E.D. Pa. Jan. 9, 2012) (rejecting *Noerr-Pennington* exclusion of

evidence because the moving party's "inability to identify a single case in which a court applied *Noerr–Pennington* to exclude evidence").

The Trustees do not premise liability of CEC on its lobbying alone, but offer it only as one aspect of an otherwise voluminous evidentiary record. Therefore, the *Noerr-Pennington* doctrine does not apply, and the evidence should be admitted.

### C.   Evidence of Lobbying Is Likewise Admissible Pursuant to Rule 407.

CEC further claims that even if its lobbying efforts are deemed relevant and not precluded by the *Noerr-Pennington* doctrine, evidence of these efforts should be excluded as evidence of "subsequent remedial measure." This argument is specious because the failed TIA amendment would not have remedied any future harm and was not, therefore a remedial action.

"Rule 407 is designed to protect the important policy of encouraging defendants to repair and improve their products and premises without the fear that such actions will be used later against them in a lawsuit." *Werner v. Upjohn Co.*, 628 F.2d 848, 855 (4th Cir. 1980). The Rule "is prompted by the fear that people will be less likely to take subsequent remedial measures if evidence of their repairs or improvements may be used against them in lawsuits arising out of prior accidents." *Cann v. Ford Motor Co.*, 658 F.2d 54, 60 (2d Cir. 1981). It is no surprise that, as CEC notes, this concept arose out of negligence and personal injury jurisprudence. Rule 407 allows actors to take actions to avoid future harm, without those actions being a tacit admission that the actor should be held accountable for such things happening in the past.

By trying to amend the law, however, CEC was not attempting to make a wrong less likely to occur in the future. Instead it was trying to change the definition of what is right and wrong here—indeed, the proposed amendment was designed to apply retroactively, and "to any action that, as of such date of enactment, has not resulted in a final, non-appealable judgment." The former is altruistic; the actor is trying to change his or her actions going forward, often times

to the benefit of others. The latter is self-serving. Far from ameliorating future injury to security holders, the amendment would have severely limited statutory protections afforded to them by the TIA and the Parent Guarantee. This is the exact opposite of what Rule 407 was set out to accomplish.

Indeed, this is made clear by the cases that CEC cites. In *Malone* v. *Microdyne Corp.*, defendant Microdyne was accused of securities fraud for not including certain data regarding "rights of return" in press releases and government filings. 26 F.3d 471, 473 (4th Cir. 1994). Microdyne then included the relevant information in a subsequent form 10-K. The plaintiff wished to include the 10-K as evidence that Microdyne understood the omission to be fraudulent. The court excluded the 10-K, concerned that "jurors likely would view its disclosure of rights of return as proof of culpable conduct, akin to a landlord's fixing a stairway after being sued by an injured tenant." *Id.* at 480. In other words, Microdyne took subsequent remedial measures, decreasing the likelihood that its shareholders might be deceived or mislead in the future. Unlike CEC, Microdyne did not take action to immunize itself from liability for prior illegal acts. CEC's attempt to change the law to retroactively justify its wrongful conduct is abhorrent to public policy and is not protected by Rule 407. Exclusion on these grounds is not warranted here.[10]

## V.   THE COURT SHOULD DENY CEC MIL NO. 5 BECAUSE THE COURT HAS ALREADY RULED THAT THE PARENT GUARANTEE PROVIDED CREDIT SUPPORT FOR THE NOTEHOLDERS.

In the final part of its *in limine* motion, CEC asks this Court for an affirmative order permitting it to introduce testimony from third-parties, analysts, and purported parties and

---

[10] The other cases cited by CEC contained similar remedial measures intended to prevent people from suffering harm going forward. *See, e.g.*, *Ford v. Schmidt*, 577 F.2d 408, 410-11 (7th Cir. 1978) (Prison ceased practice which limited prisoner's ability to mail documents); *Mobileye, Inc. v. Picitup Corp.*, 928 F. Supp. 2d 759, 776 n.l5 (S.D.N.Y. 2013) (Defendant in a false advertising action removed challenged statements from its website).

experts interpreting the purpose of the Parent Guarantee. *See* CEC Mem. at 17. But this Court has already determined that this evidence, which purports to demonstrate that "the parties all understood that the Guarantee was essentially meaningless," is "exactly the type of extrinsic evidence of subjective intent that is inadmissible under New York law." *BOKF, N.A.*, 2015 WL 5076785, at *8. CEC nevertheless tries to offer this evidence at trial through the back door of establishing *its own* intent. CEC Mem. at 18-22. Because this Court has already ruled as a matter of law that the Parent Guarantee unambiguously provided credit support, this improper extrinsic evidence is irrelevant. CEC's motion *in limine* should therefore be denied and extrinsic evidence of the meaning of the Parent Guarantee should remain excluded.

### A. The Law of the Case Doctrine Precludes CEC From Introducing Evidence to Vary the Plain Meaning of the Parent Guarantee.

In an effort to admit evidence that this Court previously determined to be irrelevant, CEC attempts to revive, on the eve of trial, its claim that the Parent Guarantee is merely one of convenience. CEC Mem. at 21. But this Court has squarely rejected this argument at the summary judgment stage, holding that "the plain language of the Guarantee section indicates that it provided credit support." *BOKF, N.A.*, 2015 WL 5076785, at *7; *see also* Tr. of Feb. 8, 2016 Hr'g at 3:24-4:15 (Exhibit 1 to the accompanying Declaration of Andrew I. Silfen). Indeed, the Court further held that the same evidence CEC now seeks to admit was "extrinsic evidence of subjective intent . . . inadmissible under New York law." *BOKF, N.A.*, 2015 WL 5076785, at *8.

CEC presents no new or different arguments justifying reconsideration. Instead, it largely incorporates by reference arguments it fully briefed during summary judgment. CEC Mem. at 21 (citing CEC Opp. to BOKF Mot. for Summ. J., *BOKF* ECF No. 44, at 28-29). But "mere disagreement with a Court's [prior] analysis," *Ndremizara v. Swiss Re Am. Holding Corp*, 93 F. Supp. 3d 301, 315 (S.D.N.Y. 2015), is generally insufficient to justify a departure from the "law

of the case" doctrine, which mandates that a court's decision on a rule of law—like the decision of this Court holding that the Parent Guarantee provided credit support—generally "continue[s] to govern the same issues in subsequent stages in the same case," *New York v. Adamowicz*, 932 F. Supp. 2d 340, 345 (E.D.N.Y. 2013) (quoting *DiLaura v. Power Auth. Of New York*, 982 F.3d 73, 76 (2d Cir. 1992)). *See generally* Plaintiffs' Joint Omnibus Motion *in Limine* No. 1, *BOKF* ECF No. 90, at 2-8 (incorporated here by reference).

CEC's bald request that the Court "reconsider" its summary judgment holding is devoid of any "cogent" or "compelling" reasons sufficient to justify departure from the "law of the case" doctrine. *See Adamowicz*, 932 F. Supp. 2d at 345 (quoting *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002)). CEC cites no "intervening change of controlling law," identifies no "new evidence," and makes no argument that the Court must "correct a clear error or prevent manifest injustice" to warrant reconsideration. *Richards v. City of New York*, 433 F. Supp. 2d 404, 416 (S.D.N.Y. 2006). Accordingly, the Trustees respectfully request that this Court decline to now reconsider issues it has squarely resolved months ago as a matter of law and exclude the evidence that was irrelevant to the interpretation of the Parent Guarantee. *See Adamowicz*, 932 F. Supp. 2d at 345 (summary judgment ruling precluded admission of contrary evidence at trial); *see also, e.g.*, *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 257 F. Supp. 2d 751, 764 (S.D.N.Y. 2003) (same); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 286 (S.D.N.Y. 1996) (same).

**B.    CEC's Proffered Evidence Consists of Purported Parties' and Nonparties' Subjective Interpretation of the Indentures and is Inadmissible to Interpret Section 12.02(c)(i)-(iii) of the Indentures.**

CEC also attempts to admit this extrinsic evidence to provide the Court with "context" in interpreting Section 12.02(c)(i)-(iii), which it argues is "unambiguously disjunctive," despite the section's conjunctive construction. CEC Mem. at 18. CEC's admission that Section 12.02(c) is

unambiguous is fatal to its attempt to vary the provision's plain meaning by reference to extrinsic evidence. Since the parties agree that no ambiguity is present, the Court need not look beyond the four corners of the Indentures.

First, this Court has already found that this very evidence of the Indentures' interpretation by nonparties, analysts, and purported parties and experts is "exactly the type of extrinsic evidence of subjective intent that is inadmissible under New York law" to vary the plain terms of the agreement. *BOKF, N.A.*, 2015 WL 5076785, at *8.[11] CEC cannot now offer extrinsic evidence on its rejected interpretation of the Parent Guarantee to somehow aid in the interpretation of Indentures Section 12.02(c)(i)-(iii). Evidence of other parties' interpretation of the Indentures is as improper in construing Section 12.02(c)(i)-(iii) as it is in interpreting the meaning of the Parent Guarantee. Additionally, for the reasons set forth in the Trustees' motion *in limine* on this subject, evidence of nonparties' or parties' uncommunicated subjective intent is inadmissible regardless of whether Section 12.02(c) is deemed to be unambiguous *or* ambiguous. Only objective, communicated manifestations of the *parties'* intent may be relevant to discern a contract's meaning. *See* Trustees' Mem. at 14-20 (Section II) (incorporated here by reference); *see also, e.g.*, *Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc*., No. 96-CV-7874 (RWS), 2002 WL 826956, at *1 (S.D.N.Y. May 1, 2002) (granting motion *in limine* to exclude evidence of uncommunicated subjective intent).[12]

---

[11] While the Trustees disagree with CEC's reading of Section 12.02(c)(i)-(iii), the Trustees *agree* that the provision is *unambiguous*. The plain language of Section 12.02(c)(i)-(iii) is unambiguous and must be read conjunctively as written. *See* Trustees' Mem. in Supp. of Joint Mot. *in Limine* for an Order (I) Holding that Sections 12.02(c)(i), (ii), and (iii) of the Indentures are Unambiguous As a Matter of Law and That They Were Intended to be Read Conjunctively as Written; or Regardless of Ambiguity, (II) Excluding Parol Evidence Proffered by CEC With Respect to Meaning of Those Sections, *BOKF* ECF No. 87 ("Trustees' Mem.").

[12] CEC's reliance on *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) and *SR International Business Insurance Co. v. World Trade Center Properties, LLC*, 467 F.3d 107, 125

CEC tries to shoehorn this evidence—which the Court has previously classified as "classic" "subjective intent" evidence—into the type of evidence that a court may consider to provide "context." CEC Mem. at 18. Far from offering context, however, the evidence would *contradict* the unambiguous meaning of the guarantee previously determined by the Court as a matter of law. CEC's proffered extrinsic evidence is even less probative of the meaning of Section 12.02(c)(i)-(iii) than it was of the meaning of the Parent Guarantee.

Further, CEC's extrinsic evidence is not properly admissible as evidence of industry custom and usage, which is only admissible to interpret discrete "contract terms which are in common use in a business or art and have a definite meaning understood by those who use them, but which convey *no meaning* to those who are not initiated into the mysteries of the craft.'" *BOKF, N.A.*, 2015 WL 5076785, at *8 (emphasis added) (citing *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)).[13] CEC has not shown that "and"—or any other term used in Section 12.02(c)—has some unique and well established meaning in the financial industry. *See BOKF, N.A.*, 2015 WL 5076785, at *8 (refusing to

---

(2d Cir. 2006) is of no moment. Indeed, on remand from the Second Circuit, the Southern District of New York in *JA Apparel Corp. v. Abboud*, found that while extrinsic evidence of the parties' intent may be admissible to construe an ambiguous agreement, "post-hoc" "subjective interpretations" of an ambiguous contract "may not be properly considered by the Court as extrinsic evidence" because it does not evince the parties' shared intent. 682 F. Supp. 2d 294, 304-08 & n.10 (S.D.N.Y. 2010). And the Second Circuit in *SR International Business Insurance Co.* merely ruled that it was not reversible error for the district judge to permit witnesses to testify about their own interpretation of a provision to the extent they provided the jury with "an understanding of the state of the parties' negotiations and helped to explain the parties overt actions," while providing the jury with a limiting instruction stating that "a witness's own understandings that are not communicated to another party cannot change the meaning of statements and acts that are communicated to that other party." 467 F.3d at 126. It recognized that "a party's uncommunicated subjective intent cannot supply the ultimate meaning of an ambiguous contract." *Id.* at 125.

[13] Moreover, even when admissible, evidence of custom and usage may not be used to add to or vary the writing. *Id.*; *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277-78 (2d Cir. 1989) ("[T]rade custom and usage is not admissible to contradict or qualify" provisions of an unambiguous contract.).

consider CEC's evidence that everyone in the financial industry understood the Parent Guarantee to be meaningless because there were "no specialized terms used in [that] provision that would necessitate looking to extrinsic evidence of custom and usage"). Instead, CEC merely asserts that the evidence demonstrates that "the Guarantee was included in the Indentures to comply with the financial reporting requirements of Rule 3-10 of Regulation S-X." CEC Mem. at 18. Bald assertions that this provision was generally understood in the industry to be read disjunctively and similar statements cannot be considered to vary the plain meaning of the word "and" here. *See generally* Trustees Mem. at 9-13 (Section I.C) (incorporated here by reference).

In sum, the parties agree that Section 12.02(c)(i)-(iii) is unambiguous. *See* CEC Mem. at 18; Trustees' Mem. at 1. Accordingly, no extrinsic evidence may be considered to vary the provision's meaning. Moreover, regardless of its ambiguity, evidence of how CEC, nonparties, analysts, experts, or other market participants now interpret the provision all constitute inadmissible expressions of CEC's and nonparties' subjective intent.

### C. CEC's Proposed Evidence is Not Relevant to the Trustees' Breach of the Duty of Good Faith and Fair Dealing or BOKF's Intentional Interference with Contractual Relations Claim, and any Marginal Relevance is Outweighed by the Danger of Undue Prejudice.

Finally, CEC contends that its evidence is also relevant to CEC's defense against two of the Trustees' claims:  the Trustees' claim of breach of the covenant of good faith and fair dealing (the "Good Faith Claims"), and BOKF's claim of intentional interference with contractual relations (the "Intentional Interference Claim"). CEC Mem. at 19-20. Evidence of interpretations by nonparties and purported parties and experts of the Parent Guarantee provision is not necessary or relevant to defend against either of these claims.

As an initial matter, post-hoc interpretations of the Parent Guarantee by CEC, nonparties, or other analysts, are irrelevant to defend against the Good Faith Claims. The Good Faith Claims

are premised on the effect of CEC's actions, which stripped CEOC of its valuable assets, rendering it unable to meet its obligations to make payments on the Notes under the Indentures, coupled with its act of stripping the Parent Guarantee. New York law implies a covenant of good faith and fair dealing into every contract. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (1995). The covenant "embraces a pledge that 'neither party shall do anything which will *have the effect* of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (emphasis added) (quotation omitted). Thus, the covenant is breached when a party "acts in a manner that . . . would deprive the other party of receiving the benefits under their agreement." *Sorenson v. Bridge Capital Corp*., 52 A.D.3d 265, 267, 861 N.Y.S.2d 280, 282 (2008). When examining whether a defendant has prevented the plaintiff from receiving the benefits of the bargain, courts give effect to "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract. *See Dalton*, 87 N.Y.2d at 389, 663 N.E.2d at 291 (citation omitted). This is an "objective standard:" that is, "[s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor *believes* his conduct to be justified." *InterDigital Commc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 536 (S.D.N.Y. 2005) (emphasis added) (quoting Restatement (Second) of Contracts § 205, cmt. D); *see In re LightSquared Inc.*, 511 B.R. 253, 333 n.120 (Bankr. S.D.N.Y. 2014) (same).

The Court has already foreclosed the possibility that CEC acted reasonably when it held that the Parent Guarantee unquestionably provides the Noteholders with credit support. *BOKF, N.A.*, 2015 WL 5076785, at *6-8. Accordingly, evidence that CEC felt "justified" in stripping the Parent Guarantee because it believed (incorrectly) that the Parent Guarantee was meaningless is

irrelevant to the construction of the Good Faith Claims in light of the Court's prior ruling and the effect on the Trustees and Noteholders of the purported stripping of the Parent Guarantee.[14]

This evidence is also irrelevant to CEC's defense of BOKF's Intentional Interference Claim. This claim is not asserted against CEC in its capacity as guarantor of the Notes under the Indenture. Rather, BOKF is asserting a direct claim against CEC based on CEC's interference with *CEOC's* performance of *CEOC's obligations* under the Indentures. The facts relevant to this claim include the role CEC played in causing CEOC to breach its obligations under the Indentures. CEC's obligations under the Parent Guarantee are not probative to prove or disprove the Intentional Interference Claim. *See Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 612 N.E.2d 289, 292 (1993) (elements of tort include (1) existence of a contract between plaintiff and third party, (2) defendant's knowledge of that contract, (3) defendant's intentional inducement of the third party to breach the contract, and (4) damages); *MDC Corp. v. John J. Harland Co*., 228 F. Supp. 2d 387, 397 (S.D.N.Y. 2002) (if defendants assert defense that it has economic interest in the contract between the plaintiff and a third party, plaintiffs must prove that defendants acted maliciously).

CEC nevertheless argues that the purpose of the Parent Guarantee is "directly relevant to addressing . . . that CEC acted with 'malice' or in a manner that was 'fraudulent or illegal.'" CEC Mem. at 20. But CEC's (and other parties') subjective understanding of the Parent Guarantee does not make it any more or less likely that CEC acted in bad faith when it caused CEOC to breach its contractual obligations to make payments on the Notes.

---

[14] Even if CEC were allowed to present evidence that its subjective beliefs about the Parent Guarantee were reasonable, CEC still must lay a proper foundation for that evidence at trial. Post-hoc rationalizations interpreting the Parent Guarantee or contemporaneous reports or advice not actually relied on by CEC have no bearing on CEC's intent at the time it engaged in the challenged activity.

Since the evidence is not material to CEC's defense against the Good Faith and Intentional Interference Claims, it should be excluded under Federal Rule of Evidence 402. Moreover, "[e]ven if the bounds of materiality could be stretched to encompass" this evidence, "the prejudicial effect of the evidence would still outweigh any probative value" under Rule 403. *Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007). If permitted to hear evidence regarding the intent of the Parent Guarantee, the jury may second guess the Court's decision on that issue. Accordingly, this evidence should be excluded.

## CONCLUSION

For the foregoing reasons, the Trustees respectfully request that CEC's motions *in limine* be denied.

Respectfully submitted,

Dated: New York, New York
      February 19, 2016

*/s/ Andrew I. Silfen*
Andrew I. Silfen, Esq. (AS-1264)
Michael S. Cryan, Esq. (MC-4887)
Mark A. Angelov, Esq. (MA-5291)
ARENT FOX LLP
1675 Broadway
New York, NY 10019-5820
Tel:    (212) 484-3900
Fax:    (212) 484-3990
Email: andrew.silfen@arentfox.com
       michael.cryan@arentfox.com
       mark.angelov@arentfox.com

-and-

Ralph A. Taylor, Jr., Esq. (*admitted pro hac vice*)
Jackson D. Toof, Esq. (*admitted pro hac vice*)
ARENT FOX LLP
1717 K Street, N.W.
Washington, D.C. 20006
Tel:     (202) 857-6000
Fax:     (202) 857-6395
Email: ralph.taylor@arentfox.com
            jackson.toof@arentfox.com

*Attorneys for BOKF, N.A., solely in its capacity as successor Indenture Trustee under the Indenture governing the Second Lien Notes*


/s/ David A. Crichlow
David A. Crichlow
Craig A. Barbarosh
Karen B. Dine
Rebecca Kinburn
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Tel:     (212) 940-8800
Fax:     (212) 940-8776
Email: craig.barbarosh@kattenlaw.com
            david.crichlow@kattenlaw.com
            karen.dine@kattenlaw.com
            rebecca.kinburn@kattenlaw.com

*Attorneys for Plaintiff UMB Bank, N.A. solely in its capacity as successor Indenture Trustee under the Indentures governing the First Lien Notes*